# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

§
Hatim BALDE, Junior Alberto MATUTE BANEGAS, §
Celinda Aracely RODRIGUEZ LEMUS, Port Isabel §
Detention Center, 27991 Buena Vista Blvd., Los Fresnos, §
TX 78566; Sadat IBRAHIM, South Texas Detention Center §
566 Veterans Drive, Pearsall, TX 78061; Mikailu JALLOH §
Laredo Detention Center, 4702 E. Saunders, Laredo, TX §
78401, §
§
§
    *Plaintiffs*, §   Civil Action No. _____
§
*v.* §
§ **Complaint for Injunctive and**
§ **Declaratory Relief**
Elaine DUKE, Acting Secretary of the Department of §
Homeland Security, Washington, DC 20528; Thomas §
HOMAN, Acting Director of U.S. Immigration and §
Customs Enforcement ("ICE"), 500 12th St., SW, §
Washington, DC 20536; Matthew ALBENCE, ICE §
Executive Associate Director of Enforcement and Removal §
Operations, 500 12th St., SW, Washington, DC 20536; §
Phillip MILLER, ICE Deputy Executive Assistant Director §
of Enforcement and Removal Operations, 500 12th St., SW, §
Washington, DC 20536; Nathalie ASHER, ICE Assistant §
Director of Field Operations for Enforcement and Removal §
Operations, 500 12th St., SW, Washington, DC 20536; Tae §
JOHNSON, ICE Assistant Director for Custody §
Management for Enforcement and Removal Operations, §
500 12th St., SW, Washington, DC 20536; Daniel BIBLE, §
ICE Field Office Director for Enforcement and Removal §
Operations, 1777 NE Loop 410, Suite 1500, San Antonio, §
TX 78217; Janie BENNETT, ICE Assistant Field Office §
Director, Port Isabel Detention Center, 27991 Buena Vista §
Blvd, Los Fresnos, TX 78566; FNU AGUIRRE, ICE §
Officer, 27991 Buena Vista Blvd., Los Fresnos, TX 78566; §
William OESTREICH, ICE Officer, 27991 Buena Vista §
Blvd., Los Fresnos, TX 78566; FNU QUINTERO, ICE §
Officer, 27991 Buena Vista Blvd., Los Fresnos, TX 78566; §
Andrew HURON, ICE Assistant Field Office Director, §
South Texas Detention Center, 566 Veterans Drive, §
Pearsall, TX 78061; FNU GROLL, ICE Officer, 566 §
Veterans Drive, Pearsall, TX 78061; Robert CERNA, ICE §
Assistant Field Office Director, Laredo Detention Center, §

4702 E. Saunders, Laredo, TX 78401; and FNU Gamez,    §
ICE Officer, 4702 E. Saunders, Laredo, TX 78401,       §
ALL IN THEIR OFFICIAL CAPACITIES,                      §
                                                       §
       *Defendants.*                                   §
_____§

## **COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ………………………………………………….. 1

II.   JURISIDCTION AND VENUE…………………………………………..2

III.  PARTIES………………………………………………………… 2

IV.   FACTS…………………………………………………….. 5

          Legal Background…………………………………………….5

          Defendants' Changing Policies…………………………………..7

          Plaintiffs' Allegations…………………………………………12

          Prison-Like Conditions………………………………………..20

          Defendants' Duties and Actions…………………………………21

V.    CAUSES OF ACTION……………………………………………. 25

          Due Process…………………………………………………. 25

          First Amendment……………………………………………… 26

          APA…………………………………………………………28

VI.   PRAYER FOR RELIEF……………………………………………. 30

## I.   <u>Introduction</u>

1. The Plaintiffs in this case are young civilians who were forced to flee their homelands due to the ongoing violence there. All are in danger of severe persecution and/or torture should they return.

2. Rather than enter the United States unlawfully, the Plaintiffs presented themselves to U.S. officials at a U.S. Port of Entry and requested political asylum, as authorized by 8 U.S.C. §§ 1158(a)(1) and 1225. All have passed their credible fear interviews. Nevertheless they remain in the harsh and prison-like conditions of immigration detention facilities while they await final decisions on their claims. As set forth below, Plaintiffs have been detained for between five and twenty months as of the filing of this Complaint.

3. Defendants, pursuant to their current policy and practice described below, have denied parole to the Plaintiffs in order to: a) penalize them for their status as asylum-seekers; b) so burden their right to petition for asylum that they relinquish their claims and return home; and c) deter other victims of persecution from seeking asylum in the United States.

4. Defendants' policies are unconstitutional and violate the laws and treaties of the United States, as well as the basic principles of international law, or *jus cogens* norms. Plaintiffs bring suit for declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. §702 *et seq.* ("APA"), and the First and Fifth Amendments of the United States Constitution.

## II.    Jurisdiction and Venue

1.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. Defendants have waived sovereign immunity for purposes of this suit pursuant to 5 U.S.C. § 702. This Court has equitable powers to grant injunctions, and authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

2.   This Court has venue pursuant to 28 U.S.C. § 1391(b)(2) and/or (b)(3), and/or 28 U.S.C. § 1391(e)(1)(A).

## III.    Parties

*PLAINTIFFS:*

3.   Plaintiff Hatim Balde is a 28-year-old citizen of Guinea. He is currently detained at the Port Isabel Detention Center, in Los Fresnos, Cameron County, Texas. He has been detained for seven months now.

4.   Plaintiff Celinda Aracely Lemus Rodriguez is a 30-year-old citizen of Guatemala. She is currently detained at the Port Isabel Detention Center, in Los Fresnos, Cameron County, Texas. She has been detained for over seven months now.

