UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

HATIM B., *et al.*

     *Plaintiffs*,

       v.

KIRSTJEN NIELSEN, Secretary of
Homeland Security, *et al.*,

     *Defendants*.

_____

Civil Action No. 1:17-cv-1976-RC


### <u>PLAINTIFFS' AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

I.  Introduction ................................................................................................................ 1

II.  Statutory and Regulatory Framework ...................................................................... 4

III.  Standards for issuance of a preliminary injunction ................................................. 7

IV.  Irreparable Harms to the Plaintiffs .......................................................................... 8

V.  Balance of Interests ................................................................................................ 13

VI.  Likelihood of Success on the Merits ...................................................................... 15

  a.  Defendants' Deterrence Policy ............................................................................ 15

  b.  Defendants' are Liable for the Policy .................................................................. 20

  c.  Plaintiffs Will Prevail on Their APA Claims ..................................................... 22

    i.  All Threshold Requirements for APA Claims are Met ................................. 22

    ii.  Defendants' Policy Violates the Foreign Affairs Reform and Restructuring Act  (5 U.S.C. § 706(2)(A)) ................................................................................................ 27

    iii.  Defendants' Policy is Arbitrary and Capricious (5 U.S.C. § 706(2)(A)) .................. 28

    iv.  Defendants' Policy was Adopted without Observance of Required Legal Procedure (5 U.S.C. § 706(2)(D)) ................................................................................................ 32

    v.  Defendants' Policy is Contrary to Plaintiffs' Constitutional Rights (5 U.S.C. § 706(2)(B)) ................................................................................................................. 33

  d.  Defendants' Actions Violate Due Process ......................................................... 34

    i.  Defendants are Violating Plaintiffs' Substantive Due Process Rights ...................... 38

    ii.  Deterrence of Immigration is an Invalid Basis for Prolonged Detention .................. 42

VII.  Public Interest ....................................................................................................... 43

TABLE OF AUTHORITIES

## CASES

*Abdi v. Duke*, NO. 1:17-CV-0721-EAW, 2017 WL 55995521 (W.D.N.Y. 2017) ...................... 23

Addington v. Texas, 441 U.S. 418 (1979) .............................................................................. 29

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ................................................................ 24

*Ahad v. Lowe*, 235 F. Supp. 3d 676 (M.D. PA. 2017) ........................................................... 28

*Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106 (D.C. Cir 1993) ................ 45

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ............................................. 37

*Banks v. York*, 515 F.Supp.2d 89, 111 (D.D.C. 2007) ........................................................... 34

*Bautista v. Sabol*, 862 F.supp.2d 375 (M.D. Pa. 2012) ......................................................... 29

*BE&K Const. CO. v. N.L.R. B.*, 536 U.S. 516, 525 (2002) ...................................................... 33

*Bearden v. Georgia*, 461 U.S. 660 (1983) ............................................................................ 29

*Bennett v. Spear*, 520 U.S. 154 (1997) ................................................................................ 36

*Boumedienne v. Bush,* 553 U.S. 723 (2008) ......................................................................... 27

*Brownell v. We Shung*, 352 U.S. 180 (1956) ......................................................................... 38

*Burough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011) ................................................... 34

*Chamber of Commerce v. FEC*, 69 F.3d 600 (D.C. Cir. 1995) ................................................. 41

*Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice*, 846 F.3d 1235 (D.C. Cir. 2017) ....................................................................................................... 37

*Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402 (1971) ......................................... 39

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) ............................................................ 23

*Clark v. Martinez*, 543 U.S. 371 (2005) ......................................................................... 26, 41

*Clifford v. Pena*, 77 F.3d 1414 (D.C. Cir. 1996) ................................................................... 39

*Cobell v. Babbitt*, 91 F. Supp. 2d 1 (D.D.C. 1999) ............................................................... 36

*Cohen v. United States*, 650 F.3d 717, 732 (D.C. Cir. 2011) ................................................. 38

*Covington v. Harris*, 419 F.2d 617, 623 (D.C.Cir.1969) ....................................................... 30

*Darby v. Cisneros*, 509 U.S. 137 (1993) ........................................................................ 36, 37

*Daugherty v. Sheer*, 248 F. Supp. 3d 272, (D.D.C. 2017) ...................................................... 34

*Davis v. U.S. Sentencing Com'n*, 716 F.3d 660 (2013) .......................................................... 38

*Demery v. Arpaio*, 378 F.3d 1020 (9th Cir. 2004) ................................................................. 31

*Demore v. Kim*, 538 U.S. 510 (2003) ................................................................................... 32

*DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189 (1989) ...................... 12

*Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011) ..................................................... 41

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................. 12, 33

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ....................................................................... 25, 29

*Fuller v. Winter*, 538 F.Supp.2d 179 (D.D.C. 2008) .............................................................. 43

*Garcia v. District of Columbia*, 56 F. Supp. 2d 1 (D.D.C. 1998) ............................................ 34

*Geneme v. Holder*, 935 F.Supp.2d 184 (D.C. Cir. 2013) ....................................................... 40

*Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013) ................................................................ 12

*Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658 (D.C. Cir. 1978) ........................................................................................................................................ 46

*Hartley v. Wilfert,* 918 F. Supp.2d 45 (D.D.C. 2013) ............................................................. 34

*Heckler v. Chaney*, 470 U.S. 821 (1985) ................................................................................ 39

*I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ................................................................... 32

*Jackson v. Indiana,* 406 U.S. 715 (1972) ............................................................................... 29

*Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004) ..................................................................... 31

*Judulang v. Holder*, 565 U.S. 42 (2011) ............................................................................... 42

*Kansas v. Crane*, 534 U.S. 407 (2002) .................................................................................. 32

*Kansas v. Hendricks*, 521 U.S. 346 (1997) ........................................................................... 33

*Lee v. Reno*, 15 F.Supp.2d 26 (D.D.C. 1998) ....................................................................... 38

*Lopez v. Federal Aviation Admin.*, 318 F.3d 242 (D.C. Cir. 2003) ...................................... 43

*Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015) ................................................................... 41

*Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003) ......................................................................... 41

Lynch *v. Canatella,* 810 F.2d 1363, 1373-1374 (5th Cir.1987) ........................................... 25

*Maldonado v. Macias*, 150 F. Supp. 3d 788  (W.D. Tex. 2015) .................................... 23, 26

*Martinez-Aguero v. Gonzalez,* 459 F.3d 618 (5th Cir. 2006) ............................................... 25

*Medina-Morales v. Ashcroft*, 371 F.3d 520, 528 (9th Cir. 2004) ......................................... 40

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ............................................ 12

*Morton v. Ruiz*, 415 U.S. 199 (1974) .................................................................................... 43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983) .. 42

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992)
................................................................................................................................................ 46

*National Mining Ass'n v. Kempthorne*, 512 F.3d 702 (D.C. Cir. 2008) ............................... 41

*Nio v. United States Department of Homeland Security*, 270 F.Supp.3d 49 (D.C. Cir. 2017) ..... 45

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) ..................................................................... 25

*O'Connor v. Donaldson,* 422 U.S. 563 (1975) ..................................................................... 31

*Padula v. Webster*, 822 F.2d 97 (D.C. Cir. 1987) ................................................................ 39

*Pinson v. United States Department of Justice*, 246 F. Supp.3d 211 (D.D.C. 2017) .................. 34

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................... 36

*Reed v. Town of Gilbert, Ariz.* 135 S. Ct. 2218 (2015) ......................................................... 33

*Reno v. Flores*, 507 U.S. 292 (1993) .................................................................................... 25

*Rice & Adams Corp. v. Lathrop*, 278 U.S. 509 (1929) ......................................................... 11

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ............................................... 17, 29, 41

*Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015) .......................................................... 26

*Rosales-Garcia v. Holland*, 322 F. 3d 386, (6th Cir.  2003) ................................................. 26

*Salazar v. King*, 822 F.3d 61 (2d Cir. 2016) ........................................................................ 39

*Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42 (D.C. Cir. 2016) ......... 37

*Seling v. Young*, 531 U.S. 250 (2001) ................................................................................... 29

*Sharp v. Weston,* 233 F.3d 1166 (9th Cir. 2000) .................................................................. 31

*Shelton v. Tucker,* 364 U.S. 479 (1960) ............................................................................... 30

*Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) ..................................................... 11

*Sierra Club v. Environmental Protection Agency*, 873 F.3d 946 (D.C. Cir. 2017) ................... 45

*Snyder v. Massachusetts*, 291 U.S. 97 (1934) ...................................................................... 25

*Toolaprashad v. Bureau of Prisons,* 286 F. 3d 576, 584-85 (D.C. Cir. 2002) ........................ 34

*Traynor v. Turnage*, 485 U.S. 535, 542-44 (1988) ............................................................... 40

*Trudeau v. Federal Trade Com'n*, 456 F.3d 178 (D.C. Cir. 2006) ........................................ 40

*Turner v. Rogers*, 564 U.S. 431 (2011) ................................................................................ 29

*U.S. v.* Salerno, 481 U.S. at 750 (1987) ........................................................... 28
*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........................... 43
*Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925 (D.C. Cir. 2008) .............. 36
*Watervale Marine Co., Ltd. V. DHS*, 55 F.Supp.3d 124 (D.D.C. 2014) ..................... 39
*Way of Life Television Network, Inc. v. F.C.C.*, 593 F.2d 1356 (D.C. Cir. 1979) ........ 43
*Westfahl v. District of Columbia*, 75 F.Supp.3d 365 (D.C. Cir. 2014) ....................... 33
*Woodruff v. Peters,* 482 F. 3d 521 (D.C. Cir. 2007) ............................................. 34
*Zadvydas v. Davis*, 533 U.S. 678 (2001) ........................................................... 26
*Zinerman v. Burch,* 494 U.S. 113 (1990) ........................................................... 25

## STATUTES

5 U.S.C. § 500 .......................................................................................... 35
5 U.S.C. § 553 ..................................................................................... 45, 46
5 U.S.C. § 553(b)(A) ................................................................................. 46
5 U.S.C. § 701(a) ...................................................................................... 36
5 U.S.C. § 706(2)(A) ............................................................................. 41, 42
5 U.S.C. § 706(2)(B) ................................................................................. 40
5 U.S.C. § 706(2)(D) ................................................................................. 45
8 U.S.C. § 1158(a)(1) ................................................................................... 6
8 U.S.C. § 1182(d)(5)(A) ..................................................................... 6, 19, 39
8 U.S.C. § 1225(b) ........................................................................... 38, 41, 44
8 U.S.C. § 1225(b)(1)(A)(ii) ........................................................................... 9
8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ..................................................................... 9
8 U.S.C. § 1225(b)(2)(A) ......................................................................... 9, 42
8 U.S.C. § 1226(c) ............................................................................... 32, 41
8 U.S.C. § 1231 note ............................................................................ 17, 42

## OTHER AUTHORITIES

Executive Order No. 13767, 82 Fed. Reg. 8793 ..................................................... 10
Wright, Miller & Cooper, *Federal Practice and Procedure* (2013) ............................. 11

## RULES

Fed. R. Civ. P. Rule 65 ................................................................................. 5

## REGULATIONS

8 C.F.R. § 1003.19(h)(2)(i) ...................................................................... 36, 38
8 C.F.R. § 1003.19(h)(2)(i)(B) ....................................................................... 10
8 C.F.R. § 212.5 .................................................................................. 39, 45
8 C.F.R. § 212.5(b)(5) ................................................................................. 39

## EXHIBIT LIST

Exhibit 1:      Declaration of Araceli R.

