# Exhibit 7

# Declaration of Andrea Northwood

## DECLARATION OF ANDREA K. NORTHWOOD

I, Andrea K. Northwood, declare as follows:

I make this declaration based on my own personal knowledge and if called to testify I could and would do so competently as follows:

### I. Qualifications

1. I am a clinical psychologist with expertise in the psychological diagnosis and treatment of survivors of torture. Most survivors of torture I have assessed and treated have also been asylum seekers; some of these asylum seekers were detained upon entry into the U.S. and subsequently released on parole. My employer, the Center for Victims of Torture (CVT), uses the U.S. definition of torture to determine eligibility for rehabilitative services in its U.S.-based service locations. This definition specifies torture as act(s) committed by a person acting under color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control (section 2340A, Title 18, United States Code).

2. I received my Ph.D. in clinical psychology and child development from the University of Minnesota in 1996. I have been a Licensed Psychologist in the State of Minnesota from 1998 through the present.

3. I have worked at the Center for Victims of Torture in Minnesota for the past 22 years. In that capacity, I have assessed and treated hundreds of asylum-seeking torture survivors from all over the world, using both short- and long-term outpatient interventions and including group and individual modalities. I have interviewed many individuals who, for reasons including lack of credibility, are determined not to be torture survivors and

therefore not eligible for our program. In various leadership roles, I have supervised, and developed programming for, the rehabilitation of thousands of torture survivors across CVT's domestic and international programs. I have trained health care and law enforcement professionals, including U.S. Asylum Officers and the F.B.I.'s Office of Victim Assistance, on the psychological effects of torture and interviewing torture survivors. Currently I serve as CVT's Director of Client Services, with a primary emphasis on our domestic services.

4. I have testified in immigration court on the psychological effects of torture and its impact on witness testimony as well as the treatment our Center has provided for asylum-seeking clients. I have also provided affidavits as an expert witness on the psychological effects of torture without testifying, again on behalf of asylum-seeking CVT clients. Finally, I have declined to provide testimony on behalf of asylum-seeking CVT clients when our treatment team has unresolved questions about the credibility of a client (this is standard practice at CVT). It should be noted that CVT does not accept clients who only desire expert witness evaluation; these persons are referred out, and CVT focuses its limited resources on those torture survivors who show a clear, consistent desire for rehabilitative services.

## II. Purpose of Declaration and Basis for Opinions Provided

5. I am making this declaration to provide my considered opinions concerning the impact of prolonged detention on the mental health of asylum seekers who have experienced significant and repeated trauma—i.e., trauma in their home countries, during their travel to the United States, and after their arrival in the United States upon being held in prison-like conditions in immigration detention facilities.

...

6. I have reviewed the complaint for Case 1:17-cv-01976RC submitted on behalf of HATIM BALDE, CELINDA ARACELY RODRIGUEZ LEMUS, SADAT IBRAHIM, and MIKAILU JALLOH. I have also reviewed the individual affidavits of these four asylum seekers. I have not examined these individuals or visited their prison environments.

7. My opinions are based on my review of each of their affidavits, my 22 years of clinical experience assessing and treating hundreds of asylum-seekers who have been detained in prison or prison-like environments, and review of the relevant scientific literature, including the following publications:

Amaral, P. (2010). Becoming vulnerable in detention. Civil Society Report on the Detention of Vulnerable Asylum Seekers and Irregular Migrants in the European Union (The DEVAS Project). Brussels: Jesuit Refugee Service-Europe.

American Psychiatric Association (2013). *Diagnostic and statistical manual of mental health disorders, fifth edition*. Washington D.C.: American Psychiatric Press.

Carswell, K., Blackburn, P., & Barker, C. (2011). The relationship between trauma, post-migration problems and the psychological well-being of refugees and asylum-seekers. *International Journal of Social Psychiatry, 57*, 107-119.

Cleveland, J., Rousseau, C. (2013). Psychiatric symptoms associated with brief detention of adult asylum seekers in Canada. *The Canadian Journal of Psychiatry, 58*, 409-416.

Coffrey, G.J., Kaplan, I., Sampson, R.C., Tucci, M.M. (2010). The meaning and mental health consequences of long-term immigration detention for people seeking asylum. *Social Science & Medicine, 70*, 2070-2079.

