# Exhibit 8

# Declaration of Bethany Carson

# Expert Declaration of Bethany Carson

## I. Qualifications

1. My name is Bethany Carson. I am an immigration researcher and organizer at Grassroots Leadership, where I have worked since December 2014.
2. For the past three years I have interviewed immigrants who were currently or previously detained as part of research on the immigrant detention bed quota, Operation Streamline, and conditions at the T. Don Hutto Residential Center. I co-authored the reports Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota, the Immigrant Detention Inspection Series report on the T. Don Hutto Residential Center, and the book Indefensible: A Decade of Mass Incarceration of Migrants Prosecuted for Crossing the Border. In the course of preparing my research, I frequently read statements and documentation collected by other researchers from immigrants in detention and exchange information with other researchers and advocates.
3. I have visited immigrant detention centers across Texas including the T. Don Hutto Residential Center, Laredo Detention Center, Pearsall Detention Center, Prairieland Detention Center, Johnson County Detention Center, and Karnes Residential Center for human rights monitoring tours, as well as visits with individual detained immigrants.
4. I hold a Bachelors in Government and Spanish from Centre College in Kentucky.
5. My research on the immigrant detention bed quota, Operation Streamline and migrant prosecutions and perspectives on for-profit immigrant detention and the asylum process have been reported in numerous media outlets. During the last Texas legislative session, I testified at the state legislature on proposed legislation on family detention and detainer policy. In 2016, I provided a congressional briefing on the mass prosecution of migrants for crossing the border along with advocates from the ACLU and Justice Strategies. Earlier that year, I also submitted joint comments with New York think tank Justice Strategies to the U.S. Sentencing Commission regarding sentencing guidelines for improper entry and reentry convictions based on interviews with defenders, judges and individuals who had been prosecuted for these offenses. In 2012, prior to my work around immigrant detention, I co-authored a report to the U.S. Embassy in Colombia after a Witness for Peace delegation monitoring compliance with the labor rights corollary to the U.S. - Colombia free trade agreement.

## II. Purpose of Declaration and Basis for Opinions Provided

6. The purpose of this declaration is to provide considered opinions about the conditions I have observed in immigrant detention facilities.
7. The data and experiences that have informed my opinions include:
    a. Individual visits with individuals at the T. Don Hutto Detention Center, Pearsall, Laredo Detention Center, and Karnes Family Residential Center to provide emotional support;

b. Monitoring tours of the T. Don Hutto Residential Center, Prairieland Detention Center, and Johnson County Detention Center during which I observed the living conditions in these facilities and at Hutto and Prairieland was able to speak with immigrants detained there;

c. Data reviewed and interviews conducted for the report Payoff: How Congress Ensures Private Prison Profit with an Immigrant Detention Quota and book Indefensible: A Decade of Mass Incarceration of Migrants Prosecuted for Crossing the Border of currently and formerly detained immigrants who were detained in ICE facilities across the country including Port Isabel, Pearsall, Brooks County Detention Center, East Hidalgo Detention Center, and El Paso Detention Center about their experience in detention;

d. Written correspondence received in the course of advocacy work with women who were on hunger strike in the T. Don Hutto Residential Center;

e. Written correspondence received in the course of advocacy work with a group of women who had been transferred from the T. Don Hutto Residential Center to the Laredo Detention Center in mid-2016;

f. Response received from Immigration and Customs Enforcement to public campaigns elevating cases of individuals experiencing severe barriers to their health and well-being at the T. Don Hutto Residential Center.

## III. Prison-Like Conditions

8. In all immigrant detention centers I have visited, or which have been described to me by immigrants detained there, detained individuals are subject to restrictive and punitive conditions. These conditions are more similar to those that typically exist in a jail or prison than in a residential shelter.

9. Restricted movement

   a. No detained individual in any ICE detention center is permitted to leave the facility at will for any reason. Facilities are surrounded by multiple layers of chain linked fencing, often topped by razor wire, and are built with heavy metal doors. Many of the physical structures were formerly prisons, and more than 70 percent of detention facilities are operated by private prison corporations, including Port Isabel, Laredo, and Pearsall.

   b. If contact visitation is permitted, visitors are allowed only in a particular visitation room, and are escorted and observed by guards for the duration of the visit. Detained individuals at Laredo are wanded with a metal detector before leaving the visitation room. Visitation is limited to 30 minutes at a time and available hours are divided by security classification. At Pearsall, there is no contact visitation so visits are conducted on the opposite side of a glass pane, using a phone where all conversations are monitored and recorded. No pen, paper, or other belongings are permitted during non-legal visitation at either facility.

    c. Within the detention facilities, freedom of movement is severely limited. Detained individuals are counted multiple times a day. One woman detained in Laredo who has a leg injury that she cares for by walking wrote to Grassroots Leadership that, "In this place you barely leave the bed and they shout at you "to your bed, count." In Pearsall, a man I interviewed recounted a time that he was praying with his wife on the phone but he was late for the count so they called the sergeant and threatened to put him in solitary confinement. There are particular, limited, hours when detained individuals are permitted to access services like the computer and library area if they are offered. Detained individuals are not permitted to freely move internally without some level of supervision or surveillance. One man I interviewed who had been detained in Pearsall told me that they were placed in handcuffs and accompanied by a guard whenever they were transferred between sections within the facility.

10. Punishment and verbal abuse
    a. There are strict rules that are often harshly enforced by guards, regardless of the individual circumstance. One woman detained in Laredo wrote in a letter to Grassroots Leadership that because of her diabetes, she needed to drink a lot of water and eat some food between meals. A guard would shout at her to dump out her water that she kept by her bed and throw away the bread that she tried to bring from the cafeteria to eat. In Laredo, Pearsall, and Hutto, detained individuals have told me that they are threatened with solitary confinement as a form of punishment.
    b. Taunts, threats, and other forms of verbal abuse by guards are common. In Laredo, one woman wrote that an official would make sarcastic comments that they were in a five star hotel, and that they really received a banquet today when they were given a dinner of beans, ham, and two pieces of bread.
    c. A detained woman at Hutto told me that an ICE official told her that here she was their slave and had to do what they told her when she refused to sign a document in English, a language she did not understand.
    d. Another woman detained at Hutto who was very sick was told by an official that she had better sign her deportation and go back to her country if she wanted to receive treatment because she wouldn't get it in the detention center.

11. Hygiene
    a. I was shocked by the description of unhygienic and harsh living conditions at the Laredo Detention Center that I received in letters from a group of women who had been transferred to Laredo in the fall of 2016. Multiple women wrote of frequent flooding of the dormitories with dirty drainage water, which the women were forced to clean without any protective equipment. Afterwards, the women were not given clean or dry shoes and many got foot fungus as a result.

    b. They described other harsh conditions, such as being placed in a cold room with no blankets or coverings whatsoever the night after they arrived. Many women came down with colds or nose bleeds afterwards as a result.
    c. They also must wear used, and stained underclothes.
    d. They also reported that there were two days during which they were not permitted to use the bathroom at all. When they pleaded to use a bathroom, they were shouted at and their request was ignored.

12. Food
    a. The food provided is not sufficiently nutritious. Fresh fruits and vegetables are hardly ever served, and I have heard complaints from individuals across multiple detention centers of food that is expired, moldy, or otherwise unfit to eat.
    b. One woman I visited believes that she received a bacterial infection as a result of bad food, and told me of a day at Hutto when many women began vomiting after a meal because the milk served had been spoiled. Several women detained in Laredo wrote letters to Grassroots Leadership describing terrible food that smelled bad and caused stomach aches, diarrhea and vomiting.
    c. It is common for detained individuals to find the food served in detention facilities so unpalatable that they feel compelled to purchase soups and other food items from the commissary instead although there is little nutritious food available for purchase and prices are marked up.

13. Recreation
    a. Recreation time and space is extremely limited and surveilled in many detention facilities. In Pearsall the only "outside" recreation space is a square room that is bricked up to the sky with bars on top. Injuries are common there because it is small, crowded, and there is no grass. The man I interviewed found it extremely disorienting not to see grass or trees for the 10 months he was detained. In Laredo, one woman wrote that the guards in the outside recreation area carry shotguns so she preferred not to go to the area.

14. Dormitories
    a. Dormitories are loud and often crowded. Across detention centers, detained individuals complain of a lack of privacy, especially in the bathrooms. There are frequent searches of detained individuals' personal belongings and it is not unusual for personal items such as letters or photographs to be confiscated.

15. Uniforms
    a. In Laredo and Pearsall, detained individuals wear prison uniforms color coded by security classification. Detained individuals I have visited there have found this extremely distressing and told me that they didn't understand why they were treated like criminals when they only came to this country seeking refuge.

16. Communication

   a. Communication with the outside world is difficult and expensive for detained individuals. No one is permitted to use cell phones while detained, even if they had brought one with them when they entered the country. They are not able to receive incoming calls and can only make outgoing collect calls if they or the person they would like to call can purchase expensive calling cards or minutes on phone systems which are often the same systems used by prisons, such as Securus or Telmate. One woman who lived in another Texas city told me that she spent $400 / month to talk to her husband who was detained at Pearsall. International calls are particularly expensive and have prohibited many people I have spoken with from being able to talk with family, friends, or agencies in their home country in order to gather evidence for their asylum case.
   b. Each call is preceded by a recorded message that announces that this is a call from a detainee at a particular detention center, sometimes includes the name of the person calling, and instructs to dial a particular option to accept the call. Calls are all recorded and monitored. Because of this, detained individuals I have spoken with by phone have not been comfortable freely sharing about improper conditions or rights abuses that have happened to them for fear of retaliation. Sound quality is often poor, making it difficult to hear. One woman detained in Laredo wrote in a letter to Grassroots Leadership that officials cut the call, and sometimes all the phone lines, if someone starts talking about conditions in the facility.
   c. According to the recorded message at the Laredo Detention Center and the Hutto Detention Center, there is a way to record an urgent message for someone detained there but I have attempted to do so on two different occasions and the individual never received my message. Detained individuals cannot leave a message for someone they call as the call must first be accepted.
   d. There is no email capability at all for individuals detained at the Laredo Detention Center. Coupled with high phone costs, this makes it impossible for an indigent individual to personally gather evidence for their asylum case.
17. Medical and mental health care
   a. In Laredo, Pearsall, and Hutto, it is common to hear from detained individuals that over-the-counter pain medication or drinking water is prescribed for any ailment in lieu of real diagnosis or treatment. In Pearsall, a man I interviewed was told to put in an internal request for medical care for a band-aid for an open burn wound, even though processing a request takes at least two days. He was also told to put in an internal request for medical care when he fell on his back playing basketball and was in severe pain, despite asking urgently to see a doctor.
   b. A woman I visited in both the Hutto and Laredo detention centers received a disciplinary report instead of medical attention for fainting at Hutto. The same woman received a disciplinary report for remaining in bed resting after she was

given morphine in Laredo. She repeatedly asked for outside medical care at both detention centers because she was vomiting blood and had terrible migraines. She finally received the exams she needed after nearly a year in detention and in that time she had developed a hernia and a cyst in her breast and ovary.. She also contracted tuberculosis inside the facility from unsanitary conditions in the medical unit.

   c. One woman with Type 1 diabetes at Hutto was refused proper medical treatment and her insulin levels reached dangerous highs after officials discarded her medicine when she entered the country, changed her to a different medication, did not provide a healthy diet, and did not sufficiently monitor her insulin levels. Grassroots Leadership launched a public campaign calling for her to receive immediate outside treatment as her health was so urgent, but received no communication or reaction from Hutto officials, while her insulin levels stayed dangerously high for days. During this time she became so desperate to leave detention that she felt obligated to sign her own voluntary deportation. Only after public pressure from calls to ICE and the Laredo detention center, she was transferred to Laredo, given fresh fruit and vegetables and regular monitoring and her insulin levels finally started to fall.
   d. Medical and mental health services that are in high need in a population of women who are fleeing trauma are nonexistent in many detention facilities. In Laredo, a woman who was having frequent vaginal infections after she had been sexually abused in her home country asked to see a gynecologist but was told that that service is not offered. Trauma-informed, culturally appropriate mental health care is also sorely lacking.
   e. If detained individuals need to access medical care outside of the detention facility, they are escorted by an armed guard and walked into the hospital or medical office in chains and a prison uniform. I have personally visited with women in both the Laredo and Hutto detention centers who found this treatment both mortifying and physically painful.
18. Legal access
   a. The Laredo detention center does not have regular pro bono legal assistance or know your rights presentations inside the facility. There are many detained individuals who are not able to find or afford an attorney, and must represent themselves. Many lack access to basic services such as translation of their evidence in order to submit it to the judge, or preparation of their asylum applications.
19. Impact on victims of trauma
   a. The harsh, military style conditions in these detention centers are extremely re-traumatizing for victims of violence. In Pearsall, GEO guards dress in military style uniforms with heavy combat boots.

    b. In Laredo, one woman wrote that she preferred not to go to the recreation area because it scared her to be around guards carrying weapons because she had been shot by officials in her country.

    c. Another woman wrote that guards shouted so loudly at her that it made her recall her past domestic abuse.

    d. A third woman in Laredo said that as someone who had been raped, tortured, and humiliated, the fact that officials ignored her health made her feel like she was worthless.

    e. These conditions of confinement in which detained individuals lack control over their own lives and are subject to regimented, often harsh, rules forces many trauma survivors to experience anew many conditions similar to those they fled in their home countries.

## IV. Individualized Parole

20. In my time visiting with individuals in detention, I have observed that parole grants are rare. I have noticed that there are certain time periods when ICE grants detained individuals with bonds or parole more frequently than during other time periods. These changes appear to apply across the board, rather than dependent on the merits of any one detained individual's asylum case or family ties.

21. I received documentation of the above trend when I viewed a set of internal emails from the ICE San Antonio field office obtained in a FOIA request by the National Immigrant Justice Center. One email sent April 17, 2014 from the Assistant Field Office Director of the ICE San Antonio field office contains instructions from ICE headquarters in DC to raise bonds across the board from $7,500 to $10,000 the following day. A September 17, 2013 email directs ICE officers to lower bond amounts imposed after a particular date, across the board, because area detention space "is close to maximum bed space capacity." A February 14, 2014 email stated that $7500 bonds were currently being placed on individuals who had passed their credible fear interviews. These emails indicate that the asylum seeker parole directive that instructs that individualized parole determinations be made for individuals who receive a positive credible fear finding is not being followed and there is a practice coming from ICE headquarters mandating high bonds or no parole.

22. Another trend I have observed is that the majority of detained individuals who are in withholding of removal proceedings or who came through ports of entry are not assigned a bond by ICE and are not paroled. Many of these individuals I have visited with have strong family ties in the United States and no criminal history. This trend is often a source of confusion and distress inside of detention facilities as these individuals see others who have recently arrived able to be released, while they must remain detained for the duration of their asylum proceedings for reasons that are not specific to their individual cases.

## V.   Compensation

23. I have not received any compensation, monetary or otherwise, for writing this statement.

## VI.   Prior Testimony

24. I have not testified as an expert in prior litigation.
25. I reserve the right to amend or supplement this report as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury under the laws of the United States that the foregoing is my true and correct declaration.

Executed this __18__ day of __January__, 201_8_, at __Austin__, __TX__.

_(signature)_

Bethany N. Carson