# Exhibit 11

# Declaration of Eleanor Acer

# Expert Declaration – Eleanor Acer
## ICE Policies Regarding the Parole of Arriving Asylum Seekers

### Qualifications

1. I am the Senior Director for Refugee Protection at Human Rights First. My current business address is: 75 Broad Street, 31st Floor, New York, New York 10004.
2. Human Rights First is a non-governmental organization established in 1978 that works to ensure American leadership on human rights globally and compliance domestically with U.S. human rights commitments.  Human Rights First operates one of the largest programs for *pro bono* legal representation of refugees in the nation, working in partnership with volunteer lawyers at leading law firms to provide legal representation without charge to indigent asylum applicants, including asylum seekers held in immigration detention. Human Rights First's pro bono efforts are conducted through its offices in New York, New York; Washington, D.C.; Houston, Texas; and Los Angeles, California. Our organization's clients include many asylum seekers who had initially requested asylum after arriving at U.S. ports of entry, including formal entry points along the U.S. southern border with Mexico. Human Rights First has conducted extensive research and issued reports regarding the current and historical practices of, and legal framework governing, the U.S. system of immigration detention and parole of asylum seekers.
3. I have been employed with Human Rights First since 1996.  At that time, the organization was known as the Lawyers Committee for Human Rights.  Throughout my years at the organization, I have conducted and/or supervised research and reporting on the detention and parole of asylum seekers, in addition to other research and advocacy relating to the human rights and protection of refugees.  I also oversaw Human Rights First's pro bono legal representation program from 1996 to 2014.  I am admitted to practice law in the State of New York.
4. I have authored or co-authored numerous articles on refugee protection, including "Restoring America's Commitment to Refugees and Humanitarian Protection," published in the Georgetown Immigration Law Journal in 2013, and "Reaffirming Rights; Human Rights Protections of Migrants, Asylum Seekers, and Refugees in Immigration Detention," published in the Georgetown Immigration Law Journal in 2011.  I have researched, authored, coauthored and/or supervised staff conducting the research for, and drafting of, a number of Human Rights First reports on U.S. detention and parole of asylum seekers including: "In Liberty's Shadow: U.S. Detention of Asylum Seekers in the Era of Homeland Security" (2004); "U.S. Detention of Asylum Seekers: Seeking Protection, Finding Prison (2009); "Lifeline on Lockdown: Increased U.S. Detention of Asylum Seekers" (2016); and "Judge and Jailer: Asylum Seekers Denied Parole in Wake of Trump Executive Order," published in

1

September 2017. I have also testified before the U.S. Congress on asylum matters including at a hearing on February 11, 2014 before the House Judiciary Committee's Subcommittee on Immigration and Border Security and a March 23, 2016 joint hearing before the House Oversight and Government Reform Committee and the Subcommittee on National Security and the Subcommittee on Government Operations.

5. My curriculum vitae is attached as Exhibit A.

6. I am submitting this declaration in order to provide my expert opinion about past and present DHS and ICE policies regarding parole for "arriving" asylum seekers, that is, those who presented themselves at an airport or other formal entry point, referred to as a U.S. Port of Entry (POE), and requested protection.

7. My opinion is based on my over twenty years of working on refugee protection and asylum matters in the United States, including my oversight of Human Rights First's pro bono legal representation program from 1996 to 2014, my research, fact-finding, monitoring and reporting of U.S. detention and parole policies relating to asylum seekers, meetings with U.S. government officials and experts, and interviews with asylum seekers, pro bono attorneys and others.

**Past Policy and Practice Regarding Detention of Arriving Asylum Seekers**

8. Before U.S. Immigration and Customs Enforcement (ICE) issued its December 2009 asylum parole directive Human Rights First and other organizations conducted research that showed that the former Immigration and Naturalization Service (INS), and subsequently ICE, often failed to implement agency parole authority effectively, fairly, or consistently, with local officials routinely failing to follow the agency's parole criteria. This research resulted in reports issued by Amnesty International and Human Rights Watch, as well as a 1998 report from the Lawyers Committee for Human Rights entitled "Refugees Behind Bars." That report detailed the INS failure to consistently and effectively implement its parole authority and provided examples of asylum seekers who had been unnecessarily detained for long periods of time in the United States. Additional research conducted by Human Rights First several years later found that the agency's parole guidelines for asylum seekers were often disregarded in many locations, leaving many asylum seekers in detention for long periods of time even though they met the criteria for release. That research was included in Human Rights First's 2004 report "In Liberty's Shadow."

9. Governmental entities also expressed concern about the detention and parole of asylum seekers. On May 17, 1999, the U.S. Secretary of State's Advisory Committee on Religious Freedom addressed the detention of asylum seekers. In its final report, the Committee stated:

2

"The unnecessary detention of already traumatized victims of religious persecution, as well as other types of persecution, should be examined with the goal of providing release. Serious concerns have been raised over the length of time these traumatized individuals are spending in detention facilities, the conditions they are being kept in, the types of detention facility that are being used and the variation in policies from district to district."

10. Congress subsequently directed the bipartisan U.S. Commission on International Religious Freedom ("USCIRF") to examine whether immigration officers, in exercising expedited removal authority over individuals who may be eligible for asylum, were – among other things - improperly detaining them or detaining them under inappropriate conditions. In 2005, USCIRF issued a comprehensive 500-page report on these issues, based in part on ICE statistics not normally available to the public. The USCIRF report detailed the ways in which parole rates continued to vary widely across the country, found that "the formal release criteria are not being consistently applied," and found no evidence that ICE was following the parole criteria provided in the policy guidelines. USCIRF made a number of recommendations to improve implementation of parole, and reiterated its recommendations in subsequent reports. In a February 2007 Report Card, USCIRF gave ICE a grade of "F" for its failure to codify the parole criteria into regulations and another "F" for its failure to ensure consistent and correct parole decisions by developing standardized forms and national review procedures.

11. Despite USCIRF's reporting and findings, inconsistencies and deficiencies persisted in parole implementation. Based on its research and monitoring, Human Rights First concluded in its 2009 report "U.S. Detention of Asylum Seekers," that "asylum seekers have been detained for months or sometimes for years, even when they can establish their identities, community ties, and that they do not present a flight risk or a danger to the community," and that the parole criteria specific to asylum seekers "have often been ignored by local officials who may base their decisions on other factors, such as the availability of detention 'bed space' at local facilities." As indicated in that report, ICE statistics showed that parole rates dropped from 62.5% in 2003 to 41.23% in 2004 before plummeting to 4.2% in 2007. These statistics showed that at least 2,200 asylum seekers who were taken into custody in 2007 were detained for six months or longer.

12. In the wake of the USCIRF and other reports, ICE issued a new policy directive in December 2009, titled "Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture," outlining in greater detail the asylum parole criteria applicable to asylum seekers categorized as "arriving aliens." The policy, based largely around federal regulations that provide for parole of individuals "whose continued detention is not in the public interest,"

3

instructs ICE personnel to parole arriving asylum seekers who have sufficiently established their identity and demonstrated that they are not a flight risk and do not present a danger to the community. USCIRF welcomed the 2009 parole guidance.

13. The 2009 asylum parole directive, which became effective in January 2010, provides that an arriving asylum seeker determined to have a credible fear of persecution should generally be paroled from detention if his or her "identity is sufficiently established, the alien poses neither a flight risk nor a danger to the community, and no additional factors weigh against release." It further requires that ICE officers provide each asylum seeker determined to have credible fear with a "parole advisal and scheduling notification" form, informing the asylum seeker that she or he will be interviewed for parole consideration and the deadline for submitting documents supporting the parole request. The directive and its procedural requirements required that even asylum seekers not represented by counsel—and therefore less likely to know about parole procedures—as well as those represented by counsel who did not submit formal written requests for parole, would be considered for potential release from detention.

**Lack of Timely and Detailed Statistics from DHS/ICE**

14. One challenge in researching and monitoring parole practices stems from the failure of federal immigration authorities (both INS and subsequently ICE) to provide complete and timely statistics on the detention and release of asylum seekers. Frustrated by the lack of data, in 1998, Congress passed the Haitian Refugee Immigration Fairness Act (HRIFA) of 1998. This law required the INS to provide data on the number of asylum seekers in detention, country of origin, gender, detention facilities, average lengths of stay in detention, and rates of release. That requirement subsequently shifted to DHS and ICE.

15. The former INS and now ICE have however failed to provide timely and complete reports on the detention of asylum seekers. For example, in March 2016, Human Rights First submitted a Freedom of Information Act (FOIA) request to ICE seeking the required the Haitian Refugee Immigration Fairness Act (HRIFA) reports on the detention of asylum seekers. When ICE finally responded on May 25, 2017, it only provided the reports up until fiscal year 2014.

**Recent DHS Parole Policy**

16. Despite the provisions of the 2009 asylum parole directive, Human Rights First's research has revealed that ICE officers currently largely disregard the directive, a shift that appeared

4

to occur in the wake of former Secretary Jeh Johnson's November 20, 2014 enforcement priorities memorandum and – in particular, more recently – President Donald Trump's January 25, 2017 executive order on "Border Security and Immigration Enforcement Improvements." The November 20, 2014 policy memorandum, titled "DHS Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants," characterizes people "apprehended at the border or at ports of entry attempting to unlawfully enter the United States" as a category 1 enforcement priority. This memorandum followed a policy announcement from earlier that year aimed at deterring Central American families from attempting to reach the United States. On June 24, 2014, in response to the increasing number of children and families fleeing Honduras, Guatemala, and El Salvador to seek protection at the southern U.S. border, the Obama Administration announced plans to significantly increase capacity to detain children with their parents. In testimony before Congress, Secretary Johnson proposed "an aggressive deterrence strategy," including the rapid expansion of family detention, which would send a message to adults who brought their children with them: "we will send you back."

17. Although government officials advised that the asylum parole directive was still in effect, Human Rights First observed, through its research and legal representation, a decline in the granting of parole to arriving asylum seekers. From late 2015 to June 2016, Human Rights First conducted fact-finding and research related to U.S. detention of asylum seekers and release policies and practices. That research was included in a July 2016 report, "Lifeline on Lockdown," in which Human Rights First detailed how some ICE field offices and officers failed to follow the 2009 asylum parole directive, in many cases leaving asylum seekers who were eligible for release in detention for months or longer. The use of detention to deter people from seeking asylum or migrating to the United States violates the Refugee Convention, its Protocol, and the International Covenant on Civil and Political Rights (ICCPR), as do other flaws in the U.S. use of detention. For example, despite ICCPR requirements of prompt court review of detention, arriving asylum seekers are not provided prompt access to immigration court custody hearings to contest their confinement.

18. As part of the research for this report, Human Rights First staff conducted a national survey of lawyers at non-profit legal services organizations who assist asylum seekers and immigrants in detention. As the report explained, the most experienced practitioners – those who had been in the field for more than ten years –indicated to Human Rights First that ICE was denying more parole applications. Among attorneys who had been practicing at least three years, 90 percent said ICE denied parole despite asylum seekers providing ample evidence to establish their identities and prove that they did not pose a flight risk or security risk, which are the criteria for parole.

19. Moreover, the report also documented the marked increase in detention of asylum seekers. In fiscal year 2014, ICE reported that it held 44,270 asylum seekers in immigration detention facilities, nearly a three-fold increase from 2010, when the agency reported that it detained 15,769 asylum seekers. While the number of individuals seeking asylum in the United States increased between 2010 and 2014, which, according to UNHCR, is part of a global trend that reflects the increase in displaced people fleeing persecution, war, and deteriorating security, the percentage of asylum seekers sent to detention also increased. The report also cited ICE statistics that indicated that in 2010, ICE detained 49 percent of those with positive credible fear determinations; in 2014 ICE detained 84 percent of asylum seekers who had previously passed a credible fear interview.

20. On January 25, 2017, President Trump issued an executive order which directed the Department of Homeland Security (DHS) to allocate "all legally available resources" to construct and operate immigration detention facilities and hold immigrants there for the duration of their proceedings. A February 20 implementing memorandum from the DHS Secretary stated that the asylum parole directive was still in effect (an assertion that the government repeated to the Supreme Court one day later in a February 21 brief filed in the Jennings v Rodriguez case), but the February 20 DHS memorandum, like the President's executive order, signaled that ICE should not generally release asylum seekers from detention on parole. The DHS memorandum for instance indicated that parole authority should be used "sparingly" and that the parole directive's effectiveness is subject to pending review, evaluation and the issuance of addition ICE guidance.

21. Since the issuance of that executive order and its February 20th implementing memorandum, Human Rights First's research has revealed that ICE has largely refused to release asylum seekers from detention on parole. Non-profit attorneys working at facilities detaining adult asylum seekers in South Texas, Illinois, Louisiana, Southern California, Arizona, and New Jersey, among other locations, reported to Human Rights First researchers that parole grants are extremely rare or virtually non-existent, even when clients meet the relevant release criteria. In fiscal year 2016, the average daily detention population was 34,376, while in April and August of 2017, the average daily detention population was 40,467 and 38,153, respectively. This research and data is described in Human Rights First's September 2017 report "Judge and Jailer: Asylum Seekers Denied Parole in Wake of Trump Executive Order."

22. Families detained in family detention who are deemed arriving asylum seekers continue to be held in detention for several weeks and after that time in detention, which can be harmful to children according to medical experts, generally released on parole according to information received from legal providers that provide pro bono support at family detention facilities.

23. These practices of preventing release or severely restricting options for release of individuals who meet the criteria for parole, despite the clear directions provided in the 2009 asylum parole directive, are part of a policy to deter individuals from coming to the United States to seek asylum, and to in effect punish those who already have done so. In some cases, asylum seekers have given up their asylum claims due to the difficulty of being held in immigration detention for extended periods of time.

**Prison-Like Conditions**

24. Asylum seekers are typically held in jails or in facilities that have conditions that are identical to or closely resemble those used in correctional facilities. In these facilities, asylum seekers typically wear prison uniforms and generally have limited outdoor access, in many facilities have little if any access to contact visitation, do not have free movement within the secure facility and are sometimes held in the same room for 23 hours each day. International human rights authorities, U.S. criminal justice and corrections experts, and USCIRF have explained that such conditions are inappropriate for civil immigration detention of asylum seekers. A comprehensive study by medical professionals, conducted by Physicians for Human Rights and the Bellevue NYU Program for Survivors of Torture, documented that asylum seekers held in U.S. immigration detention suffer from high levels of depression, PTSD and anxiety and these conditions worsen the longer that asylum seekers are held in detention.

**Compensation**

25. I have not been compensated by counsel for the plaintiffs or any other party for providing this expert declaration.

**Prior Testimony**

26. I have not testified as an expert in prior litigation in the United States.
27. I reserve the right to amend or supplement this report as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury under the laws of the United States that the foregoing is my true and correct declaration.

Executed this **11** day of **January**, 2018, at **New York**, **NY**.

_[signature]_
NAME

# EXHIBIT A

**ELEANOR A. ACER**
301 11th Street
Brooklyn, New York 11215
(917) 880-1487 – eleanoracer@msn.com

**Human Rights, Migration and Refugee Experience**

**Human Rights First** (former Lawyers Committee for Human Rights)
*Senior Director, Refugee Protection,* 2014-18
- Lead Human Rights First's refugee and asylum research and advocacy
- Conduct field research on refugee and migrant issues, past research in Egypt, Jordan, Lebanon, South Africa, Turkey, Mexico as well as the United States
- Draft and oversee publication of reports, briefing papers and other analysis
- Speak at symposia, briefings, Congressional hearings and events
- Engage with the media, draft and oversee press releases, op-eds, and other public advocacy materials

*Director, Refugee Protection Program,* 1996 to 2014
- Supervised legal representation staff in three offices and oversaw assessment and launch of legal representation office in Houston
- Advocated with U.S. government officials for fair asylum laws and procedures consistent with international human rights standards
- Oversaw Human Rights First's Iraq Refugee Crisis Initiative
- Spoke publicly at trainings, panels and press briefings, and to the media
- Conduct annual outcome planning and reporting, coordinated strategic planning

**American Bar Association, Commission on Immigration,** and Advisory 2009-2015
- Contributed to development of ABA guidelines on civil immigration detention

**International Detention Coalition, Advisory Committee,** founding to present

**New School for Social Research, Graduate Program in International Affairs,**
Adjunct Professor, 2008 and 2009 academic years
- Taught "Refugees and Asylum" and "Migrants Rights and Refugee Protection"

**Refugee Council USA, Vice Chair,** 2006-2008

**Prior Legal Experience**

**Kirkpatrick & Lockhart LLP**, Litigation Associate, 1993 to 1996
- Represented individuals, securities firms and national securities exchange in complex securities, corporate, contract and other litigation matters
- Pro bono representation of asylum seekers, amicus curiae brief and other projects

**Lord Day & Lord, Barrett Smith**, Litigation Associate, 1988 to 1993
- Handled contract and securities matters; briefs, discovery, depositions.

1

**Other Public Service Experience**

**Mentor Programs**, sponsored by NYC Board of Education and Federal Bar Council
- Coordinated firms' participation in mentoring programs with local high schools
- Served as mentor for students and discussed legal issues at high school classes

**Education**

**Fordham University School of Law, J.D. 1988**
- International Law Journal, Moot Court Board

**Brown University, B.A. History 1984**
- Resident and Head Resident Counselor, Student Life Program Coordinator

**Memberships And Awards**

- Fordham University School of Law, Louis J. Lefkowitz Public Service Award
- Board of Advisors, Crowley Program in International Human Rights, Fordham University School of Law
- Association of the Bar of the City of New York, served on the International Human Rights Committee and the Immigration Law Committees

**Publications**

- "How the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 Has Undermined US Refugee Protection Obligations and Wasted Government Resources," Journal of Migration and Human Security, 2017.
- "Restoring America's Commitment to Refugees and Humanitarian Protection," with Tara Magner, Georgetown Immigration Law Journal, Volume 27, Issue 3, Spring 2013.
- "Reaffirming Rights; Human Rights Protections of Migrants, Asylum Seekers, and Refugees in Immigration Detention," with Jake Goodman, Georgetown Immigration Law Journal, Volume 24, Issue 4, 2010/11.
- Panel Presentation, "Should There be Remote Public Access to Court Filings in Immigration Cases?," The Philip D. Reed Lecture Series, Conference on Privacy and Internet Access to Court Files, Fordham Law Review October 2010.
- "Obtaining Parole of Asylum-Seekers, Jumping the Hurdles of Expedited Removal and Detention," with Leslie E. Vélez and Annie Sovcik, Immigration Law Today, May/June 2008.
- "The Post-September 11 Asylum System," with Anwen Hughes, American Bar Association's Litigation: The Journal of the Section on Litigation, Vol. 32, No. 4, Summer 2006.
- "Refuge in an Insecure Time: Seeking Asylum in the Post-9/11 United States," Fordham International Law Journal, Vol. 28, No. 5, May 2005.
- "Making a Difference: A Legacy of Pro Bono Representation," Journal of Refugee Studies, Oxford University Press, Vol. 17. No.3, September 2004.

- "Fairness Sacrificed: Recent Changes to the U.S. Asylum System," In Defense of the Alien, The Center for Migration Studies, Vol. 26, 2003.
- "Living up to America's Values: Reforming the U.S. Detention System for Asylum Seekers," Refuge, Vol. 20, No. 3, Centre for Refugee Studies, York University, Toronto, Canada, May 2002.
- "Detaining the Displaced," Introductory piece as guest editor for special edition of Refuge including articles on detention practices in Mexico, South Africa, Australia, Canada and the United States, Vol. 20, No.3, May 2002.
- "And the Boat is Still Rocking: Asylum Practice Update in the Midst of Shifting Regulations and Case Law," with Beth Lyon, Immigration Briefings Nos. 99-2, 99-3, Feb and March 1999.