5.   Plaintiff Junior Alberto Matute Banegas is a 19-year-old citizen of Honduras. He is currently detained at the Port Isabel Detention Center, in Los Fresnos, Cameron County, Texas. He has been detained for over five months now.

6.   Sadat Ibrahim is a 31-year-old man from Ghana. He is currently detained at the South Texas Detention Center in Pearsall, Frio County, Texas. He has been detained for over twenty months now.

7.  Mikailu Jalloh is a 26-year-old- citizen of Sierra Leone. He is currently detained at the Laredo Detention Center in Laredo, Webb County, Texas. He has been detained for more than eight months.

*DEFENDANTS:*

8.  Defendant Elaine Duke is the Acting Secretary of the Department of Homeland Security.  She is sued in her official capacity and resides in or near Washington, D.C.

9.  Defendant Thomas Homan is the Acting Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or near Washington, D.C.

10. Defendant Matthew Albence is the Executive Associate Director of Enforcement and Removal Operations ("ERO") for U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or close to Washington, D.C.

11. Defendant Phillip Miller is the Deputy Executive Assistant Director of ERO for U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or close to Washington, D.C.

12. Defendant Nathalie Asher is the Assistant Director of Field Operations for ERO, within U.S. Immigration and Customs Enforcement. She is sued in her official capacity and resides in or close to Washington, D.C.

13. Defendant Tae Johnson is the Assistant Director for Custody Management for ERO, within U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or close to Washington, D.C.

14. Defendant Daniel Bible is the Field Office Director of ERO for U.S. Immigration and Customs Enforcement Office in San Antonio, Texas. He is sued in his official capacity and resides in or near San Antonio, Bexar County, Texas.

15. Defendant Janie Bennett is the Assistant Field Office Director of ERO for U.S. Immigration and Customs Enforcement at the Port Isabel Detention Center. She is sued in her official capacity and resides in Cameron County, Texas.

16. Defendant Aguirre is an ICE official at the Port Isabel Detention Center. He is sued in his official capacity and resides in Cameron County, Texas.

17. Defendant Oestreich is an ICE official at the Port Isabel Detention Center. He is sued in his official capacity and resides in Cameron County, Texas.

18. Defendant Quintero is an Immigration and Customs ("ICE") official at the Port Isabel Detention Center. He is sued in his official capacity and resides in Cameron County, Texas.

19. Defendant Andrew Huron is the Assistant Field Office Director of ERO for U.S. Immigration and Customs Enforcement at the South Texas Detention Center. He is sued in his official capacity and resides in Frio County, Texas.

20. Defendant Groll is an ICE official at the South Texas Detention Center. He is sued in his official capacity and resides in Frio County, Texas.

21. Defendant Robert Cerna is the Assistant Field Office Director of ERO for U.S. Immigration and Customs Enforcement at the Laredo Detention Center. He is sued in his official capacity and resides in Webb County, Texas.

22. Defendant M. Gamez is an ICE official at the Laredo Detention Center. He is sued in his official capacity and resides in Webb County, Texas.

4

IV.   <u>FACTS</u>

*LEGAL BACKGROUND*

23. After the global devastation of World War II, the United Nations promulgated the 1951 U.N. Convention Relating to the Status of Refugees ("Refugee Convention").[1] In relevant part, the Refugee Convention provides that states shall not impose penalties on refugees for illegal entry or presence, nor shall states "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention Art. 31, Art. 33.[2]

24. The United States adopted these protections by signing the 1967 Protocol Relating to the Status of Refugees ("Protocol"), which incorporated Articles 2-34 of the Refugee Convention.[3]

25. In order to comply with U.S. obligations under the Protocol, the United States promulgated the Refugee Act of 1980,[4] which required the United States to establish procedures for noncitizens physically present in the United States, at a land border, or at a port of entry to apply for asylum.

---

[1]  April 22, 1954, 189 U.N.T.S. 150.

[2] The Refugee Convention also stipulates that states should allow refugees to move freely within their territory and choose their place of residence.  *Id.* at Art. 26.

[3]  Oct. 4, 1967, 606 U.N.T.S. 267. The United States acceded to the Protocol on November 1, 1968.

[4]  Pub.L. No. 96-212, 94 Stat. 105 (1980).

26. The prohibition against *refoulement* is enshrined in other important treaties ratified by the United States, including the International Covenant on Civil and Political Rights ("ICCPR")[5] and the Convention Against Torture and Other Cruel, Degrading or Inhuman Punishment ("CAT").[6]

27. The Foreign Affairs Reform and Restructuring Act of 1998 went on to implement the *non-refoulement* provision of CAT (Art. 3), pronouncing it U.S. policy "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture" and directing the appropriate agencies to prescribe regulations to comport with such policy.[7]

28. The objective of these international and domestic laws is to protect and provide a safe haven for persons fleeing imminent persecution and/or torture in their homelands.

29. Under the current U.S. statutory scheme, persons fleeing persecution are entitled to request asylum and/or CAT protections at any U.S. Port of Entry. 8 U.S.C. §§ 1158(a)(1) and 1225 (hereinafter "P.O.E. Asylum Seekers"). They need only cross the international bridge or roadway and present themselves to the U.S. immigration officers stationed there. Such crossings and requests are lawful.

---

[5] Dec. 16, 1966, 999 U.N.T.S. 171 (entered into force March 23, 1976). The United States ratified the ICCPR on June 8, 1992.

[6] Dec. 10, 1984, 1465 U.N.T.S. 85 (entered into force June 26, 1987). The United States ratified CAT on Oct. 21, 1994.

[7] Pub. L. No. 105-277, Div. G, 112 Stat. 2681-822.

30. These P.O.E. asylum seekers must be referred to a designated asylum officer for a preliminary credible fear interview ("CFI"). 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4).[8]

31. Once the asylum seeker passes the CFI, he or she enters standard immigration court removal proceedings under 8 U.S.C. § 1229a.[9]

32. Prior to the CFI, detention of P.O.E. asylum seekers is mandatory. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). However, after the person passes the CFI, he or she may be released on parole by ICE. 8 U.S.C. § 1182(d)(5)(A); 8 CFR § 212.5.

33. The parole decision may not be reviewed by an immigration judge. 8 C.F.R. § 1003.19(h)(2)(i).

### DEFENDANTS' CHANGING POLICIES

34. In 2009, ICE issued a policy directive "to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States." Parole of Arriving Aliens Found to Have Credible Fear, ICE Policy Directive 11002.1 (Jan. 4, 2010) ("ICE Policy Directive").[10] The policy, based on federal regulations, instructed ICE personnel to grant parole to any asylum seeker who established his or her identity and did not present a flight risk or danger to the community. As the Policy Directive explained, "continued detention of such persons

---

[8] In the alternative, the asylum seeker may be placed directly into regular removal proceedings, which commence with the issuance of a Notice to Appear. 8 U.S.C. § 1225(b)(2).

[9] Those who do not pass their CFI are subject to expedited removal. 8 U.S.C. § 1225(b)(1)(B)(iii).

[10] Then Acting Secretary of Homeland Security Kelly clarified that this policy directive remains "in full force and effect" in a 2017 memo. Implementing the President's Border Security and Immigration Enforcement Improvements Policies, Memorandum from DHS Secretary Kelly to CBP, ICE and USCIS leadership at 9 (Feb. 17, 2017) ("Kelly Memorandum").

is not in the public interest." *Id.* at ¶ 6.2; *see also* HUMAN RIGHTS FIRST, LIFELINE ON LOCKDOWN 9 (July 2016) ("LIFELINE").

35. In 2014, however, there was a great surge in immigration along the southern U.S.-Mexico border. *See* LIFELINE at 9. This surge resulted, in part, from extraordinary levels of violence and repression in Central America, where the murder rates reached some of the highest levels in the world.

36. By then, unlawfully crossing the Rio Grande or other parts of the U.S.-Mexico border had become extremely dangerous, as well as costly.[11]

37. Many asylum seekers chose to cross into the United States lawfully, and to ask for asylum at a port of entry pursuant to 8 U.S.C. § 1158(a)(1) and 1225.

38. In response to the 2014 surge, Defendants began to implement de facto policies and practices aimed at deterring asylum seekers from entering the United States, including the denial of parole to and the prolonged detention of P.O.E. asylum seekers.[12] Although parole is still usually granted to minors, pregnant women, and an

---

[11]  Much of this strategic border area, such as the state of Tamaulipas, is now under the control of transnational criminal organizations, who charge victims fleeing persecution high fees for the right to cross the border and kill or forcibly recruit those who do not make proper payment. Falling victim to trafficking rings is a serious risk, as are assaults, robberies, and beatings. The kidnapping of asylum seekers by local gangs has become rampant in certain regions. In addition, asylum seekers and their children face the risk of drowning or perishing in the desert as they seek a safe haven.  *See, e.g.*, UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES, WOMEN ON THE RUN 6 (2016); Aaron Nelson, *Border Journalists in Reynosa Mexico Navigate Continuing Dangers to Report on Continued Gunbattles in the Street*, SAN ANTONIO EXPRESS NEWS, May 15, 2017; Abel Fernandez, *Authorities Rescue 10 Cubans Allegedly Kidnapped in Mexican Border City*, MIAMI HERALD, Feb. 9, 2017; Sarah Stillman, *Where are the Children?* THE NEW YORKER, April 27, 2015.

[12] See *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. Feb. 20, 2015) (injunction issued against prolonged detention of families), citing *Matter of D.J.*, 23 I&N Dec. 572 (AG 2003).

adult accompanying a child, most eligible adults like the Plaintiffs are denied without justification. *See, e.g.*, 8 C.F.R. § 212.5(b).

39. As reported by Human Rights First, the percentage of P.O.E. asylum seekers released on parole after passing their CFI was 80 percent in 2012. By 2015, this figure had dropped by more than 30 percent, to 47 percent. LIFELINE at 13.

40. In order to achieve this result, Defendants have implemented a de facto policy and practice of giving great weight to the factor of deterrence in deciding parole requests. Deterrence of immigration is an unlawful basis for subjecting bona fide asylum seekers to prolonged detention.

41. Other harsh and unlawful measures were implemented in 2014, such as the prolonged detention of families. In the resulting litigation, U.S. Defendants expressly cited deterrence of immigration as a key justification for their policy. An injunction was issued in favor of Plaintiffs. *R.I.L-R*, 80 F. Supp. 3d at 190-91.

42. In late 2016, a second immigration surge began at the southern border. Subsequently, at the end of 2016 and in early 2017, many asylum seekers were unlawfully turned away at ports of entry by U.S. officials and were forced back into Mexico without the mandatory processing required by 8 U.S.C. §§ 1158(a)(1) and 1225. This too has resulted in litigation. *See Al Otro Lado Inc. v. Kelly*, No. 2:17-cv-5111 (C.D. Cal. filed July 12, 2017).[13]

---

[13]   In 2017, U.S. officials also announced that in the future, children arriving at the southern border might be separated from their parents as a further measure of deterrence. Samantha Schmidt, *DHS is considering separating mothers and children who cross the border illegally*, THE WASHINGTON POST, Mar. 7, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/03/07/dhs-is-considering-separating-mothers-and-children-who-cross-the-border-illegally/?utm_term=.7124a3d839b4. In addition, under the Trump Administration, criminal

43. Defendants also continue to give great weight to the factor of deterrence in deciding the parole requests of P.O.E. arriving asylum seekers as set forth in ¶40 above.[14]

44. As a result, many eligible adults are wrongfully denied parole and subjected to prolonged and arbitrary detention in prison-like conditions. This miscarriage of justice occurs despite official agency policy favoring the grant of parole to P.O.E. asylum seekers who do not pose a flight risk or danger to the community. The release of such persons is deemed to be in the public interest. ICE Policy Directive at ¶ 6.2. Defendants may not impose an irrebuttable presumption of flight risk or danger to the community upon asylum seekers.

45. Defendants intend for their actions to serve as a deterrent to asylum seekers by forcing them to either endure prolonged detention or risk the grave perils involved in unlawful entries. This practice unjustly punishes persons like the Plaintiffs, who have committed no crimes, for their status as P.O.E. asylum seekers and deters others from seeking refuge in the United States.

46. Medical experts report that persons who have experienced trauma, such as the Plaintiffs, are further harmed when they are detained in prison-like conditions.[15] As

---

prosecutions for immigration offenses committed at the border are now a priority, including offenses related to illegal entry and reentry.  Kelly Memorandum at 11-12.

[14] HUMAN RIGHTS FIRST, VIOLATIONS AT THE BORDER – THE EL PASO SECTOR 5 (Feb. 2017) (noting that 2016 investigations in Georgia, New Jersey and El Paso found that ICE "denies asylum seekers parole even when they meet the ICE parole directive guidelines for release"). *See also* Posting of Eleanor Acer to Human Rights First Blog, *Parole Denials Lead to Increased Detention*, http://www.humanrightsfirst.org/blog/parole-denials-lead-increased-detention-under-trump-s-executive-order (April 10, 2017).

[15] PHYSICIANS FOR HUMAN RIGHTS, FROM PERSECUTION TO PRISON: THE HEALTH CONSEQUENCES OF DETENTION FOR ASYLUM SEEKERS (2003), *available at* https://s3.amazonaws.com/PHR_Reports/persecution-to-prison-US-2003.pdf.

the result of prolonged detention, many P.O.E. asylum seekers fall into despair, relinquish their claims, and return to the dangers of their homelands.

47. Defendants seek to pressure asylum seekers such as the Plaintiffs to abandon their asylum claims and return to their home countries. Such a policy constitutes constructive removal, which amounts to de facto *refoulement*.

48. Prolonged detention under harsh and prison-like conditions also greatly hampers asylum seekers' ability to work with attorneys and to adequately prepare their cases. *See* "Prison-Like Conditions," *infra*.

49. Deterrence of others is an unlawful factor to weigh in determining whether bona fide victims of persecution, such as persons who have passed their CFIs, should be paroled in the public interest.

50. Defendants have no valid justification for their policy of denying parole to otherwise eligible P.O.E. asylum seekers, and such denials are discriminatory, retaliatory, arbitrary, irrational and capricious.

51. Furthermore, such denials unlawfully penalize Plaintiffs for petitioning for asylum and/or withholding of removal under CAT in the United States.

52. As a result of Defendants' unlawful policy, the Plaintiffs have spent between five and twenty months in harsh and prison-like conditions.

53. At all times relevant to this lawsuit, Defendants have acted knowingly and intentionally with regard to the unlawful nature and harmful consequences of their actions.

54. Defendants' actions shock the conscience.

**PLAINTIFFS' ALLEGATIONS**

55. Plaintiff Celinda Aracely Rodriguez Lemus ("Aracely Rodriguez"):

A. Plaintiff Aracely Rodriguez is a young woman from Guatemala. In 2016, she was forced to flee her homeland, together with her eight-year old daughter.

B. In northern Mexico, their vehicle overturned, leaving the child dead and Plaintiff Aracely Rodriguez gravely injured.

C. Upon her release from the hospital in Reynosa, Mexico, Plaintiff Rodriguez was utilizing a walker and was in pain.

D. In December 2016, Plaintiff Rodriguez crossed the international bridge connecting Reynosa, Mexico and Hidalgo, Texas and requested asylum pursuant to 8 U.S.C. §§ 1158(a)(1) and 1225.

E. U. S. officials refused to process Plaintiff Rodriguez and told her to leave. She was promptly kidnapped when she reached the Mexican side of the bridge.

F. In February 2017, Plaintiff Aracely Rodriguez again crossed the international bridge, this time accompanied by human rights monitors and attorneys, and again asked for political asylum. This time she was properly processed.

G. She passed her credible fear interview on March 29, 2017, yet she has been detained at the Port Isabel Detention Center since presenting herself at the port of entry seven months ago.

H. She has provided her deportation officer with substantial documentation from family and friends willing and able to sponsor her, as well as proof of her identity. She has also provided medical records, and the officials are aware of her fragile condition.

I.   Plaintiff Aracely Rodriguez has no criminal history of any kind and entered the United States legally.

J.   Although U.S. officials had promised to interview her regarding her eligibility for parole, her parole request was denied without any such interview.

K.   Plaintiff Aracely Rodriguez presented a request for redetermination of this parole denial, together with additional evidence, on May 1, 2017. When there was no response, the request was forwarded to Defendant Bible on May 26, 2017.  Her request was subsequently denied by Defendant Bennett.

L.   The officials involved in the initial denials were Defendants Oestreich and Defendant Bennett.

M.   For a time, Plaintiff Aracely Rodriguez was kept in a medical ward, allegedly to prevent any detained immigrant from using her walker as a weapon. Her ability to walk and exercise was limited. This limited her access to the commissary and thus to better food, to paper, and other necessities.

N.   She is now in the general population and is subject to the harsh and prison-like conditions described below.

O.   This treatment has caused her mental and physical harm, and has also hampered her efforts to prepare her case.

P.   Plaintiff has no access to review by an immigration judge of the denial of parole.

Q.   The denial of parole was based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding her request.

56. Plaintiff Hatim Balde:

A. Plaintiff Hatim Balde (hereinafter "Plaintiff Balde") is a young man from Guinea, and a member of the ethnic Peuhl group there.

B. After suffering severe ethnic and political persecution, Plaintiff Balde was forced to flee his homeland. He reached Reynosa, Mexico in early 2017.

C. Plaintiff Balde did not wish to enter the United States illegally or by stealth. Instead, he chose to walk across the international bridge and openly request asylum from the U.S. officials at a port of entry in February 2017. He was taken into custody and referred to proper officials for his credible fear interview.

D. Plaintiff Balde passed his credible fear interview on March 22, 2017. He has nevertheless been detained at the Port Isabel Detention Center since he presented himself at the port of entry.

E. In support of his request for parole, Plaintiff Balde presented a copy of his birth certificate together with affidavits from two childhood friends confirming his identity. The affidavits included a photograph of Plaintiff.[16]

F. Plaintiff Balde also presented a letter of sponsorship from La Posada, a shelter run by the Sisters of Divine Providence in nearby San Benito, Texas. The shelter has sponsored numerous asylum seekers released pending their hearings for more than twenty years. The shelter has a close working relationship with

---

[16] Plaintiff Hatim Balde cannot obtain a new national identity card without returning in person to Guinea, which he cannot safely do.

immigration officials,[17] who often request that La Posada receive certain immigrants being released from detention.

G. Plaintiff Balde also presented his official background check, confirming that he has no criminal record. He is also willing to wear an ankle monitor if released pending his hearing.

H. Defendants notified him that he would be interviewed regarding his parole request, but no such interview took place, and Plaintiff was denied parole. He requested redetermination, but was again denied. Defendants Bennett and Aguirre were responsible for the initial denials.

I. Plaintiff Hatim Balde remains in harsh and prison-like conditions that greatly hamper his ability to locate family and friends, as well as to prepare for his asylum hearing.

J. He is unable to tolerate the unhealthy prison diet, and despite medical recommendations has not been given different foods.

K. These harsh conditions have caused Plaintiff Hatim Balde both mental and physical harm.

L. Plaintiff Hatim Balde has no access to review by an immigration judge of the denial of parole.

M. The denial of parole was based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding his request.

57. Plaintiff Junior Alberto Matute Banegas:

---

[17] As noted, U.S. immigration officers often request assistance from the Sisters at La Posada and have placed asylum seekers there for many years. La Posada provides not only food and shelter but counseling, English classes, and social services.

A. Plaintiff Junior Matute is a young man from Honduras. He and his parents were forced to flee the extraordinary violence there.[18]

B. When they reached Reynosa, Mexico, Plaintiff Junior Matute and his parents walked across the international bridge and told U.S. officials that they were in danger in Honduras and were asking for political asylum.

C. The U.S. officers told them they could not apply and sent them back to Mexico.

D. Plaintiff Junior Matute's parents later tried again to seek asylum at the U.S. port of entry in vain. They finally crossed the Rio Grande and entered the United States without inspection.

E. Plaintiff Junior Matute requested international assistance and was finally able to lawfully cross the bridge on April 12, 2017.

F. Plaintiff Junior Matute passed his credible fear interview but remains in custody at the Port Isabel Detention Center.

G. Plaintiff has never committed a crime and has presented his deportation officer with official identification.

H. In support of his request for parole, Plaintiff also presented a letter of sponsorship from the Sisters at the La Posada shelter. See note 17, *supra*.

I. Plaintiff was informed by his deportation officer that he was scheduled for an interview concerning his eligibility for parole, but no such interview took place. Plaintiff Junior Matute was denied parole without any explanation.

---

[18] Two of Plaintiff's older brothers were murdered in Honduras in the ongoing violence caused by transnational criminal organizations (i.e. cartels and gangs). One was killed shortly after being deported from the United States back to Honduras in 2016. The other was "disappeared."

16

Plaintiff has filed for redetermination but was again denied. Defendants Bennett and Quintero were involved in the initial denials.

J. Plaintiff's mother has been released on bond, since she entered without inspection.[19]

K. Plaintiff Junior Matute's unjustified and prolonged detention is causing him mental and physical harm.

L. Such detention also hampers his ability to communicate with family and help to prepare his legal case.

M. Plaintiff Junior Matute has no access to review of his parole denial by an immigration judge.

N. The denial of parole was based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding his request.

58. Plaintiff Sadat Ibrahim:

A. Plaintiff Sadat Ibrahim was forced to flee Ghana after being brutally attacked, beaten and persecuted due to his status as a gay man. His house was burned to the ground.

B. In January 2017, Plaintiff Sadat Ibrahim legally crossed the international border from Tijuana, Mexico into the United States, and requested asylum at the U.S. port of entry. His national identity cards were retained by ICE when he was taken into custody.

C. Plaintiff Sadat Ibrahim passed his credible fear interview on February 11, 2016.

---

[19] Somewhat ironically, persons entering unlawfully may be released on bond and may seek a bond hearing before an immigration judge. *See* 8 U.S.C. §1226(a)(2); 8 C.F.R. 1003.19(a).

D.  Plaintiff was transferred to detention in Atlanta, Georgia, where he was denied parole.

E.  Plaintiff's continued detention made it more difficult to prepare his legal case. For example, a key evidentiary CD sent from his family was withheld from him by the guards under the detention center's rules. Detainees are not allowed to have CDs.

F.  Plaintiff was denied asylum in 2016, and in January 2017, his appeal was denied by the Board of Immigration Appeals. He is currently seeking the assistance of an attorney to re-open his case based on the many grave errors and injustices that occurred.

G.  Plaintiff has now been detained for more than 20 months in harsh and prison-like conditions without any justification therefore.

H.  Plaintiff Sadat Ibrahim faces arrest as a gay man in Ghana. Other than this invalid charge, Plaintiff has never violated the law, as indicated by his background check. He presents no danger to the community.

I.  Plaintiffs requested redetermination of parole and/or release on his own recognizance on August 28, 2017, presenting two sponsorship offers, a copy of his passport, and a letter from a close friend confirming his identity. He remains in detention at this time. Defendants Groll and Huron were responsible for the denial of redetermination.

J.  Plaintiff Sadat Ibrahim has no access to review by an immigration judge of the denial of parole.

18

K.  Plaintiff Sadat Ibrahim has suffered mental and physical harm as a result of the improper denial of parole.

L.  The denial of parole was based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding his request.

59. Plaintiff Mikailu Jalloh:

A.  Plaintiff Mikailu Jalloh is a young journalist from Sierra Leone.

B.  Plaintiff was forced to flee after he published articles criticizing female genital mutilation and supporting gay rights.

C.  In January 2017, Plaintiff Mikailu Jalloh walked across the international bridge connecting Matamoros, Mexico to Brownsville, Texas. He presented himself to U.S. officials there and requested asylum.

D.  Although he passed his credible fear interview, Plaintiff has been denied parole and remains detained in the Laredo Detention Center.

F.  Plaintiff has submitted a copy of his national identification card from Sierra Leone, together with his press card and school identification card. He also presented a letter from a relative offering him full sponsorship. This satisfies Defendants' requirements. A request for redetermination was also made. Nevertheless, Plaintiff remains in detention. Defendants Cerna and Gamez are responsible for these denials.

G.  Plaintiff Jalloh has no access to review by an immigration judge of the denial of parole.

H.  Plaintiff Jalloh has suffered mental and physical harm as a result of the improper denial of parole.

I.   The denial of parole was based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding his request.

J.   The prolonged detention has greatly hampered Plaintiff's ability to obtain a lawyer, and to work on his own case.

### PRISON-LIKE CONDITIONS

60. Like most U.S. immigration detention centers, the Port Isabel Detention Center provides harsh and prison-like conditions. This is harmful and improper for civil detainees such as the Plaintiffs, who have never committed a crime.

61. The detainees must remain in their dormitories unless accompanied to another location by the guards. Detainees cannot mingle with other friendly detainees.

62. Many guards presume the ICE detainees are dangerous criminals and treat them as such.

63. The detainees are allowed outside for recreational purposes for two hours per day. The area is quite small. An area large enough for a soccer game is accessible only once per week.

64. The food provided is very unhealthy, with white bread and other heavily processed foods appearing in most meals. Family and friends are not permitted to send healthful foods to the detainees. Plaintiff Hatim Balde has developed chronic stomach problems as a result of this poor diet.

65. The detainees must wear prison scrubs to identify them as prisoners.

66. All calls made by a detainee begin with a recorded message stating that the call is being made from a United States Detention Center. This frightens many people, who simply hang up when they hear the message.

67. Detainees cannot use the internet or email, making communications with friends and family in foreign countries both costly and cumbersome. This limits the detainees' ability to find a lawyer, and work with him or her to prepare their cases. Lack of access to the internet further circumscribes their ability to work to prepare their own cases.

68. Family members and attorneys outside the facility cannot call directly to the dormitories, but may only leave messages with the guards. Delivery of such messages is often delayed.

69. All available telephones are tapped, so that the guards may review the conversations, and all mail other than attorney mail is also reviewed.

70. Non lawyer visitors are separated from the detainees by plate glass windows unless special arrangements are made for a special contact visit.

71. When Plaintiff Hatim Balde requested an examination by a local physician to support his case, he was twice denied. When the request was finally granted, he was brought to the clinic in scrubs, a waist chain, and handcuffs, escorted at all times by two ICE officers.

72. Conditions at other ICE detention centers, including the South Texas Detention Center in Pearsall, Texas and the Laredo Detention Center are the same or similar to those of Port Isabel, described above.

*DEFENDANTS' DUTIES AND ACTIONS*

73. All Defendants are officials of Immigration and Customs Enforcement, a United States agency, with the exception of Acting Secretary of Homeland Security Elaine Duke.

74. Defendant Janie Bennet is the Assistant Field Office Director of the Port Isabel Detention Center. Together with Defendants Quintero, Aguirre and William Oestreich, she evaluates and decides the parole requests of the P.O.E. asylum seekers in her facility. She is also responsible for assuring the proper processing and reporting of the parole requests and decisions to Defendant Bible. She and Defendants Quintero, Aguirre and William Oestreich denied the initial parole requests of Plaintiffs Aracely Rodriguez, Hatim Balde and Junior Matute.

75. Defendant Andrew Huron is the Assistant Field Office Director of the South Texas Detention Center. Together with Defendant Groll, he evaluates and decides the parole requests of the P.O.E. asylum seekers in his facility. He is also responsible for assuring the proper processing and reporting of the parole requests and decisions to Defendant Bible. He and Defendant Groll denied the request for redetermination of the parole denial of Sadat Ibrahim.

76. Defendant Robert Cerna is the Assistant Field Office Director of the Laredo Detention Center.  Together with Defendant Gamez, he evaluates and decides the parole requests of the P.O.E. asylum seekers in his facility. He is also responsible for assuring the proper processing and reporting of the parole requests and decisions to Defendant Bible. He and Defendant Gamez denied the parole requests of Mikailu Jalloh.

77. Defendant Daniel Bible, as the Field Office Director (FOD) for Enforcement and Removal Operations in San Antonio, Texas has the following responsibilities:

    a.   Implementing policy and quality assurance process

    b.   Maintaining log of parole adjudications in his geographic areas

c.   Providing monthly statistical reports

d.   Making final decisions or delegating final decision to deputy FODs or assistant FODs. The FOD has overall responsibility for compliance with the agency rules and policies.

e.   Ensuring enforcement and removal personnel and decision-makers are familiar with directives.

78. Defendant Daniel Bible is aware of the sharp decline in parole grants to P.O.E. asylum seekers, including the Plaintiffs in this case. Instead of correcting the unlawful situation, he has acquiesced in, supported and/or promoted the official policy of denying parole on the basis of deterrence.

79. Defendant Nathalie Asher, Assistant Director of Field Operations, Enforcement and Removal Operations, ensures considered and consistent decision making and record keeping nationwide of persons who have passed CFIs; oversees monthly tracking of parole statistics from all ERO field offices; and oversees the effective national quality assurance program to monitor field offices to ensure compliance with directives.

80. Upon information and belief, Defendant Nathalie Asher is aware of the sharp decline in parole grants to P.O.E. asylum seekers based on her monitoring and oversight duties. She is aware of the ongoing policy and practice of denying parole to persons such as the Plaintiffs in order to deter and penalize them. She has acquiesced, supported, and/or promoted such policy instead of correcting it.

81. Defendant Tae Johnson is the Assistant Director for Custody Management for ICE's Enforcement and Removal Operations and hence oversees all aspects of the

detention and custody of asylum seekers such as the Plaintiffs. He has acquiesced, supported and/or developed and promoted the unlawful policy of giving great weight to deterrence in determining parole requests from P.O.E. asylum seekers.

82. Defendant Matthew Albence, Executive Associate Director, Enforcement and Removal Operations, is responsible for the overall management and monitoring of the parole decision making process, including but not limited to setting, correcting and/or modifying policies and practices, and correcting deficiencies or errors in such process.

83. Phillip Miller, Deputy Executive Assistant Director, Enforcement and Removal Operations is also responsible for the overall management and monitoring of the parole decision making process, including but not limited to setting and/or modification of policies and practices, and correcting deficiencies or errors in such process.

84. Defendant Thomas Homan is the Acting Director of Immigrations and Customs Enforcement, and has final responsibility for setting, modifying and/or correcting policies and practices regarding the grant of parole to asylum seekers arriving at a U.S. port of entry.

85. Defendants Albence, Homan and Miller have acquiesced, supported and/or developed and promoted the unlawful policy of giving great weight to deterrence in determining parole requests from P.O.E. asylum seekers.

86. Defendant Elaine Duke is the Acting Secretary of the Department of Homeland Security. She thus oversees efforts to enforce and administer our immigration laws. Her duties include supervision of all the employees, files, and records of the

agencies within the Department of Homeland Security, including ICE. *See* 8 U.S.C. § 1103(a). As such, she is responsible for ensuring that the ICE Defendants do not violate the U.S. Constitution, and for taking proper remedial action when such violations do occur.

**V.**     **Causes of Action**

**FIRST CAUSE OF ACTION:**
**FIFTH AMENDMENT DUE PROCESS**

87.     Plaintiffs hereby repeat and incorporate herein ¶¶ 1- 86 above.

88.     At all times relevant to this litigation, Defendants have been acting under the color of the laws of the United States.

89.     Plaintiffs' have a liberty interest in being free from arbitrary prolonged detention, unnecessary physical restraints, and harsh and prison-like conditions.

90.     Such an interest in physical liberty is a fundamental right and is protected by substantive due process under the Fifth Amendment of the United States constitution.

91.     Plaintiffs also have a property and liberty interest in their right to petition for political asylum and/or CAT withholding of removal.

92.     Plaintiffs are also entitled to some procedural protections under the Due Process clause.

93.     Defendants have violated the Plaintiffs' Due Process rights pursuant to Defendants' unwritten policies, patterns and practices as follows:

A. Defendants, pursuant to their general policy and practice of deterring immigration, are subjecting the Plaintiffs to arbitrary and prolonged detention

in harsh and prison-like conditions, without any adequate justification therefore.

B. By giving great weight to deterrence, Defendants are in fact failing and refusing to exercise any genuine discretion at all, or to give any fair and reasonable consideration to Plaintiffs' requests for release on parole.

C. Defendants, giving great weight to deterrence, are subjecting Plaintiffs to harsh and unreasonable punishment in order to deter the future possible wrongful actions of others.

94. Such violations have caused and are causing, mental and physical harms to the Plaintiffs as well as hampering their access to justice.

95. Plaintiffs seek declaratory and injunctive relief against the Defendants in their official capacities.

96. Plaintiffs bring this constitutional claim against Defendants in their official capacities.

## SECOND CAUSE OF ACTION:
## FIRST AND FIFTH AMENDMENT

97. Plaintiffs hereby repeat and incorporate Paras. 1-86 herein.

98. At all times relevant to this litigation, Defendants have acted under color of the laws of the United States.

99. Plaintiffs have a combined First and Fifth Amendment right to petition the United States government for political asylum under 8 U.S.C. §§ 1158(a)(1) and 1225 and/or withholding of removal under the Convention Against Torture.

100. Plaintiffs have a First and Fifth Amendment right to be free of retaliation, penalties, deterrence, or chilling effects in seeking asylum and/or withholding remedies.

101. Defendants have violated the Plaintiffs' Fifth and First Amendment rights by the following actions:

A. Chilling the Plaintiffs' exercise of their rights to petition the government for asylum/withholding by subjecting them to arbitrary, prolonged detention in harsh and prison-like conditions without any adequate justification

B. Attempting to constructively remove the Plaintiffs from the United States by subjecting them to unjustified and prolonged detention in prison-like conditions. Specifically, Defendants seek to so burden the Plaintiffs' right to petition for asylum that Plaintiffs will simply relinquish their rights and return to their homelands. This constitutes constructive removal and de facto *refoulement*, without the full and fair process of law.

C. Unjustly retaliating against and penalizing the Plaintiffs for arriving at a U.S. port of entry to lawfully petition for political asylum and/or withholding of removal.

D. Unjustly hampering the Plaintiffs' ability to prepare their cases and hence their ability to have a meaningful hearing.

102. Plaintiffs have suffered and continue to suffer mental and physical harm, and to be unduly hampered in obtaining counsel and participating in the proper preparation of their cases, as a result of the Defendants' actions.

103.    Defendants have no adequate justification for such violations of the Plaintiffs'
        rights.

104.    Plaintiffs seek declaratory and injunctive relief pursuant to the First and Fifth
        Amendments of the United States Constitution.

105.    Plaintiffs bring this constitutional claim against Defendants in their official
        capacities.

## THIRD CAUSE OF ACTION
## ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §702 *et seq.*

106.    Plaintiffs hereby repeat and incorporate herein ¶¶ 1-86 above.

107.    At all times relevant to this litigation, Defendants were acting under the color of
        the laws of the United States.

108.    Immigration and Customs Enforcement is a United States agency, and all
        Defendants are officials of that agency.

109.    Defendants' denial of parole, and for redetermination of such denial, is a final
        agency action.

110.    The Refugee Protocol was ratified by the United States government, and
        incorporated into U.S. domestic law. *See* ¶¶ 23-25, *supra*.

111.    The Convention Against Torture has likewise been ratified and incorporated into
        U.S. domestic law. *See* ¶¶ 26-27, *supra*.

112.    These treaties and statutes are designed to protect victims of persecution and to
        prevent them from being returned to any region where they are at risk of
        persecution and/or torture.

113.   The rights of the Plaintiffs to seek asylum and/or withholding of removal, and to be free of removal to any region where they face persecution and/or torture, fall within the zone of interests expressly protected by these statutes and treaties.

114.   Defendants have violated the Administrative Procedure Act as follows:

A.   Defendants' policy of giving great weight to immigration deterrence as a basis for denial of parole to asylum seekers impacts substantive rights but has not passed through any required rule-making procedures.

B.   Defendants' policy and practice of denying parole to numerous eligible P.O.E. asylum seekers, and instead subjecting them to long-term detention, is in direct conflict with the objectives, requirements, and prohibitions of the Refugee Protocol, the Convention Against Torture, and the laws and Constitution of the United States. Defendants' actions are thus arbitrary, without authority, and ultra vires.

C.   Defendants are also acting ultra vires and without authority in seeking to constructively remove Plaintiffs and other asylum seekers who have passed their credible fear interviews by subjecting them to unjustified and prolonged detention. Such efforts constitute prohibited *refoulement* and violate the laws, Constitution and treaties of the United States.

D.   Defendants' practice and policy of giving great weight to deterrence in making parole determinations is arbitrary and capricious because it violates the agency's own rules and regulations, as interpreted by the 2010 ICE Policy Directive, which provides that asylum seekers who are not a flight risk or a

danger to the community should be granted parole because their continued detention is not in the public interest.

E.  All such acts were taken pursuant to Defendants' de facto policy and practice of giving great weight to deterrence of immigration in deciding parole requests of P.O.E. asylum seekers.

115.  Plaintiffs have suffered physical and emotional harm as a result of the Defendants' unlawful actions and continue to suffer such harms at this time.

116.  Plaintiffs have been and still are seriously hampered in preparing their legal cases.

117.  Plaintiffs seek injunctive relief against the Defendants pursuant to the Administrative Procedure Act, 5 U.S.C. §702 et. seq.

118.  Plaintiffs bring this claim against the Defendants in their official capacities.

## VI.   **<u>PRAYER FOR RELIEF</u>**

WHEREFORE PLAINTIFFS PRAY THAT THIS COURT:

1.  Grant declaratory relief declaring that the Defendants' policy of giving great weight to deterrence in deciding parole requests from P.O.E. asylum seekers, such as Plaintiffs, violates the Administrative Procedure Act, the First Amendment, and the Fifth Amendment of the United States Constitution;

2. Grant declaratory relief declaring the prolonged and arbitrary detention of the Plaintiffs violates the First and Fifth Amendments of the United States Constitution;

3. Grant an injunction prohibiting Defendants from penalizing the Plaintiffs, who are all P.O.E. asylum seekers, for exercising their right to petition for asylum.

4. Grant an injunction prohibiting Defendants from further violating the United States constitution, the APA, and the applicable immigration statutes by imposing prolonged and unjustified detention on Plaintiffs, who are all P.O.E. asylum seekers.

5. Grant the Plaintiffs reasonable costs.

Respectfully submitted,

/S/ Jennifer K. Harbury
Jennifer K. Harbury
Attorney in Charge
D.D.C. Bar No. TX0022
TEXAS BAR NO. 08946500
**TEXAS RIO GRANDE LEGAL AID, INC.**
301 S. Texas Ave.
Mercedes, Texas 78750
Telephone: (956) 447-4800
Email: JHarbury@trla.org

/S/Catherine Norris
Catherine Norris
Staff Attorney
N.Y. BAR NO. 4914818
**TEXAS RIO GRANDE LEGAL AID, INC.**
1111 N. Main Ave.
San Antonio, TX 78212
Telephone: (210) 212-3715
Email: CNorris@trla.org
*Pro hac vice pending*

31