Exhibit 1A:     Supplementary Declaration of Araceli R.
Exhibit 2:      Declaration of Hatim B.
Exhibit 3:      Declaration of Sadat I.
Exhibit 4:      Declaration of Mikailu J.
Exhibit 5:      Declaration of Junior M.
Exhibit 5A:     Declaration of Junior M.
Exhibit 6:      Declaration of Dr. Marsha Griffin
Exhibit 7:      Declaration of Dr. Andrea Northwood
Exhibit 8:      Declaration of Bethany Carson
Exhibit 9:      Declaration of Clara Long
Exhibit 10:     Declaration of Eunice Lee
Exhibit 11:     Declaration of Eleanor Acer
Exhibit 12:     Declaration of Dr. Mike Krosin
Exhibit 13:     ICE Policy Directive  11002.1
Exhibit 14:     Executive Order, January 25, 2017, "Border Security and Immigration
                Enforcement Improvements"
Exhibit 15:     Memorandum of Secretary John Kelly, February 20, 2017, "Implementing the
                President's Border Security and Immigration Enforcement and Improvement
                Policies."
Exhibit 16:     Human Rights First, "Lifeline on Lockdown", July 2016
Exhibit 17:     Human Rights First, "Judge and Jailer", September 2017
Exhibit 18:     Parole Request of Araceli R.
Exhibit 19:     Parole Request of Hatim B
Exhibit 20:     Parole request of Sadat I.
Exhibit 21:     Parole request of Mikailu J.
Exhibit 22:     All Parole Rejections
Exhibit 23:     Parole Worksheets for Araceli R.
Exhibit 24:     EOIR General Counsel Response to Petition for Rule Making, March 19, 2012

Now come the Plaintiffs in the above entitled and numbered cause, and set forth the following facts and jurisprudence to support their Amended Application for a Preliminary Injunction, brought pursuant to Fed. R. Civ. P. Rule 65.

At the outset Plaintiffs note that they have timely filed their request for emergency relief. Although the Complaint was filed on Sept. 26, 2017, the data necessary to properly establish the likelihood of success on the merits was not available to them until January 2018.  However, the harms inflicted on Plaintiffs by their long term detention intensified quickly. As set forth below, in December 2017 former Plaintiff Junior M. returned to Honduras in despair, despite the murder of his two brothers there. In early January 2018 Plaintiff Aracely R. was diagnosed with a dangerous bone infection, resulting from many months of inadequate medical care. Meanwhile, the emotional harms inflicted on the other Plaintiffs, became excruciating. Plaintiffs filed their original Application for a Preliminary Injunction at 3:00 a.m. on February 2, 2018. Plaintiffs now file their Amended Application in light of the February 27, 2018, Supreme Court ruling in *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018) and as authorized by this Court on March 2, 2018.

## I.   <u>Introduction</u>

The Plaintiffs in this case are asylum seekers who were forced to flee their homelands in order to escape severe persecution and death. Hatim B. fled the ethnic violence in Guinea; Sadat I., a young gay man, was beaten and threatened with death in Ghana because of his sexual orientation; Aracely R. and her young daughter escaped from the Guatemalan gangs who had threatened to kill them; Mikailu J., a young journalist who wrote against female genital mutilation, was forced to run for his life from Sierra Leone; and Junior M., who lost two older brothers to murderous local gangs, fled Honduras. Dkt. 50-1 at 15-23.

None of the Plaintiffs has ever committed a crime, either in their homelands or in the

United States. All arrived at a U.S. Port of Entry and lawfully presented themselves to officials

to request asylum pursuant to 8 U.S.C. §§ 1158(a)(1) and 1225.[1]  All were promptly transferred

to an immigration detention center. All have passed their credible fear interviews ("CFI"),

making them eligible for standard immigration court removal proceedings. All have presented

ample identification and sponsorship documents, and are eligible for parole under 8 U.S.C. §

1182(d)(5)(A).[2] Yet Plaintiffs have been denied release from detention by U.S. Immigration and

Customs Enforcement ("ICE") officers. Unlike persons who enter the United States unlawfully,

Plaintiffs are denied any review by an Immigration Judge at a bond hearing. 8 C.F.R. §

1003.19(h)(2)(i)(B).[3] As of the filing of this memorandum, Plaintiffs have been detained in harsh

and prison-like conditions for between one year and over two years. [4] This is causing them

immediate and irreparable harm.

---

[1] Such asylum applicants will be referenced herein as "POE Asylum Seekers."

[2] *See* Exhs. 18-22 (Plaintiffs' Parole Requests and Denials).

[3] After 90 days have passed from a final order of removal, a person should be released pursuant
to the ruling in *Zadvydas v. Davis,* 533 U.S. 678, 694 (2001). Such post removal release
provisions are technically separate from parole and are set forth in 8 C.F.R. § 241.4. As with
parole releases however, the Defendants' policies of heavily weighting immigration deterrence
has resulted in the improper denial of *Zadavydas* release to Plaintiff Sadat I. Plaintiff Sadat I.
was earlier improperly denied release on parole, and will again face the Defendants' improper
immigration deterrence policies regarding parole when and if his case is re-opened.

[4] Aracely R. was released on her own recognizance, pending her final asylum decision, to her
U.S. citizen relatives on Friday, January 12, 2018. As set forth in Plaintiffs' declarations, Exh. 1,
1a, she suffered a tragic accident on her way north from Guatemala, which resulted in her
daughter's death and terrible injuries to her own pelvis and femur. She received emergency
surgery in Reynosa, Mexico, and a metal rod was implanted in her femur to strengthen it. The
surgical site became infected while she was in ICE custody, and due to substandard medical care
and unhygienic conditions, *see* Exh. 6 at 12 (Decl. of Dr. Marsha Griffin and Dr. Mike Krosin),
the infection spread into her femur and slowly became resistant to certain antibiotics. She is now
undergoing a series of urgent surgeries, at the hands of non-ICE physicians.

As set forth in the Plaintiffs' Third Amended Complaint, they have been denied parole pursuant to the Defendants' unwritten and unconstitutional policy of giving heavy weight to immigration deterrence ("parole/deterrence policy") in evaluating parole requests from Port of Entry asylum seekers. (POE asylum seekers) [5]. There are two key objectives underlying this policy. First, Defendants seek to subject the Plaintiffs and other lawful asylum applicants to such prolonged and harsh detention conditions that they will eventually, in despair, relinquish their petitions and return to their dangerous homelands. Secondly, Defendants seek to punish asylum applicants arriving at U.S. Ports of Entry in order to deter other imperiled persons from petitioning for asylum in the same lawful manner.

The immediate and irreparable harms speak for themselves in this case. As a result of the prolonged detention and punitive conditions at the ICE detention centers, former Plaintiff Junior M. decided to return to Honduras, despite the fact that Honduras has one of the world's highest murder rates, and despite the murders of both his brothers there. He could not bear further detention. Exh. 5, 5A (Decl. of Junior M.). The other Plaintiffs continue to press their asylum claims, but their mental and physical well-being is deteriorating. *See* Exhs. 1-5 (Declarations of Plaintiffs). Plaintiffs continue to suffer intensifying depression, anxiety, and health problems caused by their prolonged detention. *Id.*; *see also* Exh. 11 (Decl. of Andrea Northwood, Ph.D., L.P, Center for Victims of Torture). Aracely R. nearly lost her leg due to a bone infection caused by substandard medical care and un-hygienic conditions at the Port Isabel Detention Center. Exh. 6, p.3 (Decl. of Dr. Marsha Griffin, Professor of Pediatrics, University of Texas Rio Grande Valley); Exh. 12 (Decl. of Dr. Michael Krosin, MD, Chief of Orthopaedic Surgery, Alameda

---

[5] This policy is described and discussed in detail in Section VI.a., *infra*.

County Medical Center). She was finally released on parole but she may be re-detained at any time.

Plaintiffs are suffering unconstitutional and irreparable harm and in all ways satisfy the requirements for emergency equitable relief as set forth below. They do not ask this Court to "interpret" any relevant statutes and regulations, as recently criticized by the Supreme Court. *Jennings v. Rodriguez*, 138 S.Ct. 830, 842-48 (2018). Rather, Plaintiffs seek a preliminary injunction prohibiting Defendants  from applying  8 C.F.R. § 1003.19(h)(2)(i)(B) against the Plaintiffs, and hence depriving them of a bond hearing before an immigration judge. Plaintiffs also seek injunctive relief  prohibiting Defendants from inflicting harsh punitive or deterrence measures on the Plaintiffs' lawful actions, and from further violating the requirements of ICE Policy Directive  No. 11002 (Jan. 4, 2010) ("Morton Policy Directive").

## II.  <u>Statutory and Regulatory Framework</u>

The relevant immigration statutes and regulations are set forth in detail in the Plaintiffs' Third Amended Complaint, and are summarized below.

In light of the human devastation wrought by World War II, the United Nations promulgated the 1951 U.N. Convention Relating to the Status of Refugees ("Refugee Convention").[6] In relevant part, the Refugee Convention provides that states shall not impose penalties on refugees for illegal entry or presence, nor shall states "expel or return ("*refouler*") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention Art. 31, Art. 33. The United States adopted these protections by signing the 1967 Protocol Relating to the Status of Refugees ("Protocol"),

---

[6] April 22, 1954, 189 U.N.T.S. 150.

which incorporated Articles 2-34 of the Refugee Convention.[7] In order to comply with U.S.

obligations under the Protocol, the United States promulgated the Refugee Act of 1980,[8] which

requires the United States to establish procedures for noncitizens physically present in the United

States, at a land border, or at a port of entry to apply for asylum.

The prohibition against *refoulement* is enshrined in other important treaties ratified by the

United States, including the Convention Against Torture and Other Cruel, Degrading or Inhuman

Punishment ("CAT").[9] The Foreign Affairs Reform and Restructuring Act of 1998 went on to

implement the non-*refoulement* provision of CAT (Art. 3), pronouncing it United States policy

"not to expel, extradite, or otherwise effect the involuntary return of any person to a country in

which there are substantial grounds for believing the person would be in danger of being

subjected to torture" and directing agencies to adopt regulations to comport with such policy.[10]

The express objective of these international and domestic laws is to protect and provide a

safe haven for persons fleeing imminent persecution or torture in their homelands, and to prevent

*refoulement*. Under the current statutory scheme, persons fleeing persecution are entitled to

request asylum and CAT protections at any U.S. Port of Entry. 8 U.S.C. §§ 1158(a)(1) and 1225.

They need only cross the international bridge or roadway and present themselves to the U.S.

immigration officers stationed there. Such crossings and requests are lawful.

POE Asylum Seekers must be referred to a designated asylum officer for a preliminary

---

[7] Oct. 4, 1967, 606 U.N.T.S. 267. The United States acceded to the Protocol on November 1, 1968.

[8] Pub.L. No. 96-212, 94 Stat. 105 (1980).

[9] Dec. 10, 1984, 1465 U.N.T.S. 85 (entered into force June 26, 1987). The United States ratified CAT on Oct. 21, 1994.

[10] Pub. L. No. 105-277, Div. G, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231 note).

credible fear interview ("CFI").  *See* 8 U.S.C. § 1225(b)(1)(A)(ii); *see also* 8 C.F.R. §

235.3(b)(4). If the POE Asylum Seeker passes the CFI, then he or she enters standard

immigration court removal proceedings under 8 U.S.C. § 1229a.[11]

Prior to the CFI, detention of POE Asylum Seekers is mandatory. 8 U.S.C. §

1225(b)(1)(B)(iii)(IV); 8 C.F.R. § 1003.19(h)(2)(i)(B). Once the person passes the CFI, he or she

may be paroled by ICE.  8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5. When ICE denies parole to

a POE Asylum Seeker,  review by an Immigration Judge is foreclosed. 8 C.F.R. §

1003.19(h)(2)(i)(B).[12] The lack of judicial review for custody determinations makes POE

Asylum Seekers unique among other asylum seekers. Even asylum seekers who unlawfully enter

the U.S. and later pass their CFI can seek a bond from an Immigration Judge.  All other

categories of immigrants subject to 8 C.F.R. § 1003.19(h)(2)(i)(B) consist of persons who  have

engaged in some kind of unlawful act.

Given past inconsistencies in application, formal ICE policy was established by the

agency with a directive that entered into effect in 2010. *See* Exh. 11 at 2-4 (Decl. of Eleanor

Acer, Senior Director for Refugee Protection, Human Rights First); Exh.13 (ICE Morton Policy

Directive). This Directive made it clear that POE Asylum Seekers presenting identification and

U.S. sponsors should be released on parole in the interests of justice. Exh. 13 at 3, ¶ 6.2 (Morton

---

[11] POE Asylum Seekers who do not pass their CFI are subject to expedited removal. 8 U.S.C. §
1225(b)(1)(B)(iii).

[12] After 90 days have passed from a final order of removal, a person should be released pursuant
to the ruling in *Zadvydas v. Davis,* 533 U.S. 678, 694 (2001). Such post removal release
provisions are technically separate from parole and are set forth in 8 C.F.R. § 241.4. As with
parole releases however, the Defendants' policies of heavily weighting immigration deterrence
has resulted in the improper denial of *Zadavydas* release to Plaintiff Sadat I. Plaintiff Sadat I.
was earlier improperly denied release on parole, and will again face the Defendants' improper
immigration deterrence policies regarding parole when and if his case is re-opened.

Policy Directive).

Despite public pronouncements to the contrary, Defendants have departed from the

Morton Policy Directive in the wake of President Trump's 2017 Executive Order No. 13767, 82

Fed. Reg. 8793, and Defendants' February 20, 2017 guidance implementing the Executive

Order. Exhs. 14 and 15.  ICE officials are now *de facto* required, when evaluating parole requests

and similar requests for release,[13] to give heavy weight to the factor of immigration deterrence.

*See* Exh. 11 at 7, ¶ 23 (Decl. of Acer) and Exh. 3 at 4, ¶ 11 (Decl. of Sadat I). As a result, the

release of eligible POE Asylum Seekers has plummeted, leaving these persons in prolonged,

harsh, and prison-like confinement. *See* Exhs. 1-5 and 7-8. This change in policy and the severe

drop in parole grants are set forth in further detail below at Section VI.a.

### III. <u>Standards for issuance of a preliminary injunction</u>

"Defined broadly, a preliminary injunction is an injunction that is designed to protect

plaintiff from irreparable injury and to preserve the court's power to render a meaningful

decision after trial on the merits." *See* Wright, Miller & Cooper, *Federal Practice and Procedure*

(2013), §2947 at 112. A decision to grant or deny such an injunction is based on a variety of

facts presented in a particular case, and such decision is discretionary. *Rice & Adams Corp. v.*

*Lathrop*, 278 U.S. 509 (1929); *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011).

Although each case presents its own special considerations, courts have articulated the

following as important factors when considering a request for a preliminary injunction: (1) the

---

[13] Plaintiff Sadat I. was denied parole pursuant to this abrupt change. See Exhibit 3. After he was denied relief by the BIA, he remained eligible for release, albeit under a distinct section of regulations located at 8 C.F.R. § 241.4. His Motion to Reopen is under consideration by the Eleventh Circuit, and if granted, he will again be eligible for parole. Both forms of release options have been equally impacted by Defendants' new policy of heavily weighting immigration deterrence.

significance of the threat of irreparable harm; (2) the balance between the harms to Plaintiffs, and

the interests of the Defendants; (3) the probability that the Plaintiffs will succeed on the merits,

and; (4) the public interest. *See generally*, *Federal Practice and Procedure*, supra, at §2948 at

122-24; *Sherley*, 644 F.3d at 392; *R.I.L-R v. Johnson*, 80 F. Supp.3d 164, 173 (D.D.C. 2015).

Plaintiffs address these factors in detail below. Clearly, in this case the equitable factors

overwhelmingly favor the issuance of the requested preliminary injunction.

## IV. <u>Irreparable Harms to the Plaintiffs</u>

Plaintiffs sue for violations of their constitutional rights. Plaintiffs allege that Defendants

have a policy of heavily weighting the government's interest in immigration deterrence

("parole/deterrence policy") when evaluating POE Asylum Seekers' requests for parole and

subjecting POE Asylum Seekers to prolonged detention. This not only violates Plaintiffs'

substantive due process rights to be free of unjustified detention under the Fifth Amendment, it

also constitutes an unlawful penalization of the Plaintiffs' First Amendment rights to petition the

government. These constitutional violations are *per se* irreparable. "It has long been established

that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably

constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir.

2009) (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *see also Gordon v. Holder*, 721 F.3d

638, 653 (D.C. Cir. 2013) Under this line of authority, Plaintiffs' allegation of constitutional

injury is sufficient to satisfy the irreparable injury requirement for issuance of a preliminary

injunction.

Plaintiffs, however, need not rest on the "*per se* irreparable" jurisprudence. The right to

personal liberty has long been deemed transcendent, falling within the very heart of Due Process

Clause protections. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Reno v. Flores*, 507 U.S.

8

292, 315 (1993) ("Freedom from bodily restraint means more than freedom from handcuffs, straitjackets, or detention cells. A person's core liberty interest is also implicated when she is confined in a prison, a mental hospital, or some other form of custodial institution, even if the conditions of confinement are liberal.") (citing *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 200 (1989)).

Most importantly, it is the cruel and shocking reality of the detention conditions endured by the Plaintiffs themselves, all civilians who have never committed a crime, that make a finding of irreparable harm irrefutable. These conditions are set forth in detail in their personal declarations. Exhs. 1-5. *See* also Exh. 7 (Decl. of Northwood); Exh. 8 (Decl. of Bethany Carson, Immigration Researcher, Grassroots Leadership); Exh. 9 (Decl. of Clara Long, Senior Researcher, Human Rights Watch). Plaintiffs are being detained in fully prison-like conditions. Moreover, they have been detained for close to a year now, and Plaintiff Sadat I. has endured more than two years of detention.[14] As a result, their mental and physical well-being is adversely impacted. *See* Exh.7 (Decl. of Northwood). They endure daily and unjustified humiliation, inadequate medical care, harsh personal deprivations, poor hygiene and diet, restricted exercise, loss of all privacy, hostile guards and extreme isolation which also limits their ability to help prepare their own asylum cases.[15] Examples include, but are not limited to:

1. **Declaration of Aracely R. (Exhs. 1 and 1a)**[16] - When Plaintiff Aracely R. developed an abscess at the site of an earlier surgery on her hip, the physician prescribed antibiotics. However,

---

[14] Plaintiff Hatim B. has been granted asylum and released. However, the United States has until March 26, 2018 to appeal this ruling.

[15] These conditions are in stark contrast with conditions at a refugee center in Costa Rica. *See* Exh. 2 at 2-3, ¶¶ 7-8 (Declaration of Hatim B.).

[16] Plaintiff Aracely R. was released on parole in January 2018, but can be re-detained by Defendants at any time.

she did not receive the medicine for several days and her condition worsened. When the wound

did not heal well, a physician ordered that it be cleaned and dressed twice a day. Plaintiff

repeatedly requested such care, but only received treatment once per day. The wound was

oozing. Between treatments she used soap and water and a clean sanitary napkin as a bandage.

Months went by but the wound did not heal. Standard medical care required immediate

intravenous antibiotics and surgery to avoid spread of the infection to the bone. No such care was

provided. The bone eventually became seriously infected, and use of oral antibiotics (instead of

intravenous) lead to a resistance to various antibiotics. *See* Exh. 6 (Decl. of Griffin); Exh. 12

(Decl. of Krosin). On January 10th and 11th, 2018, Aracely R. was suffering fever and chills and

such extreme pain in the infected femur that she required a wheel chair. She was finally released

to her family and is now undergoing several surgeries to repair her femur and heal the serious

infection. She could have lost her leg or her life. Exh. 6 (Decl. of Dr. Griffin), Exh.12 (Decl. of

Dr. Krosin). She can be re-detained at any time.

2. **Declaration of Sadat I (Exh. 3)** - Plaintiff Sadat I. was detained initially in Stewart

Detention Center in Georgia. His relatives had managed to obtain video footage of Sadat I.'s

partner being subjected to 100 lashes with belts and sticks, and of a local anti-gay vigilante

leader threatening all gay persons. The relatives sent a compact disc ("CD") containing this

video to Sadat I. together with other written evidentiary materials. A guard removed the CD from

the envelope because detainees are not allowed to have CDs. Guards fear the detainees will use

them as a weapon. Unfortunately, no one informed Sadat I. that the CD had been received but

removed from his mail, or that he could ask the librarian to forward the CD to the Immigration

Court. This left him without crucial evidence at his asylum hearing.

3.   At the Port Isabel Detention Center, the dormitory toilets are placed in a row with no

partitions between them, forcing the detainees to urinate and defecate in plain view of one

another. Exh. 1 at 3, ¶ 9 (Decl. of Aracely R.). Detainees in all facilities are issued used clothing

and sheets, which are often left stained and torn by previous users. In most facilities, uniforms

and sheets are washed once a week. *See* Exhs. 1-5a.

4.   All detainees must have permission to leave the dormitory unless during scheduled times

for recreation or using the library. They must usually be accompanied by a guard, and in some

facilities must walk with their hands behind their back. *See* Exh. 2 at 4, ¶ 22 (Decl. of Hatim B.).

Men cannot enter a hallway if a woman is present there. Exh. 3 at 7, ¶ 21 (Decl. of Sadat I.).

They may not stop to speak with friends. They are all are subjected to pat downs when they

return to the dormitories. They are not allowed CDs, paper clips, or their own nail clippers

because they are presumed to be dangerous. They may not have personal conversations with the

guards, even to ask what a favorite book might be or if the guard has children. All physical

contact is forbidden. Exh. 4 at 3, ¶ 21 (Decl. of Mikailu J.); Exh. 2 at 4, ¶ 10 (Decl. of Hatim B.).

If a friend receives bad news from home and is weeping, no one may even put an arm around the

person's shoulder to give comfort. *See* Exhs. 1-5a.

5.   All of the Plaintiffs, like most POE Asylum Seekers, have suffered serious trauma in their

homelands.[17] Conditions in the detention center would cause emotional harm to any person.

However, mental health experts agree that such isolation and mistreatment of already

traumatized persons is extremely harmful. *See* Exh. 7 (Decl. of Northwood). All Plaintiffs are

showing symptoms of seriously increasing depression and anxiety Exhs. 1-4. For example,

Mikailu J. has suffered stabbing chest pains, vomiting, and worsening nightmares. *See* Exh. 4 at

---

[17] *See* Exh. 1 at 1 (Decl. of Aracely R.); Exh. 2 at 1 (Decl. of Hatim B.); Exh. 3 at 1 (Decl. of
Sadat I.); Exh. 4 at 4 (Decl. of Mikailu J.); Exh. 5a at 1 (Decl. of Junior M.).

6, ¶ 22 (Decl. of Mikailu J.). Former Plaintiff Junior M. fell into despair and relinquished his

claim for asylum and returned to Honduras, despite the grave dangers he faced there. Exhs.5, 5a.

6.   The food is inedible and unhealthy for long-term consumption. *See* Exhs. 1-4. As a result,

Plaintiff Hatim B.[18] has developed painful digestive problems, and has been prescribed harsh

laxatives for nearly a year now. Exh. 2 at 4-5 (Decl. of Hatim B.). Although the doctor has

ordered a better diet, Hatim B. still receives precisely the same meals. These arrive, marked

"special diet," but the only change is in the color of the plate. Friends and family cannot send

fresh food to any detainees. Exh. 2 at 5, ¶ 11 (Decl. of Hatim B.).

7.   Detainees are permitted no internet access or cell phones, and hence cannot use

inexpensive e-mails or texts to contact friends and family, or even their attorneys. They must

instead purchase costly telephone cards to make calls, and these are not private. Most detainees

are without the necessary funds. Sadat I. went nearly a year without speaking with his mother.

Exh. 3 at 5, ¶ 16 (Decl. of Sadat I.). Also the calls begin with a stern sounding recording stating

that the call is from a U.S. detention center, and that the calls will be monitored. This frightens

and confuses many who are in unsafe areas, and causes them to hang up. Exh. 2 at 3, ¶ 9 (Decl.

of Hatim B.). Even when a connection is made, people cannot speak freely on a monitored line if

they are in a repressive area. All of this leaves the detainees very isolated. It also gravely

hampers their ability to arrange for sponsors, locate witnesses, research other avenues of relief,

or find publications that would be useful in their cases. Exh. 4 at 3, ¶ 10 (Decl. of Mikailu J.);

Exh. 1 at 3-4, ¶ 10 (Decl. of Aracely R.). This makes it very hard to assist their lawyers to help

prepare their cases. Lawyers may not bring laptops into the building, making the attorney-client

efforts more difficult.

---

[18] Hatim B. was granted asylum and released in February 2018 but the government is still entitled
to appeal at the time of filing.

8.   Contact visits with family members must be arranged in advance. Plaintiff Aracely R. was visited by her concerned father over the Christmas holidays. She made the special arrangements in advance, and he flew from Denver to Texas. A friend drove him to the facility but was not permitted to enter because he did not have car insurance with him. The father was not allowed to enter the grounds on foot.  He returned the next day and was allowed in, but no special arrangements had been made for that date, so he visited his ill and traumatized daughter through a plate glass window. *See* Exh. 1 at 5, ¶ 13 (Decl. of Aracely R.).

## V.  Balance of Interests

The United States has no adequate justification for its punitive treatment of Plaintiffs. Defendants do have an interest in controlling immigration into this country and to assure that such immigrants are properly screened for any security threat or other dangers they might present. Defendants do not have a valid interest, however, in punishing lawful POE Asylum Seekers in order to deter other immigrants from coming to the United States. As detailed below, deterrence is unconstitutional when the acts in question are legal. Authorizing prolonged civil detention to deter other immigrants, without providing access to a neutral arbiter is also unconstitutional. Further, Defendants' unlawful treatment of Plaintiffs disregards clear Congressional objectives of protecting asylum seekers and preventing their *refoulement*. *See* 8 U.S.C. § 1231 note ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.").The use of long-term detention and harsh conditions to constructively force POE Asylum Seekers to return to their homelands violates the law and shocks the conscience. This in turn negatively impacts our

nation's foreign affairs and international status. Defendants' parole/deterrence policy is also in violation of their own regulations as well as procedural requirements under the APA. The Government has no valid interest in continuing this practice and it "cannot suffer harm from an injunction that merely enjoins an unlawful practice…." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013), reversed on other grounds, *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018). In this case, Plaintiffs only seek an injunction against the application of part of a *regulation.*

To be clear, Plaintiffs do not argue here that they may never be detained at all. However, rapidly developing due process jurisprudence suggests that detention for six months marks the limits of presumptively reasonable detention. *See for example, Zadvydas v. Davis*, 533 U.S. 678 (2001). Once Plaintiffs passed their CFIs, they should promptly have been released in the absence of any serious concerns. At that stage they have presented adequate identification, and sponsors, have been subjected by the Defendants to thorough background checks, and their accounts screened by experts.  Exh. 13 at 3, ¶ 6.2 (Morton Policy Directive). As discussed below, the constitution requires very strict protective measures for the civil detention of *any* civilians such as, for example, people with mental illness. A theoretical possibility that such a civilian could cause harm is not enough to justify loss of liberty.  The Plaintiffs here pose no risks.

Nor do the Defendants have any adequate interest in preventing the flight of some persons by indefinitely incarcerating all. Even individuals charged with a crime on the basis of probable cause may be released on bail, although such person could, in theory, leave the jurisdiction. In this case Plaintiffs have committed no crime at all. They have all produced letters of sponsorship from family members with lawful status in the United States who are willing to

support them in all ways, and to assure their transportation to all hearings.[19] *See* Exhs. 18-22

(Plaintiffs' Requests for Parole and Denials). Perhaps most importantly, the Plaintiffs have

already demonstrated, by their own actions, that they are trustworthy and present no serious

flight risk: each of them *chose* to enter the United States by lawfully presenting themselves to

government officials at a Port of Entry. They did not enter the United States illegally, without

inspection, try to flee into the interior of the country, or in any other way seek to evade U.S.

immigration authorities. *See e.g.* Exh. 2 at 1 ¶ 4 (Decl. of Hatim B.) ("Out of respect to the

United States and its people, I did not want to sneak into country by swimming across the Rio

Grande."); Exh. 3 at 2, ¶ 5 (Decl. of Sadat I.) ("I have never committed a crime and so I did not

want to enter the United States illegally.").

Lastly, Defendants do not face a choice between prolonged detention and immediate

unconditional release. Defendants frequently require immigrants, including those who have

entered unlawfully, released from detention to comply with certain conditions such as posting a

bond, wearing an ankle monitor, and periodic meetings with ICE officers. Plaintiffs indicate that

they are ready and willing to accept any such requirements.

Plaintiffs' interest in being free from long-term and clearly punitive detention far

outweighs any of the theoretical concerns of the Defendants.

**VI.** <u>**Likelihood of Success on the Merits**</u>

   **a.  Defendants' Deterrence Policy**

Upon establishing a credible fear of persecution, a POE Asylum Seeker is eligible for

---

[19] Plaintiff Hatim B. had been sponsored by La Posada, a community for asylum seekers in removal proceedings operated by the Sisters of Divine Charity for more than 20 years, when he requested parole. La Posada has long cooperated with ICE. ICE officials from Port Isabel and other detention centers frequently *request* that the nuns at the shelter receive persons they wish to release pending their hearings. *See* Exh. 19.

release on parole. *See* 8 U.S.C. § 1182(d)(5)(A). Fingerprint checks and a computerized background and criminal records search are carried out upon arrival at the Port of Entry, and identity is established at the CFI. The CFI also serves to screen for fraudulent or inadequate asylum claims. While the initial discretionary parole decisions are made by local ICE officers at the detention facility, they are bound by their supervisors' review, as well as binding regulations, directives, and policies.[20] When POE Asylum Seekers apply for parole, they again present identification, together with documentation from sponsors who will support them and ensure their appearance at all required ICE appointments and court hearings.

In the past, the parole standards had been unevenly applied. This history is set forth in the Exh. 16, at 2-4, (Decl. of Acer). Accordingly, ICE officials interpreted and clarified their regulations to strongly favor the release of POE Asylum Seekers as a matter of public interest, as long as he or she had proper identification and sponsorship. This position is embodied in the ICE Morton Policy Directive, which confirmed that the categories of persons eligible for release included persons with serious medical problems, (such as Plaintiff Araceli R.), pregnant women, minors, an adult accompanying a child, *and* any other person presenting identification and sponsors who does not pose a threat to public safety. *See* Exh. 13. Pursuant to the Morton Policy Directive, all Plaintiffs should have been released upon establishing that they fall into this last category, and that their continued detention is thus not in the public interest.[21]

---

[20] The individual's deportation officer makes the initial decision, under supervision of the officer in charge of the facility. Defendant Bible, Field Office Director, supervises all such Defendants in this case, and also compiles the statistics for the purpose of review and monitoring by the Washington D.C. based Defendants. The Washington D.C. based Defendants not only review and monitor the reports from Defendant Bible, they themselves consider, determine and adopt ongoing parole policies, and require local officials to comply therewith.

[21] *See* Exh. 13 at 3, ¶ 6.2 (ICE Policy Directive). All Plaintiffs were eligible for such parole. Plaintiff Araceli R. was doubly eligible, given her medical condition.

In response to the 2014 surge in immigration along the U.S.-Mexico border, the percentage of parole grants began to decrease, as ICE openly declared a policy of deterrence of immigration. *See R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 174-76 (D.D.C. 2015) (describing the Government's policy of detaining immigrants arriving with children and its concession that deterrence was a factor they relied on). The percentage of POE Asylum Seekers released on parole after passing their CFI was 80 percent in 2012. Exh. 16 at 13 (Human Rights First, *Lifeline on Lockdown*); Exh. 11 (Decl. of Acer). By 2015, this figure dropped to 47 percent. *Id.*

Soon after his 2017 inauguration, President Trump doubled down on this idea of detention as deterrence, issuing Executive Order No. 13767, *Border Security and Immigration Enforcement Improvements*. Exh. 14. Although former DHS Secretary Kelly stated that the ICE Policy Directive remains "in full force and effect," his implementation memo also stressed that parole authority "should be exercised sparingly." *See* Exh. 15 at 9. Earlier drafts of this statement were quite frank about immigration deterrence being the intent and objective.[22]

In the first eight months following the issuance of this Executive Order, ICE "has largely refused to release asylum seekers from detention on parole, leaving many locked up in immigration detention facilities and jails." Exh. 17 at 1 (Human Rights First, *Judge and Jailer*). Simultaneously, other new deterrence efforts went into effect. Human rights and immigration attorneys and advocates reported other widespread abuses along the southern U.S. border, such

---

[22] *See* Damus et al. v. Nielsen et al., 1:18-cv-00578-JEB, Class Complaint for Injunctive and Declaratory Relief, filed March  15, 2018, at p. 19, n. 11, *available at*: https://www.aclu.org/legal-document/damus-v-nielsen-complaint (accessed March 22, 2018); *see also* Memorandum from John Kelly, Implementing the President's Border Security and Immigration Enforcement Improvements Policies (Jan. 25, 2017) (draft), http://www.aila.org/infonet/leaked-dhs-memo-on-implementation-of-presidents.

as turning POE Asylum Seekers back to Mexico instead of properly processing them.[23] Plaintiff

Aracely R. and Junior M. were both initially turned back in this manner. Exh. 1 at 1, ¶ 4 (Decl. of

Aracely R.); Exh. 5A at 1, ¶ 2 (Decl. of Junior M.). Plaintiff Aracely R. was immediately

kidnapped by local gangs when she reached the Reynosa side of the bridge after being

unlawfully turned away at the U.S. Port of Entry. *Id.*

Obtaining the requisite parole statistics from ICE has been difficult and slow.  Exh. 10 at

¶ 4 (Decl. of Eunice Lee, Co-Legal Director of the Center for Gender & Refugee Studies at

University of California Hastings College of Law); Exh. 11 at ¶¶ 14-15 (Decl. of Acer). The

2017 statistics currently available confirm that parole has plummeted in many regions. Attorney

Eunice Lee reports that initial data obtained through FOIA litigation indicate that:

1.  For the period of January through July 2017, at the Port Isabel Detention Center, the

    parole release rate was 8.7% granted, 91.3% denied. The year before, January 2016-

    December 2016, the grant rate there had been 34.7%, and the denial 65.3%. Data for

    August through December 2017 still has not been received. Exh. 10 at 2, ¶ 5.

2.  For the period of January through July 2017, the parole release rate in the South Texas

    Detention Center in Pearsall, Texas, was 26.3 % granted, and 76.7% denied. In 2016 the

    grant rate was 48.9 %, and the denial rate was 51.2%. Exh. 10 at 2, ¶ 6.

3.  For the period of January through July 2017, the parole release rate nation-wide was

    30.2% granted and 69.8% denied. In 2016 the grant rate was 47.0% and the denial rate

    was 53.0%. Exh. 10 at 2-3.[24]

---

[23] This practice has resulted in class action litigation against Defendants. *See Al Otro Lado, Inc. v. Duke*, No. 2:17-cv-05111-JFW (JPRx) (C.D. Cal. filed July 12, 2017).

[24] In the case of Damus v. Nielsen, 1:18-cv-00578-JEB, additional data is provided indicating that in five areas in the U.S., including El Paso, the percentage of parole grants is at about 4%.

Given the lack of the most recent data, Human Rights First carried out further investigations. Attorneys working in immigration detention facilities in Illinois, Michigan, Louisiana, New York, California, and South Texas report a dramatic shift in the exercise of ICE's parole authority since January 2017, such that P.O.E. asylum seekers are "rarely, if ever" granted parole. *See* Exh. 17at 10-11 (Human Rights First, *Judge and Jailer*); *See also* Exh. 11 at 6 ¶ 21 (Decl. of Acer).

In short, the Washington D.C.-based Defendants have adopted, and are requiring compliance with, a new and different nation-wide policy and practice, the parole/deterrence policy. [25] Exh.11 at 6-7, ¶¶ 20, 22 (Decl. of Acer). This is resulting in mass denials of parole to eligible POE Asylum Seekers and in their unconstitutional, prolonged detention. Most pregnant women, minors, and some adults accompanying minors continue to be released. However,

---

Plaintiffs in *Abdi v. Duke*, *supra*, also reported widespread denials of parole and many comments by the Defendant officials confirming the official policy to broadly deny parole.

[25] The existence of this policy of denying parole as a matter of deterrence is also evidenced by Plaintiffs' own experiences. When Sadat I. arrived at a U.S. Port of Entry, he was promptly taken into custody and detained at a place close to the border for two weeks. Conditions were terrible, with many detainees forced to sleep on the floors or benches. There were no showers. Exh. 3 at 2, ¶ 6 (Decl. of Sadat I.). The guards told the detainees they were being punished for entering the U.S. "without legal documents." *Id.* He was also held in a placed called the "Ice Box" because of its cold conditions. Again the guards told them this was because the detainees should not have come to the U.S., and so they would tell their friends not to come. *Id.* Later, at the Stewart Detention Center he was told that he would be released on parole, but in November 2017 he was abruptly told that this was no longer possible because of "the election". Exh. 3 at 4, ¶ 11. Likewise, Mikailu J. has been told by guards that none of the Africans will be released on bond. Exh. 4 at 5, ¶ 20. Araceli R. was eligible for parole because of her various U.S. citizen sponsors, her identification, and also because of her fragile medical condition. In fact the initial evaluation of her parole request showed that she was deemed eligible, and a draft release letter was prepared. This was abruptly cancelled and she was sent a rejection letter instead. Exh. 23. Although the Plaintiffs received documents stating they would be interviewed for parole, none of them were interviewed at all. *See* Exh.1 at 2 (Decl. of Aracely R.); Exh. 2 at 1 (Hatim B.). Moreover, most rejection letters gave no information at all, or else simply stated that the person had somehow not established that he or she would be a flight risk, without any explanation of what further information was desired. *See* Exh. 22. Clearly, the decision had been made in advance that none of these POE asylum seekers would be given parole.

Defendants now require the evaluation of all other parole and similar release requests from eligible asylum seekers to include a heavily weighted factor of immigration deterrence. This has resulted in the drastically lowered rate of release reflected in the expert reports. As stated by Eleanor Acer, Senior Director for Refugee Protection at Human Rights First:

> "These practices of preventing release or severely restricting options for release of individuals who meet the criteria for parole, despite the clear directions provided in the 2009 asylum parole directive, are part of a policy to deter individual from coming to the United States to seek asylum, and in effect to punish those who have already done so." Exhibit 11 at 7, ¶23 (Decl. of Acer).

### b.   Defendants' are Liable for the Policy

This Court has jurisdiction over Plaintiffs' claims. Plaintiffs challenge the Defendants' deterrence *policy*, not the individual decisions reached in their parole cases.  See *R.I.R-L v. Johnson*, supra, 174-176; *Abdi v. Duke* 2017 WL 55995521, at *5-*6 (W.D.N.Y. 2017); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 799–800 (W.D. Tex. 2015).This was also confirmed by the Supreme Court in *Jennings v. Rodriguez*. 138 S.Ct. at 839-41.

Defendants insist that no deterrence policy exists. Certainly, the statistics, human rights reports and expert witnesses show that it does. The definition of a policy in the constitutional and APA contexts differ somewhat, as set forth below, but lead to the same results. In this case, Plaintiffs have clearly claimed that Defendants have a policy of heavily weighting the improper factor of immigration deterrence in evaluating Plaintiffs' parole requests.

"Policy" is a term of art in constitutional cases; and federal jurisprudence has set forth clear standards for d by determining whether or not a policy in fact exists.  If a municipal or agency policy does exist, the high level decision-makers who promulgate and impose it are responsible for any resulting harms. Injunctive relief will lie against the agency, municipality or other entity itself, not due to any respondeat superior claim, but because the leadership has in fact

20

inflicted the harms, while the local subordinates merely carry out their orders. There are three basic ways that such a policy may be established. The first would be an express official policy or rule; and the second would be a direct command from a policy-making officer. The third is through a custom, practice and pattern of similar events. *See  Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 690-691(1978); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 127 (1988). Certain policies, especially unlawful ones, will be unwritten. *Praprotnik*, 485 U.S., at 127. The harm need not be inflicted in every potential instance. Claims of a policy of excessive force by officers in a certain police department need not be supported by evidence that each and every suspect is improperly battered. A Plaintiff need only show a widespread pattern of similar actions. There is no need for numerous incidents, if such incidents are egregious, or a substantial number are in evidence. *Carter v. District of Columbia*, 795 F.2d 116, 123-24 (D.C. Cir. 1986); *Cox v. District of Columbia*, 821 F.Supp.2d. 1,11 (D.D.C. 1993); *Warren v. District of Columbia*, 353 F.3d 36,38 (D.D.C. 2004).

The significance of such a policy in this case is substantial. First, it becomes clear that the local subordinates never really exercised their full and fair discretion in Plaintiffs' cases, but rather simply followed their orders to deny parole *despite* Plaintiffs' full eligibility. The policy also indicates a systemic violation of the 2010 Morton Policy Directive. Moreover, Plaintiffs cannot obtain complete relief and protection unless the injunction reaches the high level officials themselves. The unconstitutional policy itself must be addressed or Plaintiffs remain in danger. Indeed, even if named Defendants were now to grant parole, the Plaintiff could be re-detained at any later time and subjected to the same unconstitutional policy being carried out by a different subordinate.

Under the APA, the courts evaluate whether or not the practice of deterring immigration through the denial of parole is in fact a "final agency action." 5 U.S.C. § 704. If not, there is no review. As set forth in *Bennet v. Spear*, 520 U.S. 154, 177-178 (1997), an agency action is "final" if it is the consummation of agency action, and if legal consequences flow from such action. The policy need not be published. *Venetian Casino Resort, LLC v. E.E.O.C.*, 530 F. 3d 925, 931(D.C. Cir. 2008); *see also Appalachian Power Co. v. EPA*, 208 F.3d. 1015, 1022 (D.C. Cir. 2000). Accordingly, Plaintiffs may challenge the Defendants parole/deterrence policy as unconstitutional, as well as arbitrary, irrational and capricious because it requires widespread violations of the agency's own binding regulations and policies.[26] Because the policy adds substantive elements to the parole statute and regulations, as opposed to merely clarifying them, it is also void for failure to comply with the APA's procedural requirements. 5 U.S.C. § 553

Defendants may not simply announce that they have no policy. Plaintiffs have provided substantial evidence, including human rights studies, a history of Defendants' many deterrence efforts, official declarations, statements by local officers, statements by expert witnesses, and statistics indicating a shocking drop in grants of parole to Port of Entry Asylum seekers. The parole/deterrence policy is established.

### c.  Plaintiffs Will Prevail on Their APA Claims

Defendants' policy of heavily weighting immigration deterrence when making parole determinations violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* As explained below, all of the threshold requirements for APA claims are met in this case.

### i. All Threshold Requirements for APA Claims are Met

Plaintiffs fully meet the threshold elements of their APA claims. Plaintiffs challenge a (1) "final agency action," (2) "for which there is no other adequate remedy in court," and (3) that

.

action is not "committed to agency discretion by law" or precluded by another statute. 5 U.S.C. §§ 701(a), 704.

   *1. **Final Agency Action*** – As discussed above Defendants' promulgation and enforcement of their parole/deterrence policy, resulting in prolonged detention of the Plaintiffs, constitutes final agency action. The policy marks the consummation of the agency's decision-making process and is an action in which rights or obligations have been determined or from which legal consequences flow. *See Bennett v. Spear*, 520 U.S. 154, 177-178 (1997); *see also Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925, 931 (D.C. Cir. 2008), *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 56 (D.C. Cir. 2016), *cert. denied sub nom. Scenic Am., Inc. v. Dep't of Transp.*, 138 S. Ct. 2 (2017). Courts determine the finality of agency action in a pragmatic way "with any eye toward whether the agency action is definitive and has direct and immediate adverse impacts on the challenger of the action." *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 37 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001). As the Third Amended Complaint makes clear, the Defendants' policy has had direct and immediate adverse impact upon the Plaintiffs.  Rights have been determined and legal consequences have certainly occurred. S*ee R.I.L-R*, 80 F.Supp.3d at 184 (finding final agency action because "DHS's policy of considering deterrence has profound and immediate consequences" for the plaintiff detainees).

   Plaintiffs have already requested reconsideration of their parole requests, and were again denied. Unlike persons who enter the country unlawfully, Plaintiffs have no recourse to review by an immigration judge. *See* 8 C.F.R. § 1003.19(h)(2)(i). Defendants' denials of parole, pursuant to their new parole/deterrence policy, are thus final. Moreover, there is no adequate agency procedure for challenging the policy itself. The existence of any optional administrative

appeals procedures would not affect finality here. *See Darby v. Cisneros*, 509 U.S. 137, 147 (1993) ("[I]t would be inconsistent with the plain language of the [APA] for courts to require litigants to exhaust optional appeals."). An agency action does not have to be in writing in order to be final. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d at 184–85 (D.D.C. 2015) ("[A] contrary rule would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.") (internal citations omitted).

Defendants have thus reached the consummation of their decision-making process with respect to the challenged parole/deterrence policy. *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (agency's "settled position" which "officials in the field are bound to apply" was final agency action), *also R.I.L-R*, 80 F.Supp.3d at 184 (finding final agency action because "DHS's policy of considering deterrence has profound and immediate consequences" for the plaintiff detainees). The statistics, reports, witness statements, and expert declarations set forth above confirm that the parole denial policy is well settled, binding upon local officials, and has immediate impact.

***2. No other adequate remedy in court*** – An adequate alternative remedy to the APA only exists where there is clear and convincing evidence of a legislative intent to create a special, alternative remedy. *See Citizens for Responsibility & Ethics in Washington v. United States Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (internal citations omitted). The "other adequate remedy" limitation was meant only to avoid duplicating "previously established special statutory procedures for review of agency decisions." *See Darby v. Cisneros*, 509 U.S. 137, 146 (1993).

Plaintiffs have no other remedy other than bringing this suit. Immigration Courts do not provide an adequate alternative remedy. The Government takes the position that detainees held pursuant to 8 U.S.C. § 1225(b) are ineligible for bond hearings regardless of the length of their

detention. *See* 8 C.F.R. § 1003.19(h)(2)(i). Moreover, any relief available through the immigration courts is inadequate because it would necessarily be confined to individual parole determinations and would not address the method by which the agency makes parole decisions. *See Cohen v. United States*, 650 F.3d 717, 732 (D.C. Cir. 2011) (en banc) (administrative remedy not adequate where "the relief would be individualized" and the APA challenge targeted the agency's procedures rather than the agency's substantive decision). Plaintiffs, even if released, could be detained again in the future and face precisely the same unconstitutional situation.

Nor does habeas corpus also provide an adequate remedy for the Plaintiffs. Habeas corpus is a general statute just like the APA, not a "previously established special statutory procedure." *Darby*, 509 U.S. at 146. Habeas review and APA review may coexist. *See Davis v. U.S. Sentencing Com'n*, 716 F.3d 660, 666 (2013) (holding that habeas is only required where success on the merits will "necessarily imply the invalidity of confinement or shorten its duration." Otherwise plaintiffs can bring "a variety of causes of action"); *see also Lee v. Reno*, 15 F.Supp.2d 26, 33 (D.D.C. 1998); *see also Brownell v. We Shung*, 352 U.S. 180, 181 (1956) (holding that immigration actions can be challenged through habeas corpus or by seeking a declaratory judgment under the APA); *see also R.I.L-R*, 80 F.Supp.3d 164, 185-86. In short, the clear and convincing evidence of legislative intent necessary to find habeas corpus as an exclusive adequate alternative remedy is lacking.

*3. **Not committed to agency discretion or precluded by statute*** – A final agency action is committed to agency discretion only in "rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971); *see also Watervale Marine Co., Ltd. V. DHS*, 55 F.Supp.3d 124, 135 (D.D.C. 2014) ("It is well established that the exception…is a very narrow one.").

To determine whether there is "law to apply" that provides "judicially manageable standards" for judging an agency's exercise of discretion, courts look to the statutory text, the agency's regulations, and informal agency guidance that govern the agency's challenged action. *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016) (citing *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)); *see also Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987) ("Judicially manageable standards may be found in formal and informal policy statements and regulations as well as in statutes…."); *see also Clifford v. Pena*, 77 F.3d 1414, 1417 (D.C. Cir. 1996) (where words of the statute appeared "unrestricted and undefined" court found that over the years the agency "supplied a list of factors to guide its…judgment").

In this case there are clear standards to be applied.[27] The parole statute itself cabins Defendants' exercise of discretion by requiring parole determination to be made "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Regulations and agency policies also provide judicially manageable standards. 8 C.F.R. § 212.5 specifies several categories of individuals for whom a grant of parole would be proper.  Among these categories are "aliens whose continued detention is not in the public interest…." 8 C.F.R. § 212.5(b)(5). In turn, the 2010 Morton Policy Directive states that "when an arriving alien found to have a credible fear establishes to the satisfaction of [ICE] that his or her identity and that he or she presents neither a flight risk nor danger to the community, [ICE] should…parole the alien on the bases that his or her continued detention is not in the public

---

[27] Plaintiffs also note that the challenged agency action is not committed to agency discretion because agencies do not have the discretion to violate the constitution. *See Doe v. Casey,* 796 F.2d 1508. 1517–18 n. 33 (D.C. Cir. 1986); *WWHT, Inc. v. F.C.C.,* 656 F.2d 807, 815 n.15 (D.C.Cir.1981) ("In no event would a finding of non-reviewability on the ground that an action is committed to agency discretion preclude judicial review when constitutional violations have been alleged."). As explained in Section VI, *supra*, Plaintiffs are alleging that Defendants policy of heavily weighing the deterrence factor in make parole determinations is unconstitutional.

interest….” *See* Exh. 13 at 3. Given these standards it is clear that parole decisions have not been exclusively committed to agency discretion.

Congress also has not evidenced a clear and convincing intent to bar judicial review. *See Traynor v. Turnage*, 485 U.S. 535, 542-44 (1988) (finding statute that barred judicial review of "any question of law or fact" did not clearly and convincingly bar petitioners' discrimination claim). The jurisdictional bars in 8 U.S.C. § 1252 are inapplicable because Plaintiffs challenge an agency action that has not been expressly barred by a statute, and because Plaintiffs challenge the non-discretionary *procedures* by which Defendants make parole determinations, rather than an individualized parole determination itself. *See Jennings v. Rodriguez*, 138 S.Ct. 830, 841-42 (2018) (challenge to statutory framework not barred); *Medina-Morales v. Ashcroft*, 371 F.3d 520, 528 (9th Cir. 2004) ("[T]he jurisdictional bar in §1252(a)(2)(B)(ii) applies only to acts over which a statute gives the [Secretary of Homeland Security] pure discretion unguided by legal standards or statutory guidelines."); *see also Geneme v. Holder*, 935 F.Supp.2d 184, 192 (D.C. Cir. 2013); see *also Abdi v. Duke*, No. 1:17-CV-0721 EAW, 2017 WL 5599521, at *6 (W.D.N.Y. Nov. 17, 2017) (1252(a)(2)(B)(ii) did not bar petitioners habeas claims because they challenged procedure defendants used to make parole determinations).

### ii. Defendants' Policy Violates the Foreign Affairs Reform and Restructuring Act  (5 U.S.C. § 706(2)(A))

Defendants' parole/deterrence Policy also violates the Foreign Affairs Reform and Restructuring Act (FARRA) and its regulations, and is therefore "not in accordance with law." 5 U.S.C. § 706(2)(A). It can hardly be argued that an agency's actions to *de facto* force POE Asylum Seekers to return to their dangerous homelands, is not in conflict with the FARRA's clear ban on *refoulement*. *See* 8 U.S.C. § 1231 note ("It shall be the policy of the United States not to expel, extradite, or *otherwise effect* the involuntary return of any person to a country in

27

which there are substantial grounds for believing the person would be in danger of being

subjected to torture, regardless of whether the person is physically present in the United

States.")(emphasis added). Defendants' Parole/Deterrence Policy directly violates FARRA.

Former Plaintiff Junior M. returned to Honduras, a country with one of the highest murder rates

in the world[28] where his two brothers were murdered, because he could not bear further detention

under Defendants' policy. *See* Exhs. 5 and 5A (Decl. of Junior M.). Furthermore, because

Defendants' policy of authorizing prolonged detention for the purpose of deterring other

immigrants is not in accordance with their authority under the constitution, FARRA's provision

regarding authority to detain is inapplicable to Plaintiffs' claim under 5 U.S.C. § 706(2)(A). *See*

8 U.S.C. § 1231(e) note ("Nothing in [FARRA] shall be construed as limiting the authority of the

Attorney General to detain any person *under any provision of law*, including but not limited

to…[the INA].") (emphasis added)

### iii. Defendants' Policy is Arbitrary and Capricious (5 U.S.C. § 706(2)(A))

In assessing whether an agency action is arbitrary and capricious, courts must consider

"whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (citing *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)). Most

importantly, an agency is bound to adhere to its own regulations.[29] *See United States ex rel.*

---

[28] *See* United Nations Office on Drugs and Crime, *Global Study on Homicide 2013*, pg. 24, *available at*: https://www.unodc.org/documents/gsh/pdfs/2014_GLOBAL_HOMICIDE_BOOK_web.pdf (accessed March 21, 2018).

[29] The use of discretionary language in agency regulations does not excuse the agency from considering the relevant factors described by those regulations. *See Cardoza v. Commodity Futures Trading Comm'n*, 768 F.2d 1542, 1550 (7th Cir. 1985) ("The use of the term 'may' does not indicate that the Commission is free to ignore factors that in the past it has designated as highly relevant. Nor should the use of such discretionary language in a regulation exempt an

*Accardi v. Shaughnessy*, 347 U.S. 260, 265-68 (1954) (describing BIA's failure to follow its own regulations in suspension of deportation); *see also Fuller v. Winter*, 538 F.Supp.2d 179, 186 (D.D.C. 2008) (failure to follow regulations can lead to "arbitrary and capricious decision-making in violation of the APA."). Failure to do so is "fatal to the deviant action." *Way of Life Television Network, Inc. v. F.C.C.*, 593 F.2d 1356, 1359 (D.C. Cir. 1979). It is thus necessary to determine which of the Defendants' rules and policies require Defendants' compliance.

The 2010 Morton Policy Directive is clearly binding on the agency and its officers. *See* Exh. 15 at 9-10 ("[T]he ICE policy directive establishing standards and procedures for the parole of certain arriving aliens found to have a credible fear of persecution or torture shall remain in full force and effect."); *see also Abdi*, 280 F.Supp.3d 373, 389 (W.D.N.Y. 2017) (the Government "represented to the Supreme Court in February 2017 that the ICE Directive 'remains in full force and effect.'). It serves to greatly clarify and explain the eligibility for parole of POE Asylum Seekers like the Plaintiffs, and it sets forth proper procedures for determining parole requests. Moreover, the 2010 Morton Policy Directive has a clear impact on the rights of all POE Asylum Seekers like the Plaintiffs, and hence is binding on the agency and its officers.  "[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures," even if those procedures are not outlined in a legislative rule. *Morton v. Ruiz*, 415 U.S. 199, 235 (1974); *see also Lopez v. Federal Aviation Admin.*, 318 F.3d 242, 247 (D.C. Cir. 2003) (distinguishing between procedural rules benefitting the agency and procedural rules affecting the rights of third parties).

The clearly binding nature of the 2010 ICE Morton Policy Directive was discussed in the recent case of *Abdi v. Duke*, also concerning parole of POE Asylum Seekers. Defendants cited

---

agency from its obligation to follow its rules or policies upon which the public justifiably has come to rely.").

rote disclaimers contained in the same 2010 Morton Policy Directive to support their argument

that the Directive is non-binding. The court ruled as follows:

> "In short, Respondents cite no case law that would compel the conclusion that
> agencies can avoid application of *Accardi* by simply disclaiming any binding
> effect in the directive itself. To find otherwise would render the teachings of
> *Accardi* and its progeny meaningless. It is not the internal policy itself that creates
> (or eliminates) the rights of enforcement. Rather, the relevancy of the internal
> policy is to ascertain whether it pertains to individual rights. If so, under binding
> Supreme Court and Second Circuit precedent, that internal policy must be
> followed. In the words of the Supreme Court, "[w]here the rights of individuals
> are affected, it is incumbent upon agencies to follow their own procedures. This is
> so even where the internal procedures are possibly more rigorous than otherwise
> would be required...." 280 F.3d 373, 389 (W.D.N.Y. 2017) (citing *Morton*, 415
> U.S. at 235).

The court in *Abdi* also noted that Defendants had testified to the Supreme Court in

February 2017 that the Morton Policy Directive "remains in full force and effect." *Id*. In the

Supreme Court oral argument for *Jennings, supra,* Defendants touted the ICE Morton Directive

as a reason for their position that bond hearings are not required for asylum-seekers detained

under 8 U.S.C. § 1225(b). ICE representatives stated to the Supreme Court that "the existing

framework provides more than sufficient process." *Id.* Also, ICE officials also stated that

"DHS's parole decisions are governed by DHS's 2010 Parole Guidelines which establish

extensive procedural safeguards" in response to a request for rule making from the National

Immigrant Justice Center. Exh. 24 at 8 (EOIR General Counsel Response to Petition for

Rulemaking).

By contrast, the Defendants' new parole/deterrence policy is not well reasoned, carefully

considered, or even put into writing. To the extent that Defendants' parole/deterrence policy

represents their interpretation of 8 C.F.R. § 212.5, it is entitled to no deference because it directly

conflicts with that provision's requirement of "case-by-case" parole evaluations and its list of

groups of aliens for whom parole would "generally be justified" provided they present neither a

security risk nor a risk of absconding. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)(deference is inappropriate where the agency's interpretation is "plainly erroneous or inconsistent with the regulation" and when "there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question.") (citations omitted). Indeed, as discussed at Section VI.c., *supra*, deterrence is an unconstitutional and unlawful consideration with regards to P.O.E. asylum seekers. The new policy also conflicts with the core legislative goals of protecting victims of repression and preventing *refoulement*.

Moreover, as explained in Section VI.e.iv, *infra*, this new policy is legislative and not interpretive, and hence required processing through proper notice and comment proceedings. Nor can this new policy serve to rescind the 2010 Morton Policy Memorandum, because it adversely affects POE Asylum Seekers and was not published in the Federal Register. *See* 5 U.S.C. § 552(a) ("Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a mater required to be published in the Federal Register and not so published."). In short, the parole/deterrence policy is entitled to no weight at all.

Accordingly, the Defendants are required to comply with the 2010 Morton Policy Memorandum. All agency policies and actions taken to covertly deny parole to most eligible POE Asylum Seekers for the purpose of immigration deterrence are unlawful.

The Defendants have thus acted in an arbitrary, irrational and capricious manner in violations of 5 U.S.C. § 706(2)(A) by: (a) engaging in the systemic violations of the terms of the 2010 Morton Policy Directive and federal regulations regarding parole of POE Asylum Seekers; (b) refusing to exercise their full and independent discretion on a case-by-case basis in

determining eligibility of POE Asylum Seekers for parole; and (c) heavily weighting the improper factor of immigration deterrence, in order to deny parole and constructively force the Plaintiffs and others to return to their dangerous homelands (*refoulement*), in violation of U.S. law and regulations. Deterrence of other immigrants has no bearing at all to any flight risk or danger to the community. *See R.I.L-R*, 80 F.Supp.3d at 188-89. Moreover, deterrence is incompatible with the urgent humanitarian considerations that would require a grant of parole. The challenged policy is therefore arbitrary and capricious. *See Judulang*, 565 U.S. at 55 ("A method for disfavoring deportable aliens…that neither focuses nor relates to an alien's fitness to remain in the country – is arbitrary and capricious.").

### iv. Defendants' Policy was Adopted without Observance of Required Legal Procedure (5 U.S.C. § 706(2)(D))

The APA provides that a reviewing court "shall…hold unlawful and set aside agency action…found to be without observance of procedure required by law." 5 U.S.C. § 706(2)(D). The procedure required for legislative rules, as opposed to interpretive rules or general policy statements, is set out in 5 U.S.C. § 553. Legislative rules are agency actions that "purport[] to impose legally binding obligations or prohibitions on regulated parties or set[] forth legally binding requirements for a private party to obtain a benefit." *Nio v. United States Department of Homeland Security*, 270 F.Supp.3d 49 (D.C. Cir. 2017). Legislative amendments to legislative rules are also subject to notice and comment procedures. *Sierra Club v. Environmental Protection Agency*, 873 F.3d 946, 952 (D.C. Cir. 2017) (citing *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir 1993)).

Defendants' policy of heavily weighting immigration deterrence when considering parole requests adds an entirely new and unrelated consideration to Defendants' parole calculus as set out in current legislative rule, 8 C.F.R. § 212.5. The policy is itself legislative because it amends

a current rule and eviscerates POE Asylum Seekers' eligibility for parole by adding an irrelevant criteria to Defendants' parole calculus. As such, Defendants' policy requires the notice and comment set forth in the APA. *Am. Min. Cong.*, *supra*, 995 F.2d at 1112 (D.C. Cir. 1993).

None of the exceptions to the APA's procedural requirements apply in this case. Defendants' policy is not interpretive. 5 U.S.C. § 553(b)(A). Interpretive rules clarify a statutory or regulatory term, remind parties of existing statutory or regulatory duties, or merely track preexisting requirements and explain something the statute or regulation already required. *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 236-37 (D.C. Cir. 1992).The 2010 Morton Policy Directive is an example. By contrast, Defendants' policy of heavily weighting deterrence clearly adds new and very different substantive criteria to their parole consideration. Defendants' policy is also not "general statement of policy." 5 U.S.C. § 553(b)(A). Such general statements leave agency officials free to exercise their informed discretion as situations arise. *See Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978). Defendants' Parole Denial Policy is obviously binding nation-wide, as evidenced by the statistics and reports set forth above

### v. Defendants' Policy is Contrary to Plaintiffs' Constitutional Rights (5 U.S.C. § 706(2)(B))

Agency action must be set aside if it is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B); *see also Trudeau v. Federal Trade Com'n*, 456 F.3d 178, 188 (D.C. Cir. 2006) ("[T]he APA's 'scope of review' provision permits [the court to find a final agency action] unlawful if [it] find[s] it 'contrary to constitutional right.'").[30] Courts owe no

---

[30] Plaintiffs note that the APA's waiver of sovereign immunity, 5 U.S.C. § 702, applies to their independent constitutional claims as well as claims regarding agency action that is "contrary to constitutional right" brought under the APA. *See Trudeau*, 456 F.3d, at 186 ("the APA's waiver

deference to agency interpretations of statutes or regulations when it "presents serious constitutional difficulties." *National Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) (citing *Chamber of Commerce v. FEC*, 69 F.3d 600, 605 (D.C. Cir. 1995)).

As argued below, Plaintiffs have clearly established the unconstitutional nature of the Defendants' policy of heavily weighting immigration deterrence when considering parole requests from POE Asylum Seekers.

### d.  Defendants' Actions Violate Due Process

Like all other persons present within the United States, the Plaintiffs are protected by the Due Process clause of the Fifth Amendment. Defendants often misinterpret the jurisprudence delineating the constitutional rights of P.O.E. Asylum Seekers. As discussed below such applicants are subject to the "entry fiction" for the purpose of determining the level of *procedural* due process protections required in their immigration cases. However, this fiction does not strip the Plaintiffs of *all* procedural rights. The proper level of procedural protections depends on the circumstances presented, and the importance of the rights in question. Importantly, there is no limitation at all on Plaintiffs' *substantive* due process right to humane treatment and personal liberty.  As the cases set forth below make clear, P.O.E. asylum seekers cannot be physically abused or subjected to prolonged and unjustified detention.

The two due process doctrines may not be conflated. The standard procedural due process analysis is based upon two questions: 1.) Is any life, liberty or property interest to trigger the due process clause, and 2.) If the due process clause does apply, how much process is due. *See e.g. Cleveland Bd. of Educ. v. Loudermill*, 470 U.S.532, 541 (1985). In determining the procedural protections due to immigrants, the Courts have examined the person's length of stay in this

---

of sovereign immunity applies to any suit [for declaratory or injunctive relief] whether under the APA or not.") (quoting *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)).

country and his or her ties to the community. Accordingly, persons arriving at ports of entry have been granted lesser procedural safeguards. In general, whatever procedures granted by Congress are usually deemed adequate. However, Congress is always bound by the constitution. *Zadvydas v. Davis,* 533 U.S. 678, 694 (2001).

In a substantive due process case, the courts must see if the official actions are so harmful as to violate the Fifth Amendment even if adequate notice and a hearing have been granted. *Foucha v. Louisiana*, 504 U.S. 71 (1992); *U.S. v. Salerno,* 481 U.S. at 750 (1987); *Obergefelle v. Hodges*, 135 S.Ct. 2584, 2616 (2015). In *Obergefelle,* the Supreme Court struck down state laws prohibiting same sex marriage, noting that:

> "This Court has interpreted the Due Process Clause to include a "substantive" component that protects certain liberty interests against state deprivation "no matter what process is provided."…The theory is that some liberties are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," and therefore cannot be deprived without compelling justification…." 135 S.Ct. at 2616.

As discussed below, substantive Due Process protections apply to all persons. *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 396 (3d Cir.1999), *amended* (Dec. 30, 1999). As stated in *Jennings v. Rodriguez*:

> "We cannot here engage in this legal fiction. No one can claim, nor since the time of slavery has anyone…successfully claimed, that the persons held within the United States are totally without constitutional protection. Whatever the fiction, would the Constitution leave the government free to starve, beat or lash those held within our boundaries?" 138 S.Ct. 830, 862 (2018)( Justice Brennan dissenting).

Unfortunately, many cases improperly cite *Shaughnessy v. Mezei*, 345 U.S. 206 (1953) for the principle that excludable persons such as the Plaintiffs have no constitutional rights. This is untrue. That McCarthy era case involved an immigrant who had left the United States, and was excluded when he sought to return. The U.S. government deemed him a potentially dangerous person. He languished at Ellis Island for some time, unable to enter the U.S., yet also unable to

find an alternative country that would accept him. The Supreme Court found no constitutional violations in this situation. *Mezei* is of course distinguishable in that it involves a *final* order of exclusion of a person specifically deemed a threat to this country. More importantly, the viability of this case is now very much in doubt. *See i.e. Rodriguez v. Robbins*, 804 F.3d 1060, 1070 (9th Cir. 2013), reversed on other grounds, 138 S.Ct. 830 (2018) (*Mezei* was "decided under pre-[Immigration Reform and Immigrant Responsibility Act of 1996] and , as such, [was] inapposite" to plaintiffs' claims regarding individuals detained pursuant to 8 U.S.C. § 1225(b)).

U.S. jurisprudence makes it abundantly clear that personal liberty lies at the very heart of substantive Due Process protections, requiring heightened scrutiny and a compelling government interest. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The courts have made it equally clear that substantive due process protections fully apply to the Plaintiffs in this case. Throughout the years the courts have frequently ruled that excludable applicants, as "persons," are of course protected by substantive due process. *See Lynch v. Canatella,* 810 F.2d 1363, 1373-1374 (5th Cir.1987)('entry fiction' that excludable aliens does not limit the right of excludable aliens to due process requirements of humane treatment); *Martinez-Aguero v. Gonzalez,* 459 F.3d 618 (5th Cir. 2006) (physical abuse of person seeking entry at ICE checkpoint); As stated by Justice Powell in *Jean v. Nelson,* 472 U.S. 846 (1985):

> "Under this view, the Attorney General, for example, could invoke legitimate immigration goals to stop feeding all detained aliens….surely we would not condone mass starvation….Only the most perverse reading of the constitution would deny detained aliens the right to bring constitutional challenges to the most basic conditions of their confinement" *Jean*, *id*. at 874-875.

This reasoning was echoed in *Rosales-Garcia v. Holland*, 322 F. 3d 386, 409-10 (6th Cir.  2003):

> "If excludable aliens were not protected by even the substantive component of constitutional due process, as the government appears to argue, we do not see why the United States government could not torture or summarily execute them. Because we do not believe that our Constitution could permit persons living in the

> United States—whether they can be admitted for permanent residence or not—to be subjected to *any* government action without limit, we conclude that government treatment of excludable aliens *must* implicate the Due Process Clause of the Fifth Amendment."

*See also Maldonado v. Macias*, 150 F. Supp. 3d 788, 799–800 (W.D. Tex. 2015); *Jennings v. Rodriguez,* 138 S.Ct. 830, 862 (2018) (J. Brennan dissenting).

In rapidly growing jurisprudence, the courts have held that immigrants in general cannot be subjected to prolonged or indefinite detention without running afoul of the substantive due process requirements. More recent Supreme Court rulings like *Zadvydas v. Davis*, 533 U.S. 678 (2001) and *Clark v. Martinez*, 543 U.S. 371 (2005), make it clear that P.O.E. Asylum Seekers have substantive due process protections with regards to prolonged detention.

In *Zadvydas* the Supreme Court dealt with a post-removal order detention similar to the situation presented in *Mezei, supra*. The Court was troubled by the fact that the lengthy post removal detention periods presented were not reasonably related to the state's purposes of protecting communities and ensuring the immigrant's appearance at hearings. *Zadvydas*, 533 U.S. at 690-92. Noting that a statute permitting the indefinite detention of an alien would raise constitutional problems, the Court held that such detention must be limited to a period reasonably necessary to accomplish the removal. *Id*. at 689. Beyond that period, due process requires strong procedural protections as well as a finding that the person is dangerous. *Id*. at 691-92. As discussed below, this ruling mirrors the constitutional standards for civil detention of U.S. citizens. In *Demore v. Kim*, 538 U.S. 510 (2003), the Court rejected a constitutional challenge to long-term detention of persons convicted of a crime. 538 U.S. at 517-18. However, the Court based its ruling in part on the fact that the time periods in question averaged 47 days for cases in which the detainee did not file an administrative appeal (85% of all removal cases at the time) and 4 months for cases appealed to the Board of Immigration Appeals. *Id*. at 529.

In *Clark v. Martinez*, the Supreme Court extended the *Zadvydas* ruling to the benefit of Cuban *Marielitos* who had been paroled into the United States, then committed crimes and were ordered deported. The Court expressly ruled that dicta in the *Zadvydas* case in no way stripped excludable persons of their rights to be free of prolonged and unjustified detention. 543 U.S. at 377-79.

The question of *all* persons' rights to be free of unjustified prolonged detention is strongly underscored in *Boumedienne v. Bush,* 553 U.S. 723 (2008). In that case, the Court held that habeas corpus was available to long detained prisoners at Guantanamo to challenge military tribunal rulings that they were indeed enemy combatants. The fundamental right of being free from arbitrary detention, especially long- term or indefinite detention, is discussed throughout. Hence even persons who have never been in the U.S. at all, and who are *de jure* physically outside the U.S. but under complete U.S. control, have basic rights to challenge the basis of their detention and be heard by an independent decision- maker .[31]

### i.   Defendants are Violating Plaintiffs' Substantive Due Process Rights

The courts must begin by evaluating the nature of the asserted right. *Reno v. Flores*, 507 U.S. 292, 301 (1993). As stated in *Foucha v. Louisiana, supra,* freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action. Thus "[i]t is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection….We have always been careful not to

---

[31] The *Boumedienne* ruling relies heavily on the separation of powers and the need to insist on review by the judiciary to avoid a rogue operation or agency. The opinion strongly underscores the need for an independent judicial review of an agency's decision to indefinitely detain a person, i.e. serving as both judge and jailor. Precisely the same situation is raised in §1225 cases. *Boumedienne*, 553 U.S. at 797 ("There are further considerations, however. Security subsists, too, in fidelity to freedom's first principles. Chief among these are freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers. It is from these principles that the judicial authority to consider petitions for habeas corpus relief derives.")

'minimize the importance and fundamental nature' of the individual's right to liberty." *Foucha*, 504 U.S. 71, 80 (citing *U.S. v. Salerno,* 481 U.S. at 750 (1987)); *see also Zadvydas*, 533 US. at 690 (2001); *Turner v. Rogers*, 564 U.S. 431, 445 (2011).

Given the fundamental importance of the right to liberty, the Defendants must present evidence of compelling government interests in subjecting POE Asylum Seekers to prolonged detention in *de facto* prisons. As set forth above, the government lacks any adequate justification. For precisely these reasons, many courts have ruled that prolonged detention of POE Asylum Seekers would violate substantive due process. *Maldonado v Macias*, 150 F. Supp.3d 788, 801-802 (W.D. Tex. 2015). To avoid striking down the immigration statutes on constitutional grounds, these courts have interpreted the statutes to require bond hearings before an immigration judge within six months. *Id.* at 807;[32] *Ahad v. Lowe,* 235 F. Supp. 3d 676, 687-88 (M.D. PA. 2017) ("The rising sea of case law acknowledges the historic development of due process jurisprudence in this field. That developing case law has consistently determined that detained aliens are entitled to some essential measure of due process in the form of a bond hearing once their detention reaches an unreasonable duration."); *Bautista v. Sabol*, 862 F.supp.2d 375, 381(M.D. Pa. 2012); *Abdi v. Duke,* 280 F.Supp.3d 373, 410-11 (W.D.N.Y 2017). The same conclusions have been reached in courts addressing other prolonged detention issues arising in the immigration context. *Rodriguez v. Robbins,* 715 F.3d 1127 (9th Cir. 2013), and cases cited therein.

---

[32] "…[T]he Constitution may well preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights. The Constitution demands greater procedural protection even for property. The serious constitutional problem arising out of a statute that, in these circumstances, permits an indefinite, perhaps permanent, deprivation of human liberty without any such protection is obvious." *Maldonado,*150 F. Supp.3d  at 807 (citing  *Zadvydas*, 533 U.S. at 692).

The Supreme Court in *Jennings v. Rodriguez,* 138 S.Ct. 830 (2018) recently overturned the Ninth Circuit's interpretation of the various immigration statutory provisions giving rise to prolonged detention. However, in that case the Court simply ruled that the statutes cannot be so radically revised by the judiciary. Instead, the constitutional questions themselves must be evaluated and decided. Nevertheless, as all of the above cited cases make clear, prolonged detention without a bond hearing, *is* unconstitutional. Plaintiffs here do not ask this Court to "interpret" the immigration statutory scheme. Rather, Plaintiffs seek a direct ruling as to the constitutionality of their prolonged detention without a bond hearing for purposes of immigration deterrence. Plaintiffs' prayer for relief is quite limited. They seek a narrow ruling that 8 C.F.R. § 1003.19(h)(2)(i)(B) is unconstitutional as applied to POE Asylum Seekers. This is the regulation which excludes the Plaintiffs from any custody review and bond hearing before an immigration judge. Of all the categories of immigrants subject to this bar, Plaintiffs stand alone as persons who have never committed a crime or even entered the United States without inspection.

This relief is fully supported by long term jurisprudence. In our society, liberty is the norm, and detention is the carefully limited exception.  All parallel areas of law reach the same conclusions. *See Salerno,* 481 U.S. at 755. For example, a deprivation of liberty is not justified if it results from a person's indigent status. *See Turner v. Rogers*, 564 U.S. 431 (2011); *see also Bearden v. Georgia*, 461 U.S. 660 (1983). Likewise only in narrow, non-punitive circumstances involving a danger to the community, will mental illness outweigh the individual's constitutionally protected interests, and justify detention. *Addington v. Texas,* 441 U.S. 418, 431-433 (1979), (in a civil commitment proceeding, the State is required to prove by clear and convincing evidence the person is mentally ill, and that commitment is needed to protect the patient or the community); *Foucha v. Louisiana,* 504 U.S. 71, 81–83 (1992) (striking down

insanity-related detention system that placed burden of proof on detainee re the issue of danger

to the community).  Such persons may only be committed or imprisoned after a rigorous hearing

is convened and the government meets the high standards of proof of such dangers.

In *Salerno,* supra, the statute carefully limited the circumstances permitting long-term

detention of persons charged with a crime: to the most serious of crimes, only after the

Government convinces a neutral decision-maker that no conditions of release could reasonably

assure public safety; and limited by the Speedy Trial Act. 481 U.S. at 739-40.

The prolonged detention of the Plaintiffs in this case provides none of these protections.

Plaintiffs present no danger to society. Moreover, as the Plaintiffs voluntarily presented

themselves to U.S. officials, in can hardly be said that they present a flight risk. Yet they are

denied any review or bond hearing before an immigration judge or any other independent fact

finder. Thus Defendants have never been required to justify their actions.[33]

This is untenable. As asylum seekers, Plaintiffs are the intended beneficiaries of the

statutory scheme. As noted above, far more protections are given to persons charged with very

serious crimes. *Salerno, supra,* 481 U.S. at 750–52. Defendants have had ample time to

investigate the Plaintiffs.  Defendants also have a wide range of release conditions; from bond, to

agency supervision, to ankle monitors. Defendants have chosen prolonged imprisonment instead.

Individuals detained in ICE facilities pending the determination of their cases, are civil

detainees. This raises serious questions as to whether or not Plaintiffs may be placed in prison-

like conditions at all. Plaintiffs do not raise this issue as a separate cause of action at this time,

hence this Court need not rule thereon. Plaintiffs note, however, the following jurisprudence.

---

[33] As evidenced in *Boumedienne v. Bush*, 553 U.S. 723 (2008)*,* in cases of prolonged detention,
an agency cannot act as judge and jailor. There must be access to an independent decision maker.

As stated in *Youngberg v. Romeo*, 457 U.S. 307, 321-322 (1982), persons who have been civilly committed are entitled to *more* considerate treatment and conditions than criminals whose conditions of confinement are designed to punish. *See also King v. County of Los Angeles*, 2018 WL 1247002, at *5-6 (9th Cir. 2018)(conditions for civil detainee are presumptively punitive if the same or similar to conditions of pre-trial detainees); *Jones v. Blanas*, 393 F. 3d 918, 934 (9th Cir. 2004)(in civil context, presumption of punitive arise when conditions are the same as those of criminal inmates); *Lynch v. Baxley*, 744 F. 2d 1452,1458-1461 (11th Cir. 1984)(mentally ill person cannot be held in local jail pending civil commitment proceedings).

The government cannot attain its objectives by means that "broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488 (1960) (less restrictive means analysis used in substantive due process cases). *See also Covington v. Harris,* 419 F.2d 617, 623 (D.C.Cir.1969); *O'Connor v. Donaldson,* 422 U.S. 563, 575 (1975) (civil incarceration is unconstitutional where a less restrictive alternative would suffice). "Due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana,* 406 U.S. 715, 738 (1972); *see also Young*, 531 U.S. at 265 (2001); *Demery v. Arpaio,* 378 F.3d 1020, 1028 (9th Cir. 2004) (quoting *Bell v. Wolfish,* 441 U.S. 520, 538 (1979)).

Defendants have a broad range of less restrictive alternatives available to them. Defendants cannot choose to utilize only the harshest measures without any justification. There may well be certain civil detainees who are extremely dangerous to the community, such as serial sexual predators, whose detention may require prison- like security measures.  In the case of the Plaintiffs however, the grim detention conditions set forth in the TAC are clearly punitive.

### ii. Deterrence of Immigration is an Invalid Basis for Prolonged Detention

Deterrence is likewise an impermissible consideration here. Lawfully crossing the border and presenting one's self to U.S. officials at a Port of Entry is expressly authorized by 8 U.S.C. §1225. The government may not  inflict punishment for such lawful acts in order to deter others. *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 181-82 (D.D.C. 2015); *see also Kansas v. Crane*, 534 U.S. 407, 412 (2002) (deterrence is a part of punishment).

 The Supreme Court has approved only two justifications for civil immigration detention – preventing flight and protecting the community from individuals found to be dangerous. *Zadvydas*, 533 U.S. at 690-92 (2001). These justifications satisfy the requirements of due process because they "relate wholly to characteristics inherent in the alien himself…." *R.I.L-*R, 80 F.Supp.3d at 188 (D.D.C. 2015) (emphasis in original). Plaintiffs' prolonged detention cannot be justified by the deterrent effect it has on *other* immigrants. Civil proceedings are not to "become a mechanism for retribution or general deterrence." *Kansas v. Crane*, 534 U.S. 407, 412 (2002), and conditions can become punitive "if excessive in relation to its legitimate purpose." *Westfahl v. District of Columbia*, 75 F.Supp.3d 365, 379 (D.C. Cir. 2014). Clearly, the prolonged detention of Plaintiffs is punitive.

## VII.    Public Interest

The public interest is never served by constitutional violations carried out by its officials. Nor is it served by the brute conditions inflicted upon Plaintiffs without just cause. Their suffering affects many family members and friends who are citizens in this country. Expending vast sums to gratuitously detain people is a waste of taxpayer funding. Likewise, undermining our international relations and obligations can only diminish our government.

The Supreme Court, in *Boumedienne,* however, identified the key public interest at stake:

"Security subsists, too, in fidelity to freedom's first principles. Chief among these
are freedom from arbitrary and unlawful restraint and the personal liberty that is

secured by adherence to the separation of powers. It is from these principles that the judicial authority to consider petitions for habeas corpus relief derives." 553 U.S. 723, 797.