Filges, T., Montgomery, E., Kastrup, M., Jorgensen, A.K. (2015). The impact of detention on the health of asylum seekers: A systematic review. *Campbell Systematic Reviews, 11*, 1-104.

Ichikawa, M., Nakahara, S., Wakai, S. (2006). Effect of post-migration detention on mental health among Afghan asylum seekers in Japan. *Australian & New Zealand Journal of Psychiatry, 40*, 341-346.

Keller, A.S., Rosenfeld, B., Trinh-Shevrin, C., Meserve, C., Sachs, E., Leviss, J.A....Ford, D. (2003). Mental health of detained asylum seekers. *Lancet, 362*, 1721-1723.

Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture (June, 2003). From persecution to prison: The health consequences of detention for asylum seekers.

Robjant, K., Hassan, R., Katona, C. (2009). Mental health implications of detaining asylum seekers: A systematic review. *The British Journal of Psychiatry, 194*, 306-312.

Robjant, K., Robbins, I., Senior, V. (2009). Psychological distress amongst immigration detainees: A cross-sectional questionnaire study. *British Journal of Clinical Psychology, 48*, 275-286.

Steel, Z., Momartin, S., Silove, D., Coello, M., Aroche, J., Tay, K.W. (2011). Two year psychosocial and mental health outcomes for refugees subjected to restrictive or supportive immigration policies. *Social Science & Medicine, 72*, 1149-1156.

Steel, Z., Silove, D., Brooks, R., Momartin, S., Alzuhairi, B., Susljik, I. (2006). Impact of immigration detention and temporary protection on the mental health of refugees. *British Journal of Psychiatry, 188*, 58-64.

van der Kolk, B. (2014). *The Body Keeps the Score: Brain, Mind and Body in the Healing of Trauma.* New York: Penguin Books.

### III. Conditions At Immigration Detention Facilities

8. Within my areas of expertise, and with the assumption that the conditions described in the affidavits are generally accurate, there are several themes in the plaintiffs' affidavits that stand out with respect to their relevance for addressing the mental health impact of these conditions on asylum seekers who are survivors of significant trauma in their home countries and during their journeys to the U.S.:

9. Living conditions: These are consistently described in the affidavits as crowded, lacking in privacy, lacking in meaningful structure or activity (e.g., trauma survivors report sitting all day with nothing to do and extremely limited or no access to any materials in their language), lacking in nutrition (e.g., lacking fresh plant-based foods, prohibited from obtaining fresh foods by either payment or connections outside the prison, lacking whole real foods rather than processed foods and stuffs made of powder), and lacking in adequate hygiene.

10. Ability to express oneself: The affidavits describe restricted movement and control (e.g., small indoor exercise areas, being unable to leave the dorm without official permission and a guard escort, being marched directly to a destination with some guards requiring survivors to hold their arms crossed over chests, being chained and shackled when going to see the doctor, being denied the basic humane response of comforting

other weeping prisoners with a hug or hand on the shoulder) and highly restricted communication (e.g., prohibited or highly discouraged fraternizing with prison staff or other detainees outside one's own locked dormitory, no cell phones, very limited access to internet, being required to use a low voice and prohibited from joining hands in song with other Christians, not being allowed CDs from the outside, monitored phone calls in which the speaker in the home country is sufficiently frightened and confused enough by the English statements from the detention facility at the beginning that s/he hangs up). Most of the affidavits describe extremely limited access to legal counsel and restricted ability to prepare their asylum case (e.g., limited internet access and ability to communicate with family members and friends who can provide supporting documentation, censored mail that in one case reportedly included denied access to a CD with video evidence that would support a gay man's asylum claim, libraries of limited if any content in the survivor's language(s), attorneys being unable to call them directly and required to leave a message, attorneys having to wait long times to meet with their clients, attorneys prohibited from using laptops or cell phones in attorney-client meetings).

11. Human dignity and presumption of innocence until proven guilty: All four of the affidavits I reviewed state that the plaintiff presented him/herself legally at a U.S. Port of Entry and requested asylum. The plaintiffs express bewilderment, shock, and repeated humiliation at being subsequently treated as a dangerous person who had committed a crime (e.g., being stripped of their personal possessions including clothes and given prison-like scrubs; being placed under locked guard at all times; being required to put one's hands behind one's back when speaking with a guard; being chained when going to

the doctor; being disallowed simple items such as CDs, paper clips, nail clippers, and fresh foods from the outside for security reasons). In addition, the affidavits also describe an overall environment of demeaning treatment by guards in terms of discriminatory statements and actions directed towards Africans, plainly cruel and unwarranted threats to send them back to the place they fled, and statements that they are unwanted here. The affidavits are consistent across culture and gender in terms of plaintiffs feeling dehumanized and treated as criminals despite having committed no known crime. They also describe rules that prevent basic human connection and dignity from being respected in simple daily guard-trauma survivor interactions, such as being prohibited from being kind toward a guard or asking him if he has children or what sports or movies he likes.

### IV. Impact of Such Conditions of Confinement on Survivors of Trauma

12. It is well established in the scientific literature that traumatized persons carry forward vulnerability from their traumatic experiences; research across types of trauma and cultures has consistently shown a significant correlation between the degree of vulnerability/impact and the chronicity or severity of trauma exposure. This vulnerability operates on both a psychological and physiological level. To cite one of the foremost experts on the effects of trauma on the brain and body:

13. "We have learned that trauma is not just an event that took place sometime in the past; it is also the imprint left by that experience on mind, brain, and body.... Trauma results in a fundamental reorganization of the way mind and brain manage perceptions. It changes not only how we think and what we think about, but also our very capacity to think.... Under normal conditions people react to a threat with a temporary increase in their stress hormones. As soon as the threat is over, the hormones dissipate and the body

returns to normal. The stress hormones of traumatized people, in contrast, take much longer to return to baseline and spike quickly and disproportionately in response to mildly stressful stimuli," (van der Kolk, as cited in 7. above, p. 21, p. 46).

14. Post-traumatic Stress Disorder and Major Depressive Disorder are the two most common psychiatric disorders among CVT's asylum-seeking clientele who have survived life-threatening traumas and are enduring catastrophic losses of family, culture, career, and all property and material possessions in exile. These two disorders often co-occur (a majority of our clients are diagnosed with both), and are present even in the absence of the prison-like conditions described in 8.-11. above.

15. Post-traumatic Stress Disorder (PTSD) results in ongoing emotional suffering in the form of debilitating nightmares, flashbacks and other forms of re-experiencing the trauma as if it were happening again in the present; avoidance behaviors; negative changes to one's thoughts and mood; and various manifestations of increased physiological arousal that make it difficult to do things such as concentrate, sleep, and feel safe.

16. One of the features of PTSD is that its re-experiencing symptoms (nightmares, flashbacks, feeling the same terror one felt during a previous trauma, etc.) are often triggered by exposure to reminders of that trauma. Immigration detention facilities are replete with these reminders: uniformed guards, institutional settings, guns, limited control or movement, shackles, wearing a prison-like uniform, being threatened with forced removal (routinely regarded as a death sentence for CVT asylum-seeking clients), being under the control of a government authority – these are all common features of traumatic events that persons who are fleeing political persecution and human rights violations have already experienced. In my experience, trauma survivors in institutional

settings such as locked hospital wards or prisons experience significant exacerbation of their PTSD re-experiencing and hyper-arousal symptoms in the presence of these triggers, with accompanying heightened distress and emotional dysregulation.

17. Major Depressive Disorder results in ongoing emotional suffering in the form of (a) depressed or sad mood, and/or (b) loss of interest in life and daily activities, combined with some combination of the following additional symptoms: diminished ability to think or concentrate or make decisions, loss of appetite or over-eating (resulting in significant weight loss or gain), insomnia or hypersomnia, fatigue and loss of energy, feelings of worthlessness or excessive guilt, restlessness or feeling slowed down (to a degree observable to others) and recurrent thoughts of death or killing oneself.

18. It has been my consistent clinical observation in treating asylum seekers that symptoms of Major Depression and PTSD increase substantially in environments of deprivation and boredom. The detention facilities described in the affidavits constitute an extreme version of such an environment. Sitting around all day with nothing to do is described as a major stressor (at best) and even a cause of insanity ("going crazy") by our asylum-seeking trauma survivors, as they use "keeping busy" and meaningful activity to distract themselves from involuntary, disturbing traumatic memories as well as profound sadness and loss. One of the first priorities of rehabilitation at CVT is to rebuild meaningful activity into the lives of asylum seekers who have applied for asylum but are not yet eligible for a work permit. This is because this change alone produces a reduction in emotional distress and calms people down.

19. The scientific literature on the impact of detention and other post-migration stressors on the mental health of asylum seekers indicates that those who are detained or otherwise

unsupported in meeting their basic needs and obtaining proper rehabilitative services fare worse than those who are not detained or who are integrated into supportive environments. While studies vary in their outcome measures, "faring worse" typically means they are more symptomatic (more severe PTSD and/or Major Depressive Disorder symptoms) and show poorer psychosocial outcomes on key aspects of successful resettlement (learning the language, acculturating, getting a job, making friends).

20. A scientifically rigorous review (meta-analysis) of only those studies specifically examining the impact of detention on the mental health of asylum seekers concluded as follows: "All studies used in the data synthesis compared detained asylum seekers to a group of asylum seekers living in the community who had a more or less similar experience of traumatic events prior to arrival. All studies report adverse effects on the detained asylum seekers' mental health. Effect sizes lies in a clinical important range despite the fact that the comparison groups used in the primary studies face a range of similar post-migration adversities and have been equally exposed to prior traumatic events. There is thus some evidence to suggest an independent deterioration of the mental health due to detention of a group of people who are already highly traumatised. Adverse effects on mental health were found not only while the asylum seekers were detained. The one study analysing asylum seekers after release suggest that the adverse mental health effect of detention may be prolonged, extending well beyond the point of release into the community," (Filges et al. in 7. above, p. 40).

21. A study of psychiatric symptoms associated with detention of adult asylum seekers in Canada found that even brief detentions (average of 31 days) were associated with significantly higher post-traumatic stress, depression, and anxiety symptoms in detained

asylum seekers contrasted with non-detained asylum seekers (see Cleveland & Rousseau in 7. above). The detentions of the plaintiffs in this case are much longer, from months to two years.

22. The affidavits of HATIM BALDE, CELINDA ARACELY RODRIGUEZ LEMUS, SADAT IBRAHIM, and MIKAILU JALLOH contain personal statements that clearly describe a worsening of psychiatric symptoms and deepening despair while under detention (see item 22 in JALLOH, items 18-19 in LEMUS, item 17 in BALDE, items 26-28 in IBRAHIM). These are described in plain English and without signs that might otherwise suggest malingering or exaggeration (e.g., there is no use of clinical terms one could get online; the symptoms are a coherent grouping – not random or unusual combinations), and they are consistent with those of traumatized asylum seekers, in my years of clinical experience. They include individualized descriptions of efforts to cope adaptively (using their faith, self-advocacy skills, social connections, outside contacts, etc) that progressively wear down and succumb to social isolation, growing despondency and withdrawal into the self that is extremely emotionally painful, in my experience of sitting with many individuals over the years who are in similar states of despair and hopelessness. The process of undergoing personality changes they describe is not dissimilar to how torturers "break" people with psychological methods involving deprivation, threat and removal of hope. I cannot diagnose these individuals or make statements about the medical necessity of specialized psychiatric and psychological treatment without evaluating them in person. However, I can unequivocally state my experience that such severe, untreated symptomatology as that described in the affidavit items above, over a prolonged period of months or years, often takes on a life of its own

within the body and brain, and often correspondingly requires a long period of treatment and re-stabilization before a survivor regains the wherewithal to benefit from treatment addressing the original traumas.

### V. Compensation

23. I have received no compensation for my participation in this case.

24. I reserve the right to amend or supplement this declaration as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury under the laws of the United States and the District of Columbia that the foregoing is true and correct.

Executed this 11th day of January, 2018, at St Paul, Minnesota

*Andrea Northwood, PhD, LP*

Andrea Northwood, Ph.D., L.P.

EMILY BELTMANN-SWENSON
Notary Public
State of Minnesota
My Commission Expires
January 31, 2019

1/11/2018