**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| ARACELY, R., *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 17-1976 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 38, 55, 61, 75, 79, |
| | : | | 89, 90 |
| KIRSTJEN NIELSEN, | : | | |
| SECRETARY, UNITED STATES | : | | |
| DEPARTMENT OF | : | | |
| HOMELAND SECURITY, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

**DENYING DEFENDANTS' MOTION TO TRANSFER VENUE; GRANTING PLAINTIFFS' MOTIONS TO
SUPPLEMENT THEIR PRELIMINARY INJUNCTION APPLICATION AND EXHIBITS; AND GRANTING
IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

Every day, individuals fleeing persecution and violence in their home countries seek

asylum within our borders.  And every day, United States immigration officials must determine

whether to admit these individuals or reject them.  This case concerns what happens to these

individuals while their requests for asylum are considered.  Plaintiffs undertook perilous

journeys to reach our borders, submitted asylum petitions, and were detained in what they claim

to be prison-like conditions for an extended period of time while their petitions were evaluated.

They contend that their detention without access to a bond hearing before an immigration judge

violated their constitutional rights.  They also contend that immigration officials routinely and

systematically failed to abide by a binding, official agency directive governing parole

determinations, and instead applied an unwritten, unconstitutional policy promulgated by top

policy makers. In the absence of this unwritten policy, Plaintiffs argue, they would have been conditionally paroled into the United States.

Presently before the Court are two preliminary motions. First, Defendants seek to transfer this litigation's venue from the District of Columbia to the Southern District of Texas. Second, Plaintiffs seek preliminary injunctive relief granting them bond hearings before immigration judges, and compelling Defendants to comply with the official directive and halt the alleged unwritten policy. For the reasons explained below, the Court denies Defendants' motion, and grants Plaintiffs' motion in part.

## II. BACKGROUND

### A. Statutory and Regulatory Framework

This case concerns statutes and regulations within the scope of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq.* The INA sets forth the conditions under which a foreign national may be admitted to and remain in the United States, and it grants the Department of Homeland Security ("DHS") the discretion to initiate removal proceedings. *See, e.g., id.* §§ 1181–1182, 1184, 1225, 1227–1229, 1306, 1324–25. Within DHS, Immigration and Customs Enforcement ("ICE") is the department that is primarily charged with administering the INA. *See* 6 U.S.C. §§ 111, 251, 291. The interactions relevant to this action involved ICE officials.

Plaintiffs are "arriving aliens" from outside of the United States who surrendered to ICE at United States ports of entry, sought asylum ("POE asylum seekers"), and were detained pursuant to 8 U.S.C. §§ 1158(a)(1) and 1225(b).[1] Section 1225(b) provides that if a non-citizen

---

[1] "Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-

"who is arriving in the United States" indicates an intention to apply for asylum or expresses a fear of persecution or torture, the individual must be interviewed to determine whether he or she has a "fear of persecution."[2] 8 U.S.C. § 1225(b)(1)(A)(ii). If the individual is determined to have a credible fear of persecution, he or she "shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). ICE officials determined that each Plaintiff had a credible fear of persecution, so Plaintiffs' detentions were governed by § 1225(b)(1)(B)(ii).

An individual detained under § 1225(b)(1)(B)(ii) can be paroled "into the United States temporarily" by the Attorney General "in his discretion." *Id.* § 1182(d)(5)(A).[3] Agency regulations provide that the Secretary of Homeland Security "may invoke" this parole authority for an individual who is "neither a security risk nor a risk of absconding" and meets one or more of a series of conditions, one of which is that "continued detention is not in the public interest." 8 C.F.R. § 212.5(a), (b)(5).[4] Plaintiffs contend that they met, and continue to meet, this condition.

_____

entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked." 8 C.F.R. § 1.2.

[2] A credible fear of persecution is defined as follows: "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. § 1158]." 8 U.S.C. § 1225(b)(1)(B)(v).

[3] Plaintiff Sadat I. was initially detained under § 1225(b) and denied parole, but an immigration judge subsequently rejected his asylum petition. He is currently seeking to re-open his petition, at which point he will be eligible for discretionary release under 8 C.F.R. § 241.4. Plaintiffs claim that ICE's release determinations under this provision "have been equally impacted by Defendants' new policy of heavily weighing immigration deterrence." Pls.' Am. Mem. at 7 n.13. That claim is discussed below.

[4] Section 212.5(b) governs parole of the following subgroups of POE asylum seekers: (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) aliens whose continued detention

Parole under § 212.5, however, "shall not be regarded as an admission of the alien."  8

U.S.C. § 1182(d)(5)(A).  Instead, when the purpose of the parole has been served, "the alien shall

forthwith return or be returned to the custody from which he was paroled and thereafter his case

shall continue to be dealt with in the same manner as that of any other applicant for admission to

the United States." *Id.*  Further, immigration judges do not have authority under §

1225(b)(1)(B)(ii) to review ICE's parole decisions for POE Asylum Seekers.  *See* 8 C.F.R. §

1003.19(h)(2)(i)(B).  In other words, a POE asylum seeker may be paroled into the United States

after passing a credible fear interview, but that individual is still considered an "arriving alien"

under the law, ICE may revoke the parole at any time, and ICE's parole determination is not

subject to review by an immigration judge.

A 2009 directive issued by ICE sets forth certain procedures that must be utilized and

factors that, according to Plaintiffs, must be considered when evaluating parole requests under 8

C.F.R. § 212.5.  ICE Directive No. 11002.1: *Parole of Arriving Aliens Found to Have a Credible*

*Fear of Persecution or Torture* ("Morton Directive" or the "Directive) (Dec. 8, 2009), Pls. Am.

Mem. P. & A. Supp. Mot. Prelim. Inj. ("Pls.' Am. Mem.") Ex. 13, ECF No. 74-16.  More

specifically, the Morton Directive explains how the term "public interest" in § 212.5(b)(5) is to

be interpreted.  According to the Directive, when an arriving alien found to have a credible fear

of persecution establishes, to the satisfaction of ICE, his or her identity and that he or she

presents neither a flight risk nor a danger to the community, "[ICE] should, absent additional

---

is not in the public interest.  Because of a severe bone infection that Plaintiffs claim was not
properly treated during her detention, Plaintiff Aracely I. was ultimately paroled under §
212.5(b)(1).  She may, however, be re-detained at any point under § 1182(d)(5)(A).

factors . . . parole the alien on the basis that his or her continued detention is not in the public interest." *Id.* ¶ 8.3.

## B.  Factual Background and Procedural History

Plaintiffs are three aliens—Mikailu J., Aracely R., and Sadat I.—who came to the United States seeking asylum.  The following is a brief description of each Plaintiff's journey to this country.

### Aracely R.

Aracely R. fled Guatemala by car in 2016 with her eight-year old daughter.  Decl. of Celinda Aracely R. ("Aracely Decl.") ¶ 2, Pls.' Am. Mem. Ex. 1, ECF No. 74-2.  While driving through Mexico on the way to the United States, their car overturned, killing Aracely's daughter and severely injuring Aracely's leg.  *Id.*  Aracely ultimately reached Hidalgo, Texas, requested asylum at the border, passed her credible fear interview, and was detained under § 1225(b)(1)(B)(ii).  *Id.* ¶ 6.  According to Aracely, she submitted to ICE officials two sponsorship letters from family members, and a copy of her national identification card in support of her request for parole.  *Id.*  She was detained for nearly a year, despite requesting parole at least once.  *Id.*; Decl. of Deborah Achim ("Achim Decl.") ¶ 6, Defs.' Opp'n Pls.' Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 63-1.  In early 2018 her injured leg required emergency surgery, so she was paroled and permitted to travel to California to receive treatment.  Pls.' Am. Mem. at 2 n.4, ECF No. 74-1.

### Mikailu J.

Mikailu J. fled Sierra Leone in early 2017.  Decl. of Mikailu J. ("Mikailu Decl.") ¶ 4, Pls.' Am. Mem. Ex. 4, ECF No. 74-6.  He requested asylum at the Brownsville, Texas port of entry, passed his credible fear interview, and was detained pursuant to § 1225(b)(1)(B)(ii). *Id.* ¶¶

5–7.  According to Mikailu, he submitted to ICE officials copies of his national identification card, his press card, his school identification card, and a letter from a relative offering him full sponsorship in the United States in support of his requests for parole.  *Id*. ¶ 8.  He has been denied parole three times, and is currently detained in the Laredo, Texas Detention Center.  *Id*. ¶¶ 8–9; Achim Decl. ¶ 8.

Sadat I.

Sadat I. fled Ghana in late 2015.  Decl. of Sadat I. ("Sadat Decl.") ¶ 4, Pls.' Am. Mem. Ex. 3, ECF No. 74-5.  After an arduous journey, Sadat requested asylum at the San Diego, California port of entry, passed his credible fear interview, and was detained pursuant to § 1225(b)(1)(B)(ii).  *Id*. ¶¶ 5–7.  According to Sadat, he submitted to ICE officials his national identification card, a copy of his passport, a criminal background check, and sponsorship letters from his uncle and a non-governmental organization in Texas in support of his request for parole. *Id*. ¶ 8.  Although he requested parole, he never received it.  *Id*. ¶¶ 7–8.  Plaintiffs do not clearly explain his current status, but it appears that his petition for asylum was denied in 2016, and he remains detained pending a motion in the Eleventh Circuit to re-open his petition.  *Id*. ¶ 11; Pls.' Am. Mem. at 7 n.13.  If this is true, his detention is pursuant to § 1231(a)(6) rather than § 1225(b), and his parole is governed by 8 C.F.R. § 241.4 rather than § 212.5.  *Id*.

Former Plaintiffs

In addition to these three individuals, Plaintiffs have submitted declarations from two former plaintiffs, Hatim B. and Junior M., who also requested asylum at a port of entry, passed their credible fear interviews, and were detained without parole.  Hatim B. was granted asylum in early 2018 and has been fully released into the United States.  See Pls.' Am. Mem. at 9 n.14. Junior M. returned to his home country of Honduras.  *Id*. at 3.

Plaintiffs claim that they were denied parole because of a de facto immigration policy promulgated by high-level officials in Washington D.C. Pls.' Updated Mem. Opp'n Defs.' Mot. Transfer Venue at 4, ECF No. 64. Specifically, Plaintiffs claim that DHS responded to a surge in asylum seekers beginning in 2014 by instituting policies designed to "serve as a deterrent to asylum seekers by forcing them to either endure prolonged detention or risk the grave perils involved in unlawful entries." Third Am. Compl. ("TAC") ¶¶ 42–44, 62, ECF No. 73. Plaintiffs further contend that "to achieve this result, Defendants initiated an *unwritten* practice and policy, ordering local officials to heavily weight immigration deterrence in deciding parole and similar forms of release." *Id*. ¶ 52. For instance, and as described in more detail below, Plaintiffs cite data compiled by a non-profit human rights organization, Human Rights First,[5] indicating that the parole release rate of the asylum seekers who crossed a U.S. Port of Entry was 80 percent in 2012, but dropped to 47 percent in 2015. *Id*. ¶ 56 (citing Human Rights First, *Lifeline on Lockdown* at 13 (July 2016)). Plaintiffs argue that "[s]uch planned, systematic denials of parole to eligible POE seekers constitute an official agency policy." TAC ¶ 59. They also suggest that Defendants re-emphasized this policy after the 2016 Presidential election. *See* Pls.' Am. Mem. at 17–18.

Plaintiffs argue that their parole requests should have been granted under both international and domestic laws. *Id*. ¶¶ 27, 31. In particular, Plaintiffs cite that the United States adopted Article 2−34 of the 1951 United Nations Convention Relating to the Status of Refugees ("Refugee Convention") and promulgated the Refugee Act of 1980, "which required the United

---

[5] According to its webpage, "Human Rights First is a non-profit, nonpartisan international human rights organization based in New York, Washington D.C., Houston, and Los Angeles." Human Rights First, https://www.humanrightsfirst.org/about (last visited March 9, 2018).

States to establish procedures for noncitizens physically present . . . at a port of entry to apply for asylum." [6] *Id.* ¶¶ 27–28. Article 31 of the Refugee Convention provides that "states shall not impose penalties on refugees for illegal entry or presence." *Id.* ¶ 26

Defendants are government officials who implemented or enforced the alleged immigration deterrence policy.[7] *Id.* ¶ 83. The Secretary of Homeland Security and certain ICE officials, including those who "established, developed and promoted the current binding policy" reside in Washington D.C. Defs' Suppl. Brief Mot. Transfer Venue ("Defs. Suppl. Br.") at 6, ECF No. 67. But, some ICE officials, including those who evaluated Plaintiffs' specific parole requests, reside in Texas. *Id.* at 7.

Plaintiffs filed this suit in late 2017, alleging that (1) ICE's parole denials based on the nation-wide, de facto immigration deterrence policy violates Plaintiffs' First and Fifth Amendment rights under the United States Constitution and is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"); and (2) they are constitutionally entitled to bond hearings before immigration judges. *See generally* Compl., ECF No. 1 They have since amended their complaint on three occasions due to their changing personal circumstances and

---

[6] The complaint also cites other treaties ratified by the United States, including the International Covenant on Civil and Political Rights and the Convention against Torture and Other Cruel, Degrading or Inhuman Punishment. TAC ¶ 29.

[7] Named Defendants include: Kirstjen Nielsen, Secretary of Homeland Security; Thomas Homan, Acting Director of ICE; Matthew Albence, ICE Executive Associate Director of Enforcement and Removal Operations; Phillip Miller, ICE Deputy Executive Assistant Director of Enforcement and Removal Operations; Nathalie Asher, ICE Assistant Director of Field Operations for Enforcement and Removal Operations; Tae Johnson, ICE Assistant Director for Custody Management for Enforcement and Removal Operations; Daniel Bible, ICE Field Office Director for Enforcement and Removal Operations; Janie Bennet, ICE Assistant Field Office Director, Port Isabel Detention Center; Fnu Aguirre, ICE officer; William Oestreich, ICE officer; Andrew Huron, ICE Assistant Field Office Director, South Texas Detention Center; Fnu Groll, ICE Officer; Robert Cerna, ICE Assistant Field Office Director, Laredo Detention Center; Fnu Gamez, ICE Officer; John Doe, ICE Headquarters Post Order Detention Unit; and Health Simon, ICE Headquarters Post Order Detention Unit.

the shifting legal landscape, but their core allegations and relief sought have not changed. *See generally* Am. Compl., ECF No. 7; Second Am. Compl., ECF No. 56; TAC. Shortly after the complaint was filed, Defendants moved to change the litigation's venue to the Southern District of Texas. *See generally* Mot. Transfer Venue, ECF No. 38. Plaintiffs moved for a preliminary injunction in early February 2018, and they amended that motion in March. *See generally* Mot. Prelim. Injunction, ECF No. 54; Pls.' First Am. Appl. Prelim. Inj., ECF No. 74. Finally, Plaintiffs moved to amend their preliminary injunction for a third time in late April 2018. *See generally* Mot. Supp. Appl. Prelim. Injunction, ECF No. 79. Now ripe for the Court's consideration are (1) Defendants' motion to change venue; (2) Plaintiffs' motion to amend their application for a preliminary injunction and update their exhibits in support of that application; and (3) Plaintiffs' motion for a preliminary injunction.

## III. LEGAL STANDARDS

### A. Venue Transfer

Even when venue is properly laid in a given judicial district, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "The idea behind § 1404(a) is that where a 'civil action' to vindicate a wrong—however brought in a court—presents issues and requires witnesses that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court." *Vasser v. McDonald*, 72 F. Supp. 3d 269, 281 (D.D.C. 2014) (citing *Continental Grain Co. v. Barge F.B.L. 585*, 364 U.S. 19, 26 (1960)). "[T]he main purpose of section 1404(a) is to afford defendants protection where maintenance of the action in the plaintiff's choice of forum

will make litigation oppressively expensive, inconvenient, difficult or harassing to defend." *Starnes v. McGuire*, 512 F.2d 918, 927 (D.C. Cir. 1974) (en banc).

## B. Preliminary Injunction

"[A] preliminary injunction is an injunction to protect [the movant] from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 954 (D.C. Cir. 2005) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedures § 2947 (2d ed. 1992)). "[T]he decision to grant injunctive relief is a discretionary exercise of the district court's equitable powers." *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 201 (D.D.C. 2017) (quoting *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1209 (D.C. Cir. 1989)). A preliminary injunction is an "extraordinary remedy," and one that is "never awarded as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008).

To warrant preliminary injunctive relief, the moving party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Of these factors, likelihood of success on the merits and irreparable harm are particularly crucial. *See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (reading *Winter* "to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction'"); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("[A] movant must demonstrate at least some injury for a preliminary injunction to issue, for the basis of injunctive relief in federal courts has always been irreparable harm." (internal citations and quotation marks omitted)).

Furthermore, "if the requested relief 'would alter, not preserve, the status quo,' the court must subject the plaintiff's claim to a somewhat higher standard." *Paleteria La Michoacana, Inc v. Productos Lacteos Tocumba S.A. de C.V.*, 901 F. Supp. 2d 54, 56 (D.D.C. 2012) (quoting *Veitch v. Danzig,* 135 F. Supp. 2d 32, 35 (D.D.C. 2001)); *see also Singh v. Carter*, 185 F. Supp. 3d 11, 17 n.3 (D.D.C 2016); *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997). Because Plaintiffs seek to alter—not preserve—the status quo, the Court will exercise extreme caution in assessing Plaintiffs' invitation to invoke the court's extraordinary equitable powers. *See Allina Health Servs. v. Sebelius,* 756 F. Supp. 2d 61, 70 n.5 (D.D.C. 2010).

## C. Administrative Procedure Act

The APA governs the conduct of federal administrative agencies. 5 U.S.C. §§ 101–913. It permits a court to "compel agency action unlawfully withheld or unreasonably delayed," and to "hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706. The APA provides for judicial review of all "final agency action for which there is no other adequate remedy in court," *id*. § 704, except when "statutes preclude judicial review" or the "agency action is committed to agency discretion by law," *id*. § 701(a).

## IV. VENUE TRANSFER ANALYSIS

The Court first considers Defendants' motion under 28 U.S.C. § 1404(a) to transfer the action to the Southern District of Texas, and their related argument that Plaintiffs' claims may only be raised through a habeas corpus petition. The Court is unpersuaded by both arguments.

## A.  Habeas Corpus

The Court first considers whether, as asserted by Defendants during the March 2, 2018 motion hearing and in many of their briefs, Plaintiffs must bring their claims through a habeas petition.  Generally, jurisdiction for a core habeas petition challenging present physical confinement lies only in the district of confinement.  *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004).  Thus, if Defendants are correct that Plaintiffs may only seek relief by way of a habeas petition, this Court would likely lack jurisdiction because none of the Plaintiffs are confined in this District.

However, Plaintiffs have not brought their claims by way of a habeas petition, nor are they required to do so.  Indeed, "a federal prisoner need bring his claim in habeas only if success on the merits will 'necessarily imply the invalidity of confinement or shorten its duration.'" *Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005)).  "Otherwise, he may bring his claim through a variety of causes of action."  *Id*.  Here, Plaintiffs challenge (1) what they claim is a de facto policy of denying parole to asylum seekers, in violation of the APA; and (2) their detention without access to a bond hearing by an immigration judge, in violation of the Constitution.  If Plaintiffs are successful and this Court enjoins Defendants from adhering to any such policy and requires that Plaintiffs be given bond hearings, that ruling would not necessarily imply that their confinement is invalid or otherwise should be shorter, because their parole could still be denied for other legitimate reasons.

Indeed, other courts in this jurisdiction facing challenges to similar nation-wide immigration policies have rejected the notion that detainees must proceed through a habeas petition.  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 186 (D.D.C. 2015)  ("although Congress

has expressly limited APA review over individual deportation and exclusion orders, *see* 8 U.S.C. § 1252(a)(5), it has never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA.").  Although, as Defendants regularly note, many of the relevant cases challenging the government's treatment of asylum seekers lie in habeas, those cases do not stand for the proposition that they could *only* have been brought as habeas petitions.  *See Davis*, 716 F.3d at 666 (holding that a federal prisoner need not bring an equal protection challenge to his sentence by means of a habeas petition because "[s]uccess would do no more than allow him to seek a sentence reduction, which the district court retains the discretion to deny").  Accordingly, Plaintiffs may proceed on their claims under the APA and the Constitution, and jurisdiction is proper in the District of Columbia.

### B. Venue

The Court now turns to its venue analysis.  Defendant moves to transfer this case to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a).  Section 1404(a) "vests 'discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness.'"  *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 50 (D.D.C. 2000) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).  When venue is properly laid in this jurisdiction, "[t]ransfer elsewhere under Section 1404(a) must . . . be justified by particular circumstances that render [this] forum inappropriate by reference to the considerations specified in that statute.  Absent such circumstances, transfer in derogation of properly laid venue is unwarranted."  *Starnes*, 512 F.2d at 925–26.

The statute "directs a district court to take account of factors other than those that bear solely on the parties' private ordering of their affairs.  The district court also must weigh in the

balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of 'the interest of justice.'" *Stewart Org.*, 487 U.S. at 30. However, the precise "standards to be considered in determining whether to grant or deny a section 1404(a) motion to transfer are generally . . . left to the discretion of the trial court," *SEC v. Page Airways, Inc.*, 464 F. Supp. 461, 463 (D.D.C. 1978), which is "broad" but "not untrammeled," *Fine v. McGuire*, 433 F.2d 499, 501 (D.C. Cir. 1970) (per curiam) (noting that the trial court must "give consideration to the traditional [forum non conveniens] factors, including the plaintiff's choice of forum").

Ultimately, the burden is on the moving party to establish that transfer under § 1404(a) is proper. *Montgomery v. STG Int'l, Inc.*, 532 F. Supp. 2d 29, 32 (D.D.C. 2008); *Trout Unlimited v. U.S. Dep't of Ag.*, 944 F. Supp. 13, 16 (D.D.C. 1996). Accordingly, Defendants must make two showings to justify transfer. First, Defendants must establish that Plaintiffs could have brought the action in the proposed transferee district. *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). Second, Defendants must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to that district. *Trout Unlimited*, 944 F. Supp. at 16. In evaluating a motion to transfer, a court should weigh several private- and public-interest factors. *Sheffer v. Novartis Pharm. Corp.*, 873 F. Supp. 2d 371, 375 (D.D.C. 2012) (citing *Trout Unlimited*, 944 F. Supp. at 16).

Although the threshold inquiry under the statute is whether the action could have been brought in the proposed transferee district, *Blackhawk Consulting LLC v. Fed. Nat'l Mortg. Ass'n*, 975 F. Supp. 2d 57, 60 (D.D.C. 2013) (citing 28 U.S.C. § 1404(a)), in this case, Plaintiffs do not dispute that the action could have been brought in the Southern District of Texas. *See* Pls.' Mem. P. & A. Opp'n Defs.' Mot. Transfer Venue ("Pls.' Opp'n") at 8, ECF No. 41. Thus,

"this Court's only task is to determine whether the private and public interest factors weigh in favor of or against transfer." Pls.' Opp'n at 8; *see Sheffer*, 873 F. Supp. 2d at 375. For the reasons stated below, the Court finds that Defendants have failed to demonstrate that these factors weigh in favor of venue transfer. Accordingly, this Court denies Defendants' motion.

## 1. Private Interest Considerations

To resolve Defendants' motion, the Court must first consider certain "private-interest factors." *Sheffer*, 873 F. Supp. 2d at 375. These factors roughly break down into three categories: (1) the preferred forum of the parties, (2) the location where the claim arose, and (3) factors of convenience.[8] *Id.*

### a. The Preferred Forum of Each Party

In this case, neither of the parties' forum preferences are entitled to significant weight. Ordinarily, a plaintiff's choice of forum is afforded "considerable deference." *S. Utah Wilderness Alliance v. Norton*, 315 F. Supp. 2d 82, 86 (D.D.C. 2004). However, that choice is "conferred less deference by the court when [it] is not the plaintiff's home forum." *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 24 (D.D.C. 2002) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981). Here, two of the three Plaintiffs are currently detained in Texas, and the third is currently located in California. *See* TAC ¶¶ 76, 79, 80. Plaintiffs claim no specific personal connection to the District of Columbia, nor do they make any argument that it should be considered their home. *See* Pls. Opp'n at 10. Thus, Plaintiffs' choice of forum does not weigh as strongly against transfer as it would if they resided in the District, and their preference is

---

[8] The private-interest considerations are typically described as including: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) the location where the claim arose; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) ease of access to sources of proof. *Sheffer*, 873 F. Supp. 2d at 375.

partly balanced against Defendant's preference for the Southern District of Texas. The parties' respective forum preferences, on balance, weigh only slightly against transfer. *See Foote v. Chu*, 858 F. Supp. 2d 116, 121 (D.D.C. 2012) (where the plaintiffs and defendants resided outside of the District, holding that "the parties' respective forum preferences weigh against transferring the case, although not as strongly as it would if Plaintiff resided in this District.")

### b. *Location Where the Claims Arose*

The parties strongly dispute whether Plaintiffs' claims arose primarily in the District of Columbia or in the Southern District of Texas. The D.C. Circuit has cautioned that "[c]ourts in this circuit must examine challenges to . . . venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia." *Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993). However, when a plaintiff directly challenges a policy promulgated in the District of Columbia, "the interests of justice could well favor venue [in this District]." *Aishat v. DHS*, 288 F. Supp. 3d 261, 270 (D.D.C. 2018). For example, in *Ravulapalli v. Napolitano*, a court in this jurisdiction held that the claims in that case arose primarily in the District of Columbia when "officials at the United States Citizen and Immigration Services ("USCIS") Texas Service Center denied Plaintiff's I-485 applications based on policy guidance issued from USCIS headquarters in the District of Columbia." 773 F. Supp. 2d 41, 56 (D.D.C. 2011).

This principle is supported, rather than undercut, by Defendants' case law. Defendants filed a Notice of Supplemental Authority directing the Court to *Aishat*, which they characterized as a recent case in which the District "granted a motion to transfer venue . . . with factual circumstances that are analogous to this case." Def.'s Notice Supplemental Auth. at 1, ECF No. 70. But rather than support Defendants' argument, *Aishat* suggests that venue is proper in this

District.  In *Aishat*, the plaintiff sued DHS, USCIS, and agency employees in both Washington

D.C. and Texas seeking to compel USCIS to resolve his naturalization application after years of

delays by its Dallas Field Office.  288 F. Supp. 3d at 264–65.  In his briefing, but importantly not

in his complaint, the plaintiff argued that USCIS had implemented an agency-wide policy

mandating denial or delay of applications from Middle Eastern or South Asian individuals, a

group including the plaintiff.  *Id*. at 269–70.  The court noted that "[w]ere [the plaintiff] directly

challenging [the policy], the [c]ourt agrees that the interests of justice could well favor venue

here . . . [p]erhaps even challenging the Dallas Field Office's *application* of [the policy] to him

would suffice."  *Id*. at 269 (citing *Ravulapalli*, 773 F. Supp. 2d at 56).  But because the plaintiff

did not raise those challenges in his complaint, they were not entitled to sufficient weight to

sustain venue in the District when the plaintiff's core allegations related to his individualized

naturalization decision made in Texas.  *Id*.

Here, Plaintiffs emphasize that "[they] are not seeking review of ICE's exercise of

discretion in reaching their individualized parole decision."  Pls. Opp'n at 8.  Rather, Plaintiffs

claim that Texas-based Defendants improperly denied parole requests "in compliance with the

official policies promulgated by the D.C. based Defendants."  *Id*.; TAC ¶¶ 52, 96.  Plaintiffs

argue that their "cause of action therefore arises from this national policy, not the low-level

decisions of individual officers who were bound by such policy."  *Id*. at 9.  Thus, as discussed in

*Ravulapalli* and *Aishat*, because Plaintiffs in this case are challenging the application of a

purported policy that supposedly emanated from an agency located in the District of Columbia,

the Court finds that this factor weighs in favor of retaining venue.

### c. *Convenience Factors*

Next, the Court must consider certain convenience factors. Specifically, the Court

considers the convenience of the parties, convenience of witnesses, and ease of access to sources

of proof. Here, these factors are in equipoise. Plaintiffs are detained or reside in Texas and

California, and Defendants reside in Texas and the District of Columbia.[9] Defs.' Mot. Transfer

Venue ("Defs. Motion") at 12, EFC No. 38-1; Pls.' Opp'n at 13. Likewise, it is very likely that

important witnesses and documents will likely be found in both Texas and the District of

Columbia. Indeed, ICE field officers who participated in Plaintiffs' parole determinations and

documents relating to those detentions will likely be located in Texas. Defs. Mot. at 12−13. On

the other hand, the government officials who allegedly established, developed, and promoted the

policy at the heart of this case, and the documents relating thereto, will likely be found, if at all,

in the District of Columbia. Defs. Suppl. Mot. at 6. Therefore, the convenience factors weigh

neither in favor of nor against transfer.[10]

### 2. Public Interest Considerations

The Court next considers certain public-interest considerations. Specifically, it considers

(1) the transferee district's familiarity with the governing law; (2) the relative congestion of the

---

[9] Given that Plaintiffs lodge APA claims against the District of Columbia-based individual Defendants in their official capacities, related to an alleged national policy, it is unclear that it was necessary for them to name the Texas-based individual Defendants in this action.

[10] The Court finds it somewhat ironic that Plaintiffs' Texas-based attorneys seek to litigate this case in the District of Columbia, while Defendants' District of Columbia-based attorneys seek to litigate this case in Texas. Regardless, "the location of counsel 'carries little, if any, weight in an analysis under § 1404(a).'" *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 52 n.7 (D.D.C. 2000) (quoting *Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp. 2d 1, 6 n. 4 (D.D.C. 1999)).

courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home. *Onyeneho v. Allstate Ins. Co.*, 466 F. Supp. 2d 1, 3 (D.D.C. 2006).

Because this case involves only federal law claims, the first factor does not weigh either for or against transfer because all federal courts are equally competent to resolve such matters. *See, e.g., Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 49 (D.D.C. 2006) (holding that "both courts are competent to interpret the federal statutes involved[,] . . . there is no reason to transfer or not transfer based on this factor").

The parties each cite favorable statistical evidence regarding the second factor, but Defendants' statistics are slightly more persuasive. Plaintiffs maintain that "the Southern District of Texas is far more congested than that of the District of Columbia." Pls. Opp'n at 16. Plaintiffs present statistics showing that, as of September 2017, there were 12,497 pending cases in the Southern District of Texas, averaging 658 pending cases per judge, while there were 3,942 cases pending in the District of Columbia, averaging 263 pending cases per judge. *Id.* Defendants, however, argue that "the chart for 2016 suggests the docket is relatively less congested in the Southern District of Texas," and they present statistics showing that "median length for a civil case that goes to trial in the District of Columbia is 31 months, and in the Southern District of Texas is 24 months." Defs. Mot. at 15. Given the statistics, the Court considers the District of Columbia to be slightly more congested because cases appear to move more slowly in this District. "Those raw statistics, however, may overstate the difference, as they 'provide, at best, only a rough measure of the relative congestion of the dockets in the two districts.'" *Aishat v. U.S. Dep't of Homeland Sec.*, 288 F. Supp. 3d 261, 271 (D.D.C. 2018) (citing *United States v. H & R Block, Inc.*, 789 F. Supp. 2d 74, 84–85 (D.D.C. 2011).

Accordingly, this factor weighs only slightly in favor of transfer, and on balance it does not overcome the factors weighing against transfer.

Finally, the potential national significance of this dispute dictates that the third public-interest factor weighs against transferring the case to satisfy a local interest. Defendants argue that "there is a strong local interest for the courts in the Southern District of Texas in deciding [this dispute]," Defs. Mot. at 15−16, because Plaintiffs are or were detained in Texas and most of the discretionary parole determinations were made by federal officials there. But, in determining whether a controversy is local, courts have often considered a variety of different factors other than where Plaintiffs are located or where the challenged decision was made. These other factors include, "whether the decision directly affected the citizens of the transferee state; the location of the controversy, whether the issue involved federal constitutional issues rather than local property laws or statutes; whether the controversy involved issues of state law, whether the controversy has some national significance; and whether there was personal involvement by a District of Columbia official." *Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 122, 126 (D.D.C. 2008) (citing *Nat'l Wildlife Fed'n*, 437 F. Supp. 2d at 49; *Sierra Club*, 276 F. Supp. 2d at 70).

Plaintiffs have been clear that their challenge is not based on the specific decisions made by federal officials in Texas, but rather upon an alleged national policy promulgated by DHS, which carries with it nationwide significance. Thus, the Court concludes that the Southern District of Texas has no particular localized interest in this litigation. *Ravulapalli*, 773 F. Supp. 2d at 56 (holding that transferee forum had no localized interest where "plaintiffs' claims focus primarily on the policies issued from [D.C.] headquarters that apply to all [regional] offices" (citing *Otay Mesa Prop. L.P.*, 584 F. Supp. 2d at 126−27)).

\*          \*          \*

After weighing the relevant private and public interest considerations, the Court concludes that, on balance, those considerations favor retaining venue in this District, albeit slightly.  Because the injuries perceived by Plaintiffs allegedly stem from policies that were conceived, promoted, and implemented by government officials in the District of Columbia, their claims hold a close connection to this forum.  While many of the factors discussed above, including factors of convenience, do not clearly favor one forum over the other, on balance they do not weigh in favor of transfer.  Accordingly, the Court concludes that the Defendants have failed to meet their burden to show that considerations of convenience and the interest of justice favor transferring this matter to the Southern District of Texas.

## V.  ANALYSIS OF PLAINTIFFS' MOTION TO SUPPLEMENT THEIR PRELIMINARY INJUNCTION APPLICATION

The Court next considers whether Plaintiffs may supplement their preliminary injunction application for a second time.  In their first amended application, Plaintiffs asked the court to:

1.  Enjoin the application of 8 C.F.R. § 1003.19(h)(2)(i)(B) against Plaintiffs, which would deprive them of a bond hearing before an immigration judge;

2.  Enjoin Defendants from considering the deterrence of immigration in evaluating Plaintiffs' requests for parole; and

3.  Enjoin Defendants from violating ICE Policy Directive 11002.1 in evaluating Plaintiffs' requests for parole.

Pls.'First Am. Appl. Prelim. Inj. at 1–4.  In their second amended application ("SAA"), Plaintiffs ask the court to:

1. Enjoin any further detention of the Plaintiffs in the absence of a custody hearing before an immigration judge "which results in a finding that that detention is necessary to prevent flight or serious danger to the community";

2. Enjoin the application of 8 C.F.R. § 1003.19(h)(2)(i)(B), and any related rules which would deprive Plaintiffs of a bond hearing before an immigration judge, against Plaintiffs;

3. Enjoin Defendants from considering immigration deterrence in evaluating Plaintiffs' requests for parole; and

4. Enjoin Defendants from violating ICE Policy Directive 11002.1 in evaluating Plaintiffs' requests for parole.

Pls.' Second Am. Appl. Prelim. Inj. at 2, ECF No. 79-1.

Plaintiffs claim that the SAA is necessary to crystallize the relief sought because "Defendants still would not grant a bond hearing before an immigration judge even if the exclusion clause in 8 C.F.R. § 1003.19(h) were enjoined from application to the Plaintiffs." Pls.' Mot. Suppl. Prayer Relief ("Pls.' Mot. Supp.") ¶ 2 n.1, ECF No. 79. The SAA is therefore intended to "provide for more flexible relief, and thereby prevent continued disputes," by expanding the relief sought with respect to bond hearings. *Id*. ¶ 3. In support of the SAA, Plaintiffs have adopted in full their previously filed Amended Memorandum in Support of their Application for Preliminary Injunction. *Id*. ¶ 6.

Defendants assert five reasons why the Court should not grant Plaintiffs' motion. First, "Plaintiffs improperly rely on Federal Rule of Civil Procedure 15" in support of their motion. Def.'s Mot. Opp'n Pls.' Mot. Supp. Prayer Relief ("Def.'s Opp'n Supp.") at 4–5, ECF No. 86. Second, Plaintiffs fail to properly support the SAA with law and facts. *Id*. at 5–6. Third, the

SAA is "a litigation strategy to forestall this Court's consideration of the venue motion." *Id*. at 6–7. Fourth, the SAA seeks the ultimate relief sought in this case. *Id*. at 7–8. And fifth, the SAA "is seeking habeas relief, which this Court cannot provide." *Id*. at 8.

The Court need only address whether Plaintiffs have legal authority to supplement their preliminary injunction application, because Defendants' other four reasons may be swiftly disposed of. While Plaintiffs have not filed a new memorandum of law and facts in support of the SAA, they clearly state that they rely on their previously filed, and fully briefed, memorandum to support it. Pls.' Mot. Supp. ¶ 6. If that memorandum does not justify the requested relief, the Court will deny it. Further, the SAA has had no impact on the timing of the Court's determination of whether the case should be transferred, which should be clear from the fact that the Court is disposing of both motions simultaneously. Next, Defendants' argument that the SAA seeks the ultimate relief sought in this case will be addressed in the Courts' evaluation of the SAA's merits. Finally, as discussed above, Plaintiffs need not bring their claims by way of habeas.

The Court now turns to Defendants' contention that Plaintiffs do not have authority to supplement their preliminary injunction application. Defendants correctly note that a motion is not, under normal circumstances, considered a pleading, which means that Federal Rule 15, addressing pleading amendments, is inapplicable here. Def.'s Opp'n Supp. at 4–5; *see Marsh v. Johnson*, 263 F. Supp. 2d 49, 53–54 (D.D.C. 2003). That is not fatal to the SAA, however, because the Court need not rely on a Federal Rule when exercising its discretion.

The Supreme Court has long recognized that "a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v.*

*Bouldin*, 136 S.Ct. 1885, 1891 (2016) (quoting *Link v. Wabash R. Co.,* 370 U.S. 626, 630–631 (1962)).  Accordingly, the Court has broad discretion to allow a party to amend a motion to "ensure that the case is adjudicated fairly and justly," particularly when "the adverse parties will not be prejudiced by the amendment."  5 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1194 (3d ed. 2018).  Defendants vaguely assert that the SAA "does not meet this standard," but they provide no support for that assertion.  Def.'s Opp'n Supp. at 5.  The SAA has not delayed the Court's resolution of Plaintiffs' motion for a preliminary injunction and Defendants' motion to transfer venue, nor does it meaningfully alter the issues argued in the parties' preliminary injunction briefing.  The SAA merely repeats the relief sought in Plaintiffs' previous application, Pls.' First Am. Appl. Prelim. Inj. at 1–2, and clarifies that Plaintiffs seek to enjoin their detention in the absence of a bond hearing before an immigration judge.  Pls.' Second Am. Appl. Prelim. Inj. at 2.  This clarity will assist the court in ensuring that the case is adjudicated fairly and justly.

Furthermore, "[c]rafting a preliminary injunction is an exercise of discretion and judgment," and in exercising its judgment a court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 at 115 (3d ed. 2013)) (internal quotation marks omitted).  This Court's discretion in granting preliminary injunctive relief is therefore not constrained by the relief Plaintiffs explicitly seek, and the SAA does not allow the Court to impose relief that it could not already impose under Plaintiffs' previous application.  In light of the Court's discretion, it is unclear how Defendants would be prejudiced by allowing Plaintiffs to refine their request for relief.

\*          \*          \*

For the reasons stated above, the Court grants Plaintiffs' motion to supplement the prayer for relief in their application for a preliminary injunction.  For the same reasons, the Court also exercises its discretion to grant Plaintiffs' recent motion to update their preliminary injunction exhibits.  The Court will now address Plaintiffs' motion for a preliminary injunction.

## VI. PRELIMINARY INJUNCTION ANALYSIS

Plaintiffs assert (1) that their detention without access to bond hearings before immigration judges violates their Constitutional rights; and (2) that pursuant to a nationwide, unwritten policy, ICE improperly considered immigration deterrence as a factor in evaluating whether they should be paroled under 8 U.S.C. § 1182(d)(5)(A).  Plaintiffs seek preliminary injunctive relief in the form of an order (1) requiring that they be provided bond hearings before immigration judges if their detention continues; (2) enjoining ICE officials from considering deterrence as a factor in their parole decisions going forward; and (3) mandating that ICE officials follow the Morton Directive in their parole decisions.  *See generally* Pls.' Second Am. Appl. Prelim. Inj.  Defendants argue that even if Plaintiffs' motion overcomes certain threshold obstacles, they have not shown that they are entitled to preliminary injunctive relief.  The Court first considers Defendants' justiciability and jurisdictional arguments, then it addresses Plaintiffs' merits arguments.  As explained below, the Court concludes that it may review the merits of Plaintiffs' arguments, and it holds that Plaintiffs have met their burden of establishing that, as a preliminary matter, they are entitled to parole determinations in compliance with the Morton Directive, but not that they are entitled to bond hearings before immigration judges.

## A. Threshold Issues

Defendants lodge two general threshold objections to this Court's review, and two threshold objections specific to Plaintiffs' APA claims. With respect to the entirety of Plaintiffs' motion, Defendants argue that (1) the Court is statutorily barred from reviewing what Defendants characterize as discretionary decisions by ICE officials; and (2) this suit is moot, because Plaintiffs have already received the relief that they seek under the Morton Directive.[11] Defs.' Opp'n at 2–3. With respect to Plaintiffs' APA claims, Defendants argue that (1) Defendants' alleged policy is not a final agency action subject to APA review; and (2) habeas is an adequate alternate remedy to the APA, such that APA review is improper. *Id*. The Court disagrees with each objection.

### 1. The Court's Jurisdiction

Defendants' first challenge to the justiciability of Plaintiffs' suit rests on 8 U.S.C. § 1252(a)(2)(B)(ii), which bars judicial review of discretionary decisions made under the INA. Defendants assert that the Court lacks jurisdiction to consider Plaintiffs' claims because the statutory bar covers judicial review of "the decision to grant or deny parole and the underlying

---

[11] Defendants raise one additional standing argument, based on their claim that "Plaintiffs seek a court order compelling the Executive to release them into the United States," among other relief. Defs.' Opp'n at 26. They argue that "[t]o the extent Plaintiffs are seeking release or a hearing before an immigration judge that will functionally result in release, Plaintiffs lack standing to seek such relief." *Id*. at 22. While it may be true that this Court cannot order Plaintiffs released into the United States, the Court does not read Plaintiffs' complaint or application for a preliminary injunction to seek such relief. And Plaintiffs explicitly deny that they seek release. *See* Pls.' Reply Defs.' Opp'n ("Pls.' Reply") at 11, ECF No. 72 ("[S]uccess for the Plaintiffs in this case will not necessarily mean immediate release from detention or a shorter stay in detention."). Also if, as Defendants claim, ICE officials adhere strictly to the Morton Directive and do not apply deterrence as a factor in making parole determinations, it is unclear why additional review would "functionally result in release" for Plaintiffs. Defs.' Opp'n at 22 Regardless, the Court will not interpret Plaintiffs' action to seek relief that it does not clearly seek. *Cf. Caterpillar Inc. v. Williams*, 482 U.S. 386, 394–95 (1987) (noting that plaintiffs are "masters of the complaint," free to choose the relief they seek).

determinations made by ICE in arriving at parole decisions." Defs.' Opp'n at 17. Plaintiffs do not contest that § 1252(a)(2)(B)(ii) bars judicial review of individual parole determinations, and they concede that they "do not ask the Court to interfere with the ultimate parole determination in each of their cases." Pls.' Reply at 12. Rather, they argue that the statutory bar does not prevent the Court from evaluating "Defendants' failure to follow procedures set out in the [Morton Directive] and their unlawful consideration of deterrence as a heavily weighted criterion when evaluating requests for parole." *Id.* The Court is persuaded by Plaintiffs' interpretation of the provision.

Under § 1252(a)(2)(B)(ii), "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security," with the exception of determinations regarding eligibility to apply for asylum under § 1158(a). "[T]his subchapter" includes § 1182(d)(5)(A), which provides the Secretary of Homeland Security with authority to parole aliens "in his discretion . . . temporarily under such conditions as he may prescribe." *See also* 8 C.F.R. § 212.5(a), (b). In other words, the parole decisions from which this action arises are discretionary, and are therefore not reviewable by this Court pursuant to § 1252(a)(2)(B)(ii).

While § 1252(a)(2)(B)(ii) undoubtedly bars judicial review of individual parole decisions, courts have declined to apply it to claims challenging the legality of policies and processes governing discretionary decisions under the INA. For instance, in *Zadvydas v. Davis*, which involved statutory and Constitutional challenges to the legality of the plaintiffs' detention pending removal from the United States, the Supreme Court held that § 1252(a)(2)(B)(ii) did not bar judicial review because the plaintiffs challenged "the extent of the Attorney General's

authority under the post-removal-period detention statute . . . the extent of that authority is not a matter of discretion." 533 U.S. 678, 688 (2001). Similarly, in *Hernandez v. Sessions*, the Ninth Circuit held that § 1252(a)(2)(B)(ii) did not bar judicial review of a Constitutional challenge to immigration judges' bond determinations, because the plaintiffs claimed "that the discretionary process itself was constitutionally flawed at their initial bond determinations." 872 F.3d 976, 988 (9th Cir. 2017). Finally, in *Jafarzadeh v. Duke*, another court in this jurisdiction held that § 1252 did not bar judicial review of APA and Constitutional challenges to USCIS's administration of a "secret" nationwide policy for processing certain immigration-related applications, because the provision did "not encompass plaintiffs' challenge to the process USCIS used to adjudicate [a plaintiff's] application." 270 F. Supp. 3d 296, 308–10 (D.D.C. 2017).

The Western District of New York recently applied this principle in *Abdi v. Duke*, in which the plaintiffs claimed that the same deterrence policy challenged here violated the APA and their Constitutional rights. 280 F. Supp. 3d 373, 381 (W.D.N.Y. 2017). The defendants argued in *Abdi* that § 1252(a)(2)(B)(ii) barred the court from considering plaintiffs' claims and, as is the case here, the plaintiffs claimed that the statutory bar was inapplicable because their challenges related to ICE's procedures in administering parole, rather than the discretionary parole decisions themselves. *Id.* at 383. Rejecting the defendants' jurisdictional argument, the *Abdi* court held that review of "the ultimate decision regarding parole . . . would plainly fall outside [the] Court's jurisdiction," but "[the plaintiffs] are asking that this Court ensure that [the

defendants] comply with certain policies and procedures in making that parole decision—issues that are beyond the jurisdictional bar." *Id.* at 384.[12]

Here, as in the cases above, Plaintiffs raise Constitutional and statutory challenges to the process by which they were detained, including the policies under which Defendants make parole determinations and the framework by which Plaintiffs are deprived of bond hearings before immigration judges. *See generally* TAC. And they have made explicitly clear that they are not seeking review of their individual parole determinations, nor are they seeking release from detention. *See* Pls.' Am. Mem. at 20 ("Plaintiffs challenge the Defendants' deterrence *policy*, not the individual decisions reached in their parole cases."); Pls.' Reply at 12. The Court is thus persuaded that § 1252(a)(2)(B)(ii) does not bar Plaintiffs' claims. *See Damus v. Nielsen*, No. 18-578, 2018 WL 3232515, at *5 (D.D.C. July 2, 2018).

Nearly all of the cases cited by Defendants in support of their argument are inapposite because they involve challenges to the types of individual discretionary decisions which clearly fall within the scope of § 1252(a)(2)(B)(ii), and which are not at issue here. In most of the cited cases, the plaintiff sought to override an individual custody determination made by an agency official. *See Altagracia v. Sessions*, No. 16-6647, 2017 WL 908211, at *2 (W.D.N.Y. Mar. 7,

---

[12] Defendants argue that this Court should not accord *Abdi* any weight because in that case the defendants argued that the Morton Directive was not legally enforceable, while here Defendants claim that they have been complying with the Directive. Defs.' Opp'n at 21–22. This argument fails for multiple reasons. First, as Plaintiffs note, § 1252(a)(2)(B)(ii)'s jurisdictional bar is triggered by the type of challenge raised, not the arguments raised in defense. Pls.' Reply at 13 n.5. Second, contrary to Defendants' argument, the *Abdi* court noted that the defendants had claimed to be following the Morton Directive in similar litigation, and it relied in part on that fact in holding that the jurisdictional bar did not apply. *Abdi*, 280 F. Supp. 3d at 384–85 ("Petitioners allege that Respondents have violated and continue to violate the Morton Directive that they claim to be following."). And third, an important predicate of Plaintiffs' action is that ICE is bound by the Morton Directive. Defendants' claim that the Directive is "binding" and zealously followed, rather than unenforceable, undercuts their argument that compliance is discretionary for purposes of § 1252(a)(2)(B)(ii). Defs.' Opp'n at 2.

2017); *Milardo v. Kerilikowske*, No. 16-MC-99, 2016 WL 1305120, at *6, 9 (D. Conn. Apr. 1, 2016); *United States v. Bush*, No. 12-92, 2015 WL 7444640, at *1 (W.D. Pa. Nov. 23, 2015); *Dugdale v. U.S. Customs and Border Protection*, No. 14-1175, 2015 WL 2124937, at *1 (D.D.C May 6, 2015); *Naul v. Gonzales*, No. 05-4627, 2007 WL 1217987, at *2 (D.N.J. Apr. 23, 2007). *Giammarco v. Kerlikowske* did not involve a direct challenge to an individual custody determination, but the plaintiff sought authorization for temporary reentry to the United States, which would functionally reverse his individual custody determination. 665 Fed. App'x 24, 25–26 (2d. Cir. 2016).

Defendants do, however, cite one case that is factually similar to this action. In that case, *Gebhardt v. Nielsen*, the Ninth Circuit held that it lacked jurisdiction to hear the plaintiff's challenge to an agency's standards for evaluating Legal Permanent Residence applications. 879 F.3d 980, 987 (9th Cir. 2018). However, the *Gebhardt* plaintiff did not claim that the standards at issue were inconsistent with other binding agency policies, as Plaintiffs do here, and the Ninth Circuit acknowledged that it has jurisdiction over challenges to "pattern and practice" claims and

Constitutional challenges related to discretionary decisions. *Id.*[13]  The Court is unpersuaded by

Defendants' cited authorities.[14]

## 2. Mootness

Defendants next assert that Plaintiffs lack standing to bring their claims because they

"have in fact already received the relief they seek: a parole determination consistent with the

[Morton Directive]."  Defs.' Opp'n at 16.  Defendants neglect to address that Plaintiffs also seek

bond hearings before immigration judges, TAC ¶¶ 114–115, and the fact that Plaintiffs have not

obtained that relief is alone sufficient to keep this case alive.  *See, e.g., Schnitzler v. United

States*, 761 F.3d 33, 37–38 (D.C. Cir. 2014) (reversing a district court's dismissal of a pro se

complaint because, among other things, the district court had adopted too narrow a construction

of the relief sought and failed to recognize that plaintiff had not received full relief); *Singh v.

Carter*, 185 F. Supp. 3d 11, 19 (D.D.C. 2016) (concluding that an offer of a "long-term religious

accommodation" did not render moot plaintiff's request for a "permanent religious

---

[13] Defendants also rely upon *Loa-Herrera v. Trominski* in support of their argument that the Court lacks jurisdiction to hear Plaintiffs' challenges.  In that case, the Fifth Circuit vacated portions of the district court's order related to the Constitutionality of the Immigration and Naturalization Service's (ICE's predecessor) parole determinations, stating that "the manner in which [the agency's] discretionary judgment is exercised, and whether the procedural apparatus supplied satisfies regulatory, statutory, and constitutional constraints—is not . . . subject to review."  231 F.3d 984, 991 (5th Cir. 2000)  As Plaintiffs note, Pls.' Reply at 14 n.6, that case involved a different INA jurisdictional bar, 8 U.S.C. 1226(e).  *Loa-Herrera*, 231 F.3d at 991. Further, another court in this jurisdiction has declined to follow *Loa-Herrera*, noting that it provides "little explanation of its reasoning," and that it cuts against the weight of the case law. *See R.I.L-R*, 80 F. Supp. 3d at177.  For those reasons, this Court also declines to follow *Loa-Herrera*.

[14] Defendants also argue that § 1182(d)(5)(A) establishes that parole determinations are "committed to agency discretion by law," and thus unreviewable under the APA.  Defs.' Opp'n at 37 (citing *Oryszak v. Sullivan*, 576 F.3d 522, 525–26 (D.C. Cir. 2009); *see* 5 U.S.C. § 701(a)(2).  Again, Defendants are correct that this Court may not second guess ICE officials' individual parole determinations.  It may, however, review whether ICE has allegedly implemented an unconstitutional, unwritten policy that contradicts existing, binding policy.

accommodation" because defendant had not given plaintiff the entire relief sought). Regardless, the Court disagrees that the record provides a basis for a finding of mootness.

Article III of the Constitution permits federal courts to adjudicate only "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). This limitation gives rise to the doctrine of mootness. *See Campbell–Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016). "A case is moot when a party has already obtained all the relief that it has sought." *Schnitzler*, 761 F.3d at 37 (internal citations and quotation marks omitted). Under such circumstances, a case should be dismissed when "events have so transpired that the decision [of the court] will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002) (internal citation omitted).

"As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell–Ewald Co.*, 136 S. Ct. at 669 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party.") (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). Furthermore, a "party's prospects of success on a claim are not pertinent to the mootness inquiry." *Looks Filmproduktionen GmbH v. CIA*, 199 F. Supp. 3d 153, 179 (D.D.C. 2016) (alterations and internal quotation marks omitted) (quoting *Schnitzler*, 761 F.3d at 39).

With regard to Plaintiffs' demand for parole determinations in accordance with the Morton Directive, Defendants conflate merits questions about whether they have properly followed the Directive—a subject of the parties' dispute—with mootness questions about whether this Court can offer meaningful relief. Both the Supreme Court and the D.C. Circuit

have cautioned that "prospects of success" on a claim "are not pertinent to the mootness inquiry." *Schnitzler*, 761 F.3d at 39 n.8 (quoting *Chafin*, 568 U.S. at 174 (internal quotation marks omitted)). Indeed, the Circuit has explained that "[i]n considering possible mootness[, courts] assume that the plaintiffs would be successful on the merits." *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955 (D.C. Cir. 2016). Here, a decision that this case is moot based on a finding that Defendants provided lawful parole determinations would run afoul of this principle. *Cf. Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008) ("[W]hether a statute has been violated 'is a question that goes to the merits . . . and not to constitutional standing.'") (quoting *La. Energy & Power Auth. v. FERC,* 141 F.3d 364, 367–68 (D.C. Cir. 1998)). Defendants' self-serving declaration that ICE officials complied with its Directive does not suffice to divest this Court of jurisdiction to determine whether it did so. *See, e.g., Schnitzler*, 761 F.3d at 39 (explaining that "whether or not the government's policy explanations are reasonable under the [APA] is a merits question, not a question of the court's jurisdiction"); *Ramirez v. ICE*, No. 18-0508, 2018 WL 1882861, at *7 (D.D.C. Apr. 18, 2018) (holding that "there was no mootness barrier" to the plaintiffs' suit where ICE claimed that it had already complied with the statutory provision that the plaintiffs argued had been disregarded).

In any event, as explained in detail below, the Court disagrees that the evidence on record shows that Defendants complied with the Morton Directive. Thus, even if this Court could consider the merits of Plaintiffs' claims in assessing whether this case is moot, it would not side with Defendants. The record indicates that Defendants considered factors inconsistent with the Morton Directive in determining whether Plaintiffs were entitled to parole. Accordingly, this Court concludes that there is no mootness barrier to Plaintiffs' suit.

### 3. Final Agency Action

Defendants next assert that "Plaintiffs cannot invoke the APA as a basis to challenge their ongoing detention because they do not allege any cognizable final agency action promulgating or effecting their alleged deterrence policy that is reviewable under the APA." Defs.' Opp'n at 34. They claim that Plaintiffs' failure to identify a "regulation, letter, memorandum, or other form of written material that comprises [ICE's deterrence policy] . . . is fatal to Plaintiffs' claims." *Id.* The Court rejects this argument, too.

Agency actions are reviewable by a court under the APA only if they are final. *See* 5 U.S.C. § 704 (establishing reviewability of "final agency action"). Courts take a pragmatic approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1815 (2016). As the Supreme Court established in *Bennett v. Spear*, a court will find that an agency action is final if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. . . second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." 520 U.S. 154, 177–78 (1997). Where there is no final agency action, a plaintiff has no cause of action under the APA.

Despite Defendants' assertions to the contrary, agency action need not be in writing to be judicially reviewable as a final action. *See Venetian Casino Resort LLC v. EEOC,* 530 F.3d 925, 929 (D.C. Cir. 2008) (entertaining an APA challenge to the agency's "decision . . . to adopt [an unwritten] policy of disclosing confidential information without notice" because such a policy is "surely a consummation of the agency's decisionmaking process" and it impacted the plaintiff's rights); *R.I.L-R*, 80 F. Supp. 3d at 184 (holding that ICE's deterrence policy is a final agency action subject to APA review, despite the lack of a writing memorializing the policy); *Ramirez,*

2018 WL 1882861, at *8 (holding that ICE's consistent failure to apply certain factors in making individual custody decisions was a final agency action subject to APA review). A contrary rule "would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing." *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.,* 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003). "Denying review of agency action that is essentially conceded but ostensibly unwritten would fly in the face of the Supreme Court's instruction that finality be interpreted 'pragmatic[ally].'" *R.I.L-R*, 80 F. Supp. 3d at 184 (quoting *FTC v. Standard Oil Co. of Cal.,* 449 U.S. 232, 239 (1980)). Here, Plaintiffs allege that the deterrence policy has been in effect for years, and that it has had "profound and immediate consequences" for Plaintiffs whose parole was declined due to its consideration. *Id.*

Furthermore, Defendants seem to ignore that Plaintiffs also seek relief for the agency's consideration of deterrence in making their individual parole decisions. *See* TAC ¶ 137. An agency action is reviewable "to the extent that, specific 'final agency action' has an actual or immediately threatened effect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990). Here, Plaintiffs allege that Defendants took specific, discrete steps when evaluating their parole status and that those steps have harmed them. The rejections of Plaintiffs' parole requests— purportedly upon consideration of an improper factor—are agency actions that have actual or immediately threatened effects. *Cf. Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50–51 (D.D.C. 2014) (rejecting challenge to "a generalized, unwritten administrative 'policy,'" but permitting challenge to five specific purported applications of that alleged policy); *RCM Techs., Inc. v. DHS*, 614 F. Supp. 2d 39, 43–46 (D.D.C. 2009) (finding no agency action in a challenge to DHS's purported policy of requiring foreign occupational and physical therapists to have master's degrees in order to obtain H–1B visas, but intimating that the specific denial of a visa

application made pursuant to the alleged policy would be justiciable).  The Court concludes that Defendants' alleged deterrence policy is susceptible to APA review as a "final agency action."

### 4. Adequate Remedy

Finally, Defendants assert that Plaintiffs may not bring their APA claims in this court because they have another adequate remedy in the form of a habeas petition.  *See* Defs.' Opp'n at 37–39 (citing 5 U.S.C. § 704, which exempts from judicial review an agency action for which there is an "adequate remedy in a court").  They claim that "because a *habeas* claim could provide Plaintiffs the relief requested, another adequate remedy exists, precluding Plaintiffs' APA claims." *Id.* at 39.  The Court agrees that Plaintiffs could have brought a habeas claim, but it disagrees that the possibility of habeas relief precludes Plaintiffs' APA claims.

"Section 704 reflects Congress' judgment that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Citizens for Responsibility & Ethics in Wash. ("CREW") v. DOJ*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).  However, the Supreme Court has explained that "[t]he exception that was intended to avoid such duplication should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903.  "When considering whether an alternative remedy is 'adequate' and therefore preclusive of APA review, [courts] look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *CREW*, 846 F.3d at 1244 (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir. 2009)).

In *R.I.L-R*, a court in this jurisdiction addressing a very similar action held that habeas was not an adequate remedy foreclosing an APA challenge. 80 F. Supp. 3d at 185. The plaintiffs challenged ICE's deterrence policy—the same policy Plaintiffs challenge here—under the APA, claiming that it was contrary to law when used as a factor in custody determinations because it violated the INA. *Id*. at 174. The defendants argued that the plaintiffs failed to state a claim under the APA because habeas was an "adequate remedy" available to them apart from APA review. *Id*. at 185. In rejecting the defendants' argument, the court held that "although Congress has expressly limited APA review over individual deportation and exclusion orders, *see* 8 U.S.C. § 1252(a)(5), it has never manifested an intent to require those challenging an unlawful, nationwide detention policy to seek relief through habeas rather than the APA." *Id*. at 186.

The Court is persuaded by this reasoning, and Defendants have not identified a compelling reason why APA and habeas review may not coexist. They have not put forth "clear and convincing evidence of legislative intent to create a special, alternative remedy and thereby bar APA review" in lieu of habeas. *CREW*, 846 F.3d at 1244 (internal quotation marks omitted). Plaintiffs' case, therefore, may proceed under the APA.

## B.  Merits

Having determined that there are no justiciability, jurisdictional, or APA threshold barriers to considering Plaintiffs' motion for preliminary injunctive relief, the Court next assesses the merits of that motion. As detailed above, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter*, 555 U.S. at 22. The movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20.

Plaintiffs seek a preliminary injunction requiring Defendants to (1) stop detaining Plaintiffs in the absence of bond hearings before immigration judges; (2) stop applying any rules and regulations that would deprive Plaintiffs of such bond hearings; (3) stop considering immigration deterrence as a factor in evaluating Plaintiffs' parole requests; and (4) comply with the Morton Directive in evaluating Plaintiffs' parole requests. *See* Second Am. Appl. Prelim. Inj. at 2. Having considered the governing legal principles, the Court concludes that Plaintiffs are not likely to succeed on the merits of their demand for bond hearings before immigration judges, and it therefore denies Plaintiffs' motion for preliminary injunctive relief requiring such hearings. However, the Court concludes that Plaintiffs' evidence of an unwritten deterrence policy contradicting the Morton Directive outweighs Defendants' self-serving declaration to the contrary; that Plaintiffs have suffered and are suffering irreparable harm as a result of the policy; that Plaintiffs' harm outweighs any potential harm to the government caused by preliminary injunctive relief; and that such relief is in the public interest. Finding that Plaintiffs have carried their burden as to all four preliminary injunction factors, the Court thus grants Plaintiffs' motion for preliminary injunctive relief regarding ICE's consideration of their parole requests.

1. **Likelihood of Success on the Merits**[15]

### a. Detention Without a Bond Hearing

The first core component of Plaintiffs' suit is their argument that, despite their status as arriving aliens, they have a constitutional right to bond hearings before immigration judges.

---

[15] Along with the arguments evaluated below, Plaintiffs appear to directly challenge their detention in "prison-like conditions," by way of freestanding First and Fifth Amendment claims.

Defendants raise a series of constitutional and statutory arguments for why Plaintiffs are not entitled to such bond hearings.  Based on the current state of the law—which is rapidly changing—the Court concludes that while Plaintiffs are entitled to a certain degree of Constitutional protection, detention pursuant to 8 U.S.C. § 1225(b) is sufficiently finite that Plaintiffs are not likely to succeed on the merits of this issue.

Plaintiffs' current access to bond hearings

Both parties agree that the INA and its implementing regulations, on their face, do not provide Plaintiffs with access to bond hearings before immigration judges.  Pls.' Am. Mem. at 6; Defs.' Resp. Opp'n Pls.' Am. Mem. ("Defs.' Am. Opp'n") at 7, ECF No. 77.  As explained above, Plaintiffs are, in the case of Mikailu J., or were, in the case of Aracely R. and Sadat I., "arriving aliens" who sought asylum under 8 U.S.C. § 1225(b)(1)(A)(ii), passed their credible fear interviews conducted pursuant to § 1225(b)(1)(B)(i), and submitted asylum petitions.  Defs.' Am. Opp'n at 7.  Under the INA, an arriving alien who passes a credible fear interview and submits an asylum petition "*shall* be detained for further consideration of the application for asylum" (emphasis added).  8 U.S.C. § 1225(b)(1)(B)(ii).  The statutory text does not authorize a bond hearing before an immigration judge.  Moreover, 8 C.F.R. § 1003.19(h)(2)(i) states that "an immigration judge may not redetermine conditions of custody imposed by the Service with respect to . . . [a]rriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act," which governs the parole at issue here.  Accordingly, in order to grant Plaintiffs' request for bond hearings, the Court must either read such a

---

*See* TAC ¶ 123.  As Defendants note, it is unclear whether POE asylum seekers have sufficient connections to the United States to entitle them to First Amendment protections.  Defs.' Opp'n at 32 n.6; *see United States v. Verdugo-Urquidex*, 494 U.S. 259, 265–66 (1990).  Regardless, the Court need not address these claims now, given the relief it is granting.

requirement into 8 U.S.C. § 1225(b), as courts in other jurisdictions have done, or find § 1225(b) unconstitutional insofar as it deprives a certain class of individuals of bond hearings before immigration judges.  As explained below, courts no longer have the power to read a bond hearing requirement into § 1225(b), and, under the current legal landscape, Plaintiffs are unlikely to successfully argue that the statute is unconstitutional.

<u>Development of due process rights for arriving aliens</u>

The Court first considers the amount of due process to which arriving aliens, such as Plaintiffs, are entitled.  The Supreme Court has issued a series of opinions on this issue.  Under this line of cases, it is clear that arriving aliens are not afforded the same Constitutional rights as individuals who are already present in the United States—including individuals who are present illegally—but they are afforded some rights.

Defendants urge the Court to follow a 1953 decision, *Shaughnessy v. United States ex rel. Mezei*, because they argue it describes "the standard framework for understanding rights of aliens under the Constitution."  Defs.' Opp'n at 28.  *Mezei* involved a once-lawfully admitted alien who left the United States, returned after a trip abroad, was refused admission, and was indefinitely detained on Ellis Island because the Government could not find another country to accept him. 345 U.S. 206, 208–09 (1953).  The Court held that the plaintiff's indefinite detention did not violate the Constitution because he was "treated," for constitutional purposes, "as if stopped at the border."  *Id.* at 215–16.  As an alien with no right to be in the United States, the Court held that the plaintiff was not entitled to constitutional protections that could have granted him release into the country.  *Id.* at 216.

Plaintiffs, on the other hand, urge the Court to more closely follow *Zadvydas*, in which the Court contemplated how to apply *Mezei*'s principles to the rights of aliens under the INA.

Pls.' Am. Mem. at 34–38. In *Zadvydas*, the Court considered the due process protections owed to an alien who is found to be unlawfully present in the United States, who is subject to a final order of removal, and who cannot be removed within the 90-day statutory "removal period" during which time the alien normally is held in custody. 533 U.S. at 682. After the statutory removal period has expired, 8 U.S.C. § 1231(a)(6) states that certain categories of aliens "may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision."[16] *Id.* The Court noted that § 1231(a)(6) does not set a limit on the length of time beyond the statutory removal period that an alien may be detained, and it concluded that such a provision "permitting indefinite detention of an alien would raise a serious constitutional problem," particularly when the provision authorizes civil, rather than criminal detention. *Id.* at 688–90. Applying the Constitutional avoidance doctrine, the Court interpreted § 1231(a)(6) to require that aliens detained within its scope are entitled to bond hearings every six months before immigration judges, during which the government must demonstrate that continued detention is necessary. *Id.* at 701–02.[17]

In *Zadvydas*, the Court was careful to note, however, that § 1231(a)(6) covers aliens who have entered the United States, sometimes lawfully, and then are removed, rather than aliens who are considered to have never entered the country. *Id.* at 693. It explained:

---

[16] The categories include inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for certain national security or foreign relations reasons, as well as any alien "who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6); *see also* 8 C.F.R. § 241.4(a).

[17] Plaintiffs suggest that Sadat I. is currently detained under § 1231(a)(6) and has been denied the bond hearing required by *Zadvydas*. Pls.' Am. Mem. at 6 n.12. However, this claim is not included in Plaintiffs' complaint, so it is beyond the scope of the Court's ability to grant relief here. *See Fares v. Smith*, 249 F. Supp. 3d 115, 125 (D.D.C. 2017) ("[I]t is axiomatic that Plaintiffs cannot amend their Complaint via their briefs.").

The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

*Id.* [18]

The Court further refined the due process rights afforded to aliens detained under the INA, in *Demore v. Kim.* In that case, the respondent—a resident alien—was undergoing removal proceedings under another provision of the INA, § 1226(c), and had not yet been issued a final order of removal. 538 U.S. 510, 513 (2003). Because the respondent had been convicted of certain crimes, he was subject to mandatory pre-removal detention without an individualized determination that "he posed either a danger to society or a flight risk." *Id.* at 514–15 (citing § 1226(c)).

In holding that the detention period mandated by § 1226(c) was constitutional, the Court found it significant that the plaintiff had been convicted of a crime, but it also relied heavily on the brevity of the alien's detention, repeatedly framing the issue as one involving the alien's detention for the "limited" or "brief" period of his removal proceedings. *Demore*, 538 U.S. at 511, 523, 526, 531; *see id.* at 511 ("The INS detention of respondent, a criminal alien who has conceded that he is deportable, for the *limited* period of his removal proceedings, is governed by these cases." (emphasis added)). It noted that detention under § 1226(c) "lasts roughly a month

---

[18] In a related case cited by Plaintiffs, *Clark v. Martinez*, the Supreme Court extended *Zadvydas* to inadmissible aliens subject to removal under § 1231(a)(6). 543 U.S. 371, 378 (2005). However, the Court's holding was based on statutory interpretation, rather than Constitutional principles. *Id.* (holding that the statute applies to both inadmissible and removable aliens and cannot be interpreted to apply differently to these different categories of aliens).

and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which an alien chooses to appeal." *Id*. at 530.  And it relied on the detention's brevity in distinguishing the case from *Zadvydas*.  *Id.* at 528 ("While the period of detention at issue in *Zadvydas* was 'indefinite' and 'potentially permanent,' the detention here is of a much shorter duration." (citations omitted)).

Finally, in February 2018, the Court applied this line of cases to arriving aliens detained under § 1225(b), the provision at issue here.  In *Jennings v. Rodriguez*, the Supreme Court addressed a Ninth Circuit decision interpreting § 1225(b) to limit detention of arriving aliens to six-month periods, after which they are entitled to bond hearings.  138 S. Ct. 830, 839 (2018).  The Court found that the Ninth Circuit misapplied the canon of constitutional avoidance, because its reading of § 1225(b) was implausible. 138 S. Ct. at 842.  It explained that "[r]ead most naturally, §§ 1225(b)(1) and (b)(2) mandate detention of applicants for admission until certain proceedings have concluded." *Id.*  It also rejected the argument that those provisions contain an implicit six-month limit on the length of detention, observing that "nothing in the statutory text imposes any limit on the length of detention" or "even hints that those provisions restrict detention after six months." *Id.* at 842, 843.  As to the canon of constitutional avoidance, the Court held that "[s]potting a constitutional issue does not give a court the authority to rewrite a statute as it pleases . . . [i]nstead, the canon permits a court to 'choos[e] between competing plausible interpretations of a statutory text.'" *Id.* at 843.  The Court remanded the action to the Ninth Circuit for a determination of whether 1225(b) is constitutional on its face.  *Id*. at 851.

When read together, these opinions delineate a basic framework for evaluating INA's various detention provisions.  Under the framework, a detention provision is more likely to be constitutionally problematic if it has the following characteristics: (1) it authorizes indefinite

detention, with no clearly defined end point; (2) it applies to aliens who are considered under the

law to have entered the United States, whether legally or illegally; and (3) it applies to aliens

who may not have been accused or convicted of a crime.  Plaintiffs note that, applying this

framework, courts in other jurisdictions have interpreted 1225(b) to authorize detention for what

they view as a constitutionally reasonable amount of time, after which the government must

make an individualized inquiry into whether detention is still necessary.  *See Abdi*, 280 F. Supp.

3d at 391–93 (collecting cases); *Ahad v. Lowe*, 235 F. Supp. 3d 676, 688 (M.D. Pa. 2017)

(holding that the plaintiff POE asylum seeker, detained under 1225(b) for 20 months, was

entitled to a bond hearing); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 812 (W.D. Tex. 2015)

(granting habeas relief to § 1225(b) detainee after two years' detention).  The Court will apply

this framework to Plaintiffs here.

<u>Plaintiffs are unlikely to succeed on their request for bond hearings</u>

Having considered the legal principles laid out above, the Court is not persuaded that

Plaintiffs are likely to successfully argue that they have a due process right to individualized

bond hearings before immigration judges.  Unlike the class of aliens considered in *Zadvydas*,

who could have legally resided in the United States before being detained, Plaintiffs are arriving

aliens, considered under the law to have never entered the United States.[19]  *See* 8 U.S.C. §

1225(b).  Furthermore, unlike the statute evaluated in *Zadvydas*, which authorized potentially

indefinite detention, § 1225(b)(1)(B)(ii), under which Plaintiffs are or were detained, authorizes

detention only until an asylum seeker's asylum petition is approved or denied.  According to

_____

[19] This includes Aracely R., even though she was paroled into the United States.  *See* 8
U.S.C. § 1182(d)(5)(A).

Defendants, Mikailu J.'s asylum petition was denied within a year of arriving at the border,[20] Defs.' Opp'n at 10, as was Sadat I.'s, *id*. at 11. Their circumstances suggest a more abbreviated detention period than the period faced by the *Zadvydas* plaintiffs, and Plaintiffs have not provided data on the average length of detention under § 1225(b)(1)(B)(ii). These factual differences render Plaintiffs' detention less constitutionally problematic than the plaintiffs' detention in *Zadvydas*.

Further, after *Jennings*, courts may no longer read a bond hearing requirement into § 1225(b), as the courts did in the cases cited by Plaintiffs. *Jennings*, 138 S. Ct. at 851. While *Mezei* may be under siege, it is still good law, and it dictates that for an alien who has not effected an entry into the United States, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Mezei*, 345 U.S. at 212 (internal quotation marks omitted). Under the high threshold established when a party seeks preliminary injunctive relief that alters the status quo, and considering the current legal landscape, the Court concludes that Plaintiffs have not sufficiently demonstrated that they are likely to succeed on the merits of this issue.

### b. Alleged Improper Deterrence Policy

The second core component of Plaintiffs' suit is that ICE has adopted an unwritten, unlawful parole policy aimed at deterring immigration. In Plaintiffs' amended complaint, this claim finds voice in three distinct theories under the APA: (1) the policy contradicts the Morton Directive, rendering it arbitrary and capricious, TAC ¶ 137(D); (2) the policy "impacts substantive rights but has not passed through any required rule-making procedures," also

---

[20] Mikailu J. remains detained under § 1225(b)(1)(B)(ii) pending an appeal of his asylum petition denial. Pls.' Am. Reply at 7.

rendering it arbitrary and capricious, TAC ¶ 137(A); and (3) the policy violates the INA and the Constitution, and is thus contrary to law, TAC ¶¶ 137(B)–(C). Plaintiffs also challenge the policy by way of a freestanding Fifth Amendment claim. TAC ¶ 115. Because the Court concludes that Plaintiffs' first APA theory, standing alone, warrants preliminary injunctive relief with respect to Plaintiffs' parole determinations, it need not reach Plaintiffs' other theories. The Court will begin with a discussion of the alleged deterrence policy's existence. It will then analyze Plaintiffs' likelihood of success on their APA claims arising from the policy.

<u>Existence of a Policy</u>

Plaintiffs maintain that Defendants developed and implemented an unwritten policy directing ICE officials to consider immigration deterrence as a factor in evaluating individual POE asylum seekers' parole requests. Pls.' Am. Mem. at 17–20. They also argue that they were repeatedly denied parole because of this policy, despite their clear eligibility under the Morton Directive. *Id*. at 21. And they argue that this policy was applied with renewed vigor after the 2016 Presidential election. Pls.' Am. Mem. at 17–18. Defendants deny that any such policy exists. Defs.' Am. Opp'n at 20–22. Plaintiffs' assertions, however, find support in the record.

First, Plaintiffs' briefs and exhibits reference government policy statements and orders that they claim tend to suggest a deterrence policy. For instance, in 2014, then-Secretary of Homeland Security Jeh Johnson announced before Congress the implementation of an "aggressive deterrence strategy" aimed at discouraging migration to the United States. Human Rights First, *Lifeline on Lockdown*, Pls.' Am. Mem. Ex. 16 at 9, ECF No. 74-19 (citing a July 10, 2014 statement by Secretary Johnson before the Senate Appropriations Committee). Also in 2014, Secretary Johnson issued a policy memorandum establishing that individuals detained at ports of entry, among other categories of immigrants, should be considered a "category 1

46

enforcement priority," which mandated increased focus on their detention. Decl. of Eleanor Acer ("Acer Decl.") ¶ 16, Pls.' Am. Mem. Ex. 11, ECF No. 74-14; *Lifeline on Lockdown* at 10. Similarly, in early 2017, President Trump issued Executive Order No. 13767, entitled "Border Security and Immigration Enforcement Improvements," which instructs the Secretary of Homeland Security to construct additional detention facilities, "end the abuse of parole and asylum provisions currently used to prevent the lawful removal of removable aliens," and issue new policy guidance "including the termination of the practice commonly known as 'catch and release.'" *See generally* Pls.' Am. Mem. Ex. 14, ECF No. 74-17. And in then-Secretary of Homeland Security John Kelly's memorandum implementing that Executive Order, Secretary Kelly stated that "[t]he practice of granting parole to certain aliens in pre-designated categories . . . created an incentive for additional illegal immigration." Pls.' Am. Mem. Ex. 15 at 9, ECF No. 74-18. In urging ICE to attack this incentive by re-examining its parole determinations, Secretary Kelly was in effect urging ICE to deter immigration.

Second, Plaintiffs' submissions reference public statements by high level government officials, and news articles quoting government sources, indicating the existence of a deterrence policy influencing all aspects of DHS's administration of the INA. For instance, Plaintiffs' recent Motion to Present Three Exhibit Updates includes an interview with former Secretary Kelly, who is now the White House Chief of Staff, in which Mr. Kelly stated that "a big name of the game is deterrence" when it comes to prosecutorial discretion in enforcing the INA. Proposed Ex. 26 at 4, ECF No. 89-1.[21]

---

[21] Moreover, several recent news articles allege that the current presidential administration has sought to deter immigration—both legal and illegal—through the enforcement of INA provisions unrelated to parole determinations. *See* Julia Ainsley, *Trump Admin Discussed Separating Moms, Kids to Deter Asylum-Seekers in Feb. 2017*, NBC News (June 18,

Third, Plaintiffs note that the government has referenced a deterrence policy in other litigations.  *See R.I.L-R*, 80 F. Supp. 3d at 175 (noting that the government has claimed that "ICE officials are *required* to follow the binding precedent contained in *Matter of D---J---,* 23 I. & N. Dec. 572 (2003), in which then-Attorney General John Ashcroft held that deterrence of mass migration should be considered in making custody determinations under [a different INA provision]").  While Defendants have not admitted to a deterrence policy here, as they did in their *R.I.L-R* briefing, *id.*, they do not contest that the government has referenced such a policy before other courts.

Fourth, Plaintiffs have provided declarations and reports from immigration lawyers, non-governmental organizations, and other experts who claim that the alleged deterrence policy causes ICE officials to deny parole to POE asylum seekers who would otherwise qualify for

2018, 3:43 PM), https://www.nbcnews.com/politics/immigration/trump-admin-discussed-separating-moms-kids-deter-asylum-seekers-feb-n884371 (discussing notes from a "town hall" held for ICE asylum officers in February 2017 in which the agency's asylum chief allegedly "laid out a number of policies specifically intended to lower the number of immigrants claiming asylum"); John Haltiwanger, *John Kelly Proposed Separating Children From Their Parents to Deter Illegal Immigration Last Year, and Now the Trump Administration Can't Get Its Story Straight*, Business Insider, (June 18, 2018, 1:04 PM), http://www.businessinsider.com/kelly-proposed-family-separation-to-deter-illegal-immigration-in-2017-2018-6 (discussing the administration's "inconsistent justifications" for its recent shift towards "zero tolerance" immigration law enforcement, and quoting former Secretary Kelly as stating that he "would do almost anything to deter the people from Central America to getting on this very, very dangerous network that brings them up through Mexico into the United States."); Tal Kopan, *Exclusive: Trump Admin Thought Family Separations Would Deter Immigrants. They Haven't.*, CNN Politics, (June 18, 2018, 12:25 PM), https://www.cnn.com/2018/06/18/politics/family-separation-deterrence-dhs/index.html (describing "internal [DHS] documents obtained by CNN" evaluating a "Prosecution Initiative" designed to deter immigration by referring all adults caught illegally crossing the border to the Department of Justice for prosecution); John Burnett, *To Curb Illegal Immigration, DHS Separating Families at the Border*, NPR (Feb. 27, 2018, 7:41 AM), https://www.npr.org/2018/02/27/589079243/activists-outraged-that-u-s-border-agents-separate-immigrant-families (quoting an ICE executive associate director as stating that "[w]e need to realize that stopping this flow [of asylum seekers] and preventing these crossings is the best thing that we can do right now").

parole under the Morton Directive. For instance, Eleanor Acer, the Senior Director for Refugee Protection at Human Rights First, stated that:

> "[t]hese practices of preventing release or severely restricting options for release of individuals who meet the criteria for parole, despite the clear directions provided in the 2009 asylum parole directive, are part of a policy to deter individuals from coming to the United States to seek asylum, and to in effect punish those who already have done so."

Acer Decl. ¶ 1, 23. Similarly, Bethany Carson, an immigration researcher at Grassroots Leadership, stated that she has observed a trend "that the majority of detained individuals who . . . came through ports of entry are not assigned a bond by ICE and are not paroled." Decl. of Bethany Carson ("Carson Decl.") ¶ 1, 22, Pls.' Am. Mem. Ex. 8, ECF No. 74-11. And in a Human Rights First survey of immigration attorneys who had been in the field for more than ten years, 90 percent stated that "ICE denied parole despite asylum seekers providing ample evidence to establish their identities and prove that they did not pose a flight risk or security risk." Acer Decl. ¶ 18. In a similar survey, nearly half of the participants agreed that Secretary Johnson's 2014 policy memorandum caused an increase in parole denials. *Lifeline on Lockdown* at 20. According to Human Rights First, the research indicates that "many asylum seekers have been denied parole even when they meet [the Morton Directive] criteria." *Id.* at 13. Finally, according to a different Human Rights First report, ICE "largely refused to release asylum seekers from detention on parole" in the first eight months following the issuance of President Trump's 2017 Executive Order. Human Rights First, *Judge and Jailer: Asylum Seekers Denied Parole in Wake of Trump Executive Order*, Pls.' Am. Mem. Ex. 17 at 1, ECF No. 74-20.

Fifth, Plaintiffs provide data that they claim suggests an abrupt decline in the percentage of successful parole requests by POE asylum seekers in the years since the Morton Directive was implemented. A Human Rights First report indicates that in 2010, ICE detained, without parole, 49 percent of asylum seekers with positive credible fear determinations, while in 2014 ICE

49

detained 84 percent of these individuals. Acer Decl. ¶ 19. Eunice Lee, the Co-Legal Director of the Center for Gender & Refugee Studies at the University of California Hastings College of Law, provided more detailed statistics indicating a marked drop in the parole grant rate of certain ICE detention centers from 2016 to 2017. Decl. of Eunice Lee ("Lee Decl.") ¶ 1, 5–6, Pls.' Am. Mem. Ex. 10, ECF No. 74-13. For instance, according to her research, the parole grant rate for the Port Isabel, Texas Detention Center was approximately 35% in 2016, and approximately 9% in 2017. *Id*. ¶¶ 5–6. Similarly, the parole grant rate for the South Texas Detention Center was approximately 50% in 2016, and approximately 26% in 2017. *Id*. Anne Daher, a Staff Attorney at the Center for Gender & Refugee Studies, stated that the combined parole denial rate for the Detroit, El Paso, Los Angeles, Newark, and Philadelphia ICE Field Offices from January 2011 through December 2013 was 8%, while the combined parole denial rate for those Field Offices in February 2017 was over 96%. Pls.' Mot. Present Three Ex. Updates, Proposed Ex. 27 at 11–13, ECF No. 89-2.[22]

Finally, Plaintiffs have described their own experiences with the alleged policy. According to Sadat I., when he was first detained at a United States port of entry, the guards told him and the other detainees that they were being punished for entering the United States "without legal documents." Sadat I. Decl. ¶ 6. He also claims to have been held in a cold cell called the "Ice Box" as a form of punishment because—he was allegedly told by the guards—the detainees should not have come to the United States, and the Ice Box experience would convince them to tell their friends not to come. *Id*. And he claims that at one point he was told that he would be released on parole, but in November 2017 he was abruptly told that this was no longer

---

[22] Because this Proposed Exhibit contains multiple declarations with overlapping paragraph numbers, the Court cites to the page numbers automatically generated by ECF.

possible because of "[the] election." *Id.* ¶ 11.  Finally, ICE officials allegedly initially determined that Aracely R. was deemed eligible for parole, but this determination was abruptly cancelled and her parole request was denied, purportedly because of the deterrence policy.  *See* Pls.' Am. Mem. at 18 n.19; *see also* Ex. 23, ECF No. 74-22.

Defendants put forth three rebuttal arguments.  First, they provide the declaration of Deborah Achim, the Deputy Field Office Director in ICE's San Antonio Field Office, who states, without elaborating, that "ICE does not have a policy of relying on deterrence as a factor in parole determinations."  Achim Decl. ¶ 1, 4.  Second, they argue that the fact that Plaintiff Hatim B. was granted asylum and Plaintiff Aracely R. was granted parole "is significant evidence that there is no policy of deterrence."  Defs.' Am. Opp'n at 21.  Third, they point out that Plaintiffs assert that the alleged deterrence policy was formulated in 2014, but the data they rely upon shows a decline in parole grant rates beginning as far back as 2010, before the alleged policy was hatched.  *Id.*  They argue that "Plaintiffs' faulty timeline cuts into the essential inference undergirding the entire case."  *Id.*  None of these arguments is sufficient to rebut Plaintiffs' evidence.

First, Ms. Achim's self-serving declaration is not sufficient to discredit Plaintiffs' substantial volume of evidence indicating the existence of a deterrence policy outside the scope of the Morton Directive influencing parole determinations.  Her conclusory denial of a policy, without elaboration, fails to acknowledge that Defendants have conceded that a deterrence policy existed in the past.  *See R.I.L-R*, 80 F. Supp. 3d at 175.  Defendants fail to explain when such a policy ceased to exist and why, despite the policy's alleged discontinuation, parole numbers continue to plummet.  While it is true that Plaintiffs have not supplied a statement from an individual with firsthand knowledge of the alleged policy, they have supplied sufficient

circumstantial evidence to suggest that they are likely to establish the existence of a deterrence policy as the litigation progresses.

Second, the changed circumstances of Hatim B. and Aracely R., if anything, support rather than discredit Plaintiffs' contentions because they were repeatedly denied parole under 8 C.F.R. § 212.5(b)(5), despite apparently falling within the Morton Directive's scope. Hatim B. requested asylum in early 2017, he presented affidavits and a birth certificate, he presented a letter of sponsorship from a local shelter for asylum seekers, he presented a background check indicating no criminal history, and he was still denied parole twice before his asylum was granted by an immigration judge. Decl. of Hatim B. ("Hatim Decl.") ¶¶ 5–6, Pls.' Am. Mem. Ex. 2, ECF No. 74-4; Achim Decl. ¶ 5. Aracely R. was denied parole under § 212.5(b)(5) until her medical condition became so severe that she required emergency surgery, warranting parole under § 212.5(b)(1). *See* Aracely Decl. ¶ 6; Decl. of Dr. Marsha Griffin, Pls.' Am. Mem. Ex. 6, ECF No. 74-9; Decl. of Dr. Mike Krosin, Pls.' Am. Mem. Ex. 12, ECF No. 74-15. Their circumstances suggest that ICE denied their parole pursuant to the alleged deterrence policy until it was forced to release them.

Third, the mere fact that ICE officials may have been disregarding the Morton Directive before Plaintiffs can pinpoint evidence of a deterrence policy, in 2014, does not undercut Plaintiffs' argument that such a policy existed. The fact that a policy was "openly announced and recognized" in 2014 does not establish that it did not exist before then. TAC ¶ 43. Furthermore, Plaintiffs have put forth evidence that the alleged policy was re-emphasized after the 2016 Presidential election, resulting in an additional drop in the parole grant rate. As the litigation progresses, Plaintiffs will have the opportunity to further refine the period during which Defendants' alleged deterrence policy has been in place, and Defendants will have the

opportunity to rebut Plaintiffs' evidence. At this stage, Plaintiffs' unrebutted statistical evidence of a significant decline in parole grants is sufficient to outweigh Defendants' weak challenge. *See Damus*, 2018 WL 3232515, at *15.

Having considered the evidence presented by both parties, the Court is satisfied that Plaintiffs are likely to show that Defendants have implemented a policy of taking immigration deterrence into account when making individual parole determinations for POE asylum seekers, and that this policy likely played a significant role in the repeated denials of Plaintiffs' parole requests. Discovery may show otherwise, but Plaintiffs have met the threshold required to obtain a preliminary injunction.

<u>Likelihood of Success</u>

Having determined that Plaintiffs are likely to show that ICE officials considered immigration deterrence when making parole determinations, the Court will determine whether Plaintiffs are likely to successfully challenge that policy under the APA. Plaintiffs assert that the policy is inconsistent with the parole factors established by the Morton Directive, and is therefore arbitrary and capricious under the APA. Pls.' Am. Mem. at 29–32. Defendants, on the other hand, argue that "[b]ecause the [Morton Directive] is not a regulation, it lacks the force of law and cannot sustain either a constitutional claim or claim based on a question of law." Defs.' Am. Opp'n at 20. The Court is unconvinced by Defendants' arguments. It concludes that Plaintiffs have demonstrated that they are likely to succeed in showing that Defendants' failure to comply with the Morton Directive in declining their parole requests was arbitrary and capricious, in violation of the APA.

An agency is bound to adhere to its own regulations. This principle was first established by the Supreme Court in *U.S. ex rel. Accardi v. Shaughnessy*. *See* 347 U.S. 260 (1954). In that

case, an alien challenged the U.S. Board of Immigration Appeals' decision to deny his application to suspend deportation, arguing that the Attorney General prejudiced the Board's decision in contravention of regulations directing the Board to exercise its own discretion. 347 U.S. at 261–62. Agreeing with the alien, the Court ordered a new Board hearing because of "the Board's alleged *failure to exercise* its own discretion, contrary to existing valid regulations." *Id.* at 268 (emphasis in original).[23]

The Supreme Court expanded this principle to cover internal agency policies in *Morton v. Ruiz*, which involved a dispute over whether Native Americans were eligible for certain federal benefits. *See* 415 U.S. 199, 204–06 (1974). An internal agency manual dictated that the eligibility requirements should have been published in the Federal Register by the agency administering the benefits program, but the agency had not published them. *Id.* at 234–35. The Court held that the agency's failure to comply with its internal manual was arbitrary and capricious under the APA because "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required." *Id.* at 235.

These principles dictate that agency actions may be arbitrary and capricious when they do not comply with binding internal policies governing the rights of individuals. For instance, in *Doe v. Hampton*, the physically disabled plaintiff challenged her termination because the defendant agency failed to comply with an internal manual dictating that the agency should

---

[23] In this jurisdiction, there is one line of cases based on the "*Accardi*" doctrine, and another line of cases under the APA concerning whether agencies must abide by their policy statements and other internal documents. *See Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 65 (D.D.C. 1998) (describing the *Accardi* doctrine and its intersection with the APA). However, "the coexistence" of the two doctrines "has been for the most part benign," because "under either theory, enforceable rules are those to which the agency intends to be bound." *Id.*

reassign the plaintiff or grant her leave without pay before terminating her. *See* 566 F.2d 265, 280 (D.C. Cir. 1977). In directing the district court to resolve whether the agency was bound to its manual, the D.C. Circuit noted that "some unpublished provisions may be binding [on the agency] if so intended [by the agency] . . . as ascertained by an examination of the provision's language, its context, and any available extrinsic evidence." *Id*. at 281.[24] Similarly, in *Abdi*, a case Plaintiffs rely upon heavily, the court held that the plaintiffs could successfully challenge ICE's failure to comply with the Morton Directive because "the [Morton Directive]—like the procedure at issue in *Morton*—affects the rights of individuals." 280 F. Supp. 3d at 388–89; *see also INS v. Yang,* 519 U.S. 26, 31–32 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned as 'arbitrary, capricious, [or] an abuse of discretion'"); *Lopez v. FAA*, 318 F.3d 242, 246–48 (D.C. Cir. 2003) ("[A]gencies cannot 'relax or modify' regulations that provide the only safeguard individuals have against unlimited agency discretion in hiring and termination."); *Ravulapalli v. Napolitano*, 773 F. Supp. 2d 41, 53–54 (D.D.C. 2011) (holding that the plaintiff stated an APA claim based on the allegation that the defendant failed to follow internal policy guidelines directing its review of the plaintiff's visa petition; *Damus*, 2018 WL 3232515, at *14.

The Morton Directive's provisions make clear that it governs the rights of POE asylum seekers requesting parole, and therefore that it can support an APA claim under *Morton*. *See* 415 U.S. at 235. The Directive lays out specific factors to be applied when making individual parole

---

[24] The *Doe* court did not address an APA challenge, but the Court finds its reasoning instructive for evaluating whether an internal agency policy may support such a challenge.

determinations, and it establishes procedural rights for asylum seekers in connection with the parole process. The Directive states that its purpose is to "ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States." Morton Directive ¶ 1. More specifically, it purports to explain "how [8 C.F.R. § 212.5(b)(5)] is to be interpreted by DRO when it decides whether to parole arriving aliens determined to have a credible fear." *Id.* ¶ 4.4.[25]

The Directive states that "when an arriving alien . . . establishes to the satisfaction of DRO his or her identity and that he or she presents neither a flight risk nor danger to the community, DRO should, absent additional factors . . . parole the alien on the basis that his or her continued detention is not in the public interest." *Id.* ¶ 6.2. The Directive proceeds to explain how a parole applicant may establish his or her identity and prove that he or she is not a flight risk or a danger to the community. *Id.* ¶ 8.3. It also explains that the "additional factors" that may be considered include "serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests." *Id.* ¶ 8.3(4). In addition, the Directive establishes a serious of procedural requirements for ICE officials making parole determinations. *Id.* ¶¶ 6.1, 6.2, 6.5–6.7. By its text, the Directive imposes procedural and substantive obligations under which "its exercise of discretion will be governed," and the rights of parole seekers will be impacted. *Yang*, 519 U.S. at 31–32.

_____

[25] As a reminder for the reader, 8 C.F.R. § 212.5(b) governs parole of the following subgroups of POE asylum seekers: (1) aliens who have serious medical conditions, where continued detention would not be appropriate; (2) women who have been medically certified as pregnant; (3) certain juveniles; (4) aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States; or (5) aliens whose continued detention is not in the public interest. § 212.5(b)(1)–(b)(5). Plaintiffs believe that, pursuant to the Morton Directive, they fall within subgroup (5).

Further, Plaintiffs persuasively contend that Defendants have indicated an intent to be bound by the Morton Directive. First, the Morton Directive itself indicates that ICE officials must comply with its guidance. It establishes a quality assurance procedure, including nationwide monthly compliance analyses, and it states that "[a]ny significant or recurring deficiencies identified during this monthly analysis should be explained to the affected Field Office, which will take appropriate corrective action." Morton Directive ¶ 8.11. Second, the government represented to the Supreme Court in February 2017, in support of its position that bond hearings are not required for detained POE asylum seekers, that "the existing framework provides more than sufficient process" because the Morton Directive "provides for notice to the alien, an interview, the opportunity to respond and present evidence, a custody determination . . . supervisory review, and further parole consideration based upon changed circumstances or new evidence." Supplemental Reply Brief for Petitioners at 6–7, *Jennings v. Rodriguez,* No. 15–1204 (brief filed Feb. 21, 2017). Third, in his 2017 memorandum implementing Executive Order No. 13767, described above, Secretary Kelly stated that "the Ice [Directive] . . . shall remain in full force and effect," and that it "shall be implemented in a manner consistent with its plain language." Pls.' Am. Mem. Ex. 15 at 9–10. Fourth, in declining a public interest group's request for rulemaking regarding POE asylum seekers' custody determinations, ICE's General Counsel stated that "DHS's parole decisions are governed by [the Morton Directive], which establish extensive procedural safeguards." Pls.' Am. Mem. Ex. 24 at 8, ECF No. 74-23. Finally, Defendants refer to the Morton Directive as "very binding, written guidance" in their briefing. Defs.' Opp'n at 2. Defendants cannot have their cake and eat it too by claiming that the Morton Directive provides sufficient procedural protection to avoid Constitutional concerns,

while also claiming that ICE officials are not obligated to follow its mandates.  *See Hampton*, 566 F.2d at 281.

Defendants urge the Court to weigh heavily the Directive's disclaimer that it "is not intended to, shall not be construed to, may not be relied upon to, and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States."  Morton Directive ¶ 10.  They argue that this language insulates the Directive from forming the basis of Plaintiffs' APA claims.  Defs.' Opp'n at 7 n.2.  The Court is not convinced that an agency can avoid challenges based on a policy that appears to be binding and that impacts the rights of individuals, simply by including a boilerplate disclaimer.  *See Damus*, 2018 WL 3232515, at *14.

In support of their contention, Defendants rely on a 1981 Supreme Court decision, *Schweiker v. Hansen*.  Defs.' Am. Opp'n at 20.  In *Schweiker*, the Court held that a government employee's "minor breach" of an agency's internal agency guidelines did not justify the Court estopping the agency's denial of certain benefits to the plaintiff, where that denial likely would not have occurred without the breach.  450 U.S. 785, 789–90 (1981), *superseded by statute on other grounds*, Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 10302, 103 Stat. 2481..  The Court relied heavily on the manual's internal nature, stating that if a "minor breach of such a manual suffices to estop petitioner, then the Government is put at risk that every alleged failure by an agent to follow instructions to the last detail in one of a thousand cases will deprive it of the benefit of the written application requirement."  *Id.* (citation and internal quotation marks omitted).  Similarly, in a case not cited by Defendants, the D.C. Circuit held that U.S. Department of Justice's internal guidelines for issuing subpoenas to news media were not binding on the government because the guidelines had very similar disclaimer language to the

Morton Directive and they related to prosecutorial discretion. *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1152 (D.C. Cir. 2006). The Court noted that "[g]iven the nature of the guidelines themselves, and the function they govern, we conclude that the guidelines provide no enforceable rights to any individuals, but merely guide the discretion of the prosecutors." *Id.* at 1153.

These cases are factually distinguishable. The internal manual provision at issue in *Schweiker* merely dictated that employees should advise individuals about certain benefits when those individuals made oral inquiries—it did not mandate specific rights or procedures. *See* 450 U.S. at 789–90. The Supreme Court noted that "at worst, [the agency employee's] conduct did not cause respondent to take action, or fail to take action, that respondent could not correct at any time." *Id.* (internal citations omitted). Here, however, the Morton Directive identifies specific factors and procedural requirements governing the deprivation of Plaintiffs' liberty, a decision over which they have very little control. And in both *Schweiker* and *Judith Miller*, there was no evidence that the agency relied upon the relevant internal guidelines in litigation, nor that it otherwise intended to be bound by them. *See Abdi*, 280 F. Supp. 3d at 389 ("In short, Respondents cite no case law that would compel the conclusion that agencies can avoid application of *Accardi* by simply disclaiming any binding effect in the directive itself."). The Court therefore declines to follow those cases here.[26]

---

[26] Defendants also correctly note that agency officials are entitled to a presumption that they have properly discharged their duties. Defs.' Opp'n at 35; *see United States v. Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926) (citations omitted). However, the presumption may be rebutted by clear evidence to the contrary. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007) (citations omitted). As discussed above, the Court concludes that Plaintiffs have put forth sufficient evidence that ICE officials failed to properly apply the Morton Directive when making parole determinations, and that they applied an improper factor. Defendants are therefore not entitled to the "presumption of regularity." *Chem. Found.*, 272 U.S. at 14–15.

Having determined that the Morton Directive is binding on Defendants, the Court concludes that Defendants' deterrence policy does not align with the Directive's parole decision factors. The Directive mandates that an alien's "continued detention is not in the public interest," and therefore that the alien *should be paroled* if the alien's identity can be established and he or she presents "neither a flight risk nor danger to the community." Morton Directive ¶ 6.2. Immigration deterrence, which is directed at third parties that have not yet travelled to this country, does not relate to an *individual* parole applicant's flight risk or danger to the community. And while the Directive allows officials to consider "exceptional, overriding factors," including "serious adverse foreign policy consequences that may result if the alien is released or overriding law enforcement interests," *Id.* ¶ 8.3(4), Defendants have not characterized their denial of Plaintiffs' parole requests as addressing a "serious foreign policy consequence" or an "overriding law enforcement interest." In considering deterrence as a factor in parole determinations, ICE officials are therefore circumventing the factors laid out in the binding Directive.[27] Because Plaintiffs have demonstrated the incompatibility of the deterrence policy and the Directive, they have met their burden of showing a likelihood of success on the merits of their APA challenge to Defendants' deterrence policy.[28] *See Venetian Casino Resort,* 530 F.3d

---

[27] While Plaintiffs focus on Defendants' alleged failure to apply the parole factors laid out in the Morton Directive, there is evidence in the record that Defendants also failed to adhere to the Directive's procedural requirements. For instance, the Directive requires that an ICE official conduct a parole interview "no later than seven days following a finding that an arriving alien has a credible fear," Morton Directive ¶ 8.2, but some Plaintiffs claim to have not received an interview. *See* Aracely Decl. ¶ 6; Hatim Decl. ¶ 5. Similarly, the Directive requires that if ICE denies parole to a POE asylum seeker, it must provide that individual with a letter that includes "a brief explanation of the reasons for denying parole." Morton Directive ¶ 8.2. However, certain of Plaintiffs' parole rejection letters contain boilerplate language that does not sufficiently explain why parole was denied. *See generally* Pls.' Am. Mem. Ex. 23.

[28] As noted above, Plaintiff Sadat I.'s status is unclear. The Morton Directive is binding only as to 8 C.F.R. § 212.5(b)(5). To the extent Sadat I. is eligible for parole under a different

at 934–35 ("To maintain two irreconcilable policies, one of which . . . apparently enables the agency . . . to circumvent the other . . . is arbitrary and capricious agency action.") (citation omitted).[29]

## 2. Irreparable Harm

The Court next considers whether Plaintiffs have met their burden of showing irreparable harm. The parties agree that Plaintiff Mikailu J.'s current detention is covered by the Morton Directive, and that Plaintiffs Sadat I. and Arcely R. were at one time detained under 8 U.S.C. § 1182(d)(5)(A), and therefore could have been paroled under the Directive. Plaintiffs argue that (1) their alleged constitutional injuries are *per se* irreparable; and (2) they have suffered—and will continue to suffer—negative physical and mental effects of detention, subpar medical and psychiatric care, and economic burdens imposed on them and their families as a result of their detentions. *See* Pls.' Am. Mem. at 8–13. Defendants disagree, arguing that preliminary injunctive relief is inappropriate because (1) Plaintiffs seek an injunction that would require the

---

regulation, Plaintiffs have not presented sufficient evidence for the Court to conclude that they are likely to succeed in challenging that regulation.

[29] The Court notes that Defendants' deterrence policy also raises Constitutional questions, insofar as it is used to justify Plaintiffs' civil detention. Civil detention is justified "in certain special and narrow nonpunitive circumstances, where a special justification, such as harm-threatening mental illness, outweighs the individual's constitutionally protected interest in avoiding physical restraint." *Zadvydas*, 533 U.S. at 690 (citations and internal quotation marks omitted). The Supreme Court has held that detention of noncitizens awaiting immigration proceedings may be justified to (1) prevent their flight; or (2) protect the community from aliens found to be especially dangerous. *See id.* Civilly detaining Plaintiffs because it may deter immigration "appears out of line with analogous Supreme Court decisions." *R.I.L-R*, 80 F. Supp. 3d at 188–89 (enjoining ICE's deterrence policy when used to justify the detention of a different class of asylum seekers than Plaintiffs; noting that "[t]he justifications for detention previously contemplated by the Court relate wholly to characteristics inherent in the alien himself or in the category of aliens *being detained* . . . . The Government here advances an entirely different sort of interest"). In light of the uncertainty regarding the due process rights of aliens considered to have never entered the United States, and because Plaintiffs are entitled to preliminary injunctive relief on the basis of their APA claims alone, the Court declines to address the policy's Constitutionality here.

Court to provide the same relief as Plaintiffs' complaint requests; and (2) Plaintiffs "waited months before filing for relief from detention." Defs.' Opp'n at 40–43. Plaintiffs' argument carries the day.

"The concept of irreparable harm does not readily lend itself to definition." *Judicial Watch, Inc. v. DHS*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007). Nonetheless, the D.C. Circuit has laid out "several well known and indisputable principles" that should underlie a court's analysis. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). First, the party seeking preliminary injunctive relief must demonstrate that the claimed injury is "both certain and great" and "actual and not theoretical." *Id.* Second, the movant "must show that 'the injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id.* (alterations in original) (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976)). Finally, the injury must be "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

In light of these legal principles, the Court concludes that Plaintiffs have met their burden of showing irreparable harm. Plaintiffs allege various physical and psychological impairments that have resulted from or worsened due to their prolonged detention. For instance, Plaintiffs describe symptoms of increasing mental distress. *See generally* Aracely Decl. ¶ 19 ("I must admit that my depression is very bad now"); Sadat Decl. ¶ 27 ("Some days I am so despondent and without hope that I do not want to do anything at all"); Decl. of Andrea Northwood ¶¶ 5, 8–22, Pls.' Am. Mem Ex. 7, ECF No. 74-10 (describing the impact "of prolonged detention on the mental health of asylum seekers who have experienced significant and repeated trauma"). Plaintiffs also describe symptoms of increasing physical distress. *See generally* Aracely Decl. ¶ 15 (describing an infection due to poor sanitation); Hatim Decl. ¶ 11 (describing "debilitating"

stomach problems due to poor diet); Sadat Decl. ¶ 19; Mikailu Decl. ¶ 22 (describing "stabbing chest pains" and vomiting); *see generally* Carson Decl.; Decl. of Clara Long, Pls.' Am. Mem. Ex. 9, ECF No. 74-12.  Plaintiff Sadat I. further claims that the privacy and safety restrictions imposed during his detention impaired his ability to fully prepare his asylum petition.  Sadat Decl. ¶ 10.

Courts in this and other jurisdictions have found that deprivations of physical liberty of the type suffered by Plaintiffs are the sort of actual and imminent injuries that constitute irreparable harm.  *See Abdi,* 280 F. Supp. 3d at 405–06 (collecting cases); *Seretse–Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 n.20 (D.D.C. 2002) (same); *Damus*, 2018 WL 3232515, at *17. Courts have likewise recognized that the "major hardship posed by needless prolonged detention" is a form of irreparable harm. *R.I.L–R*, 80 F. Supp. 3d at 191 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  And, where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure the plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact.  *See id.*

Defendants' arguments to the contrary are unavailing.  Defendants first complain that Plaintiffs' request for a preliminary injunction overlaps substantially with the complete relief requested in this case.  *See* Defs.' Opp'n at 41–43.  Defendants do not explain, however, why this might lessen the harm associated with each additional day Plaintiffs endure purportedly inappropriate detention.  *See id*.  The Court fails to see why it should deny relief on the basis that Plaintiffs might eventually secure release after this Court addresses all facets of their complaint. *See Ramirez*, 2018 WL 1882861, at *18.

As for Defendants' argument that Plaintiffs' delay in filing the motion for a preliminary injunction cuts against their contention that they have suffered irreparable harm, see Defs.' Opp'n at 42, the Court also finds this ground insufficient to justify denying Plaintiffs' motion. The record shows that Plaintiffs filed their initial motion for a preliminary injunction approximately four months after they filed the complaint. The rapidly changing legal landscape governing the rights of asylum seekers has dictated multiple rounds of additional briefing and amendments to Plaintiffs' complaint, which delayed resolution of Plaintiffs' application. The Court does not believe that the delay "substantially undermines Plaintiffs' contentions that continued detention would harm them." *Ramirez*, 2018 WL 1882861, at *18.

### 3. Balancing of the Equities and Public Interest

Finally, Plaintiffs contend that their irreparable harm in the absence of a preliminary injunction outweighs any harm claimed by Defendants should the injunction be granted. Pls.' Am. Mem. at 43–44. According to Plaintiffs, they have significant liberty interests at stake, and continued detention without proper parole determinations would result in mental and emotional harm and "a waste of taxpayer funding." *Id*. On the other hand, in support of their argument that the balance of equities weighs against granting a preliminary injunction, Defendants cite (1) the fact that an injunction would alter, rather than preserve, the status quo; and (2) the public's interest in enforcement of the United States' immigration laws. *See* Defs.' Opp'n at 43–44. The Court concludes that the balance of the hardships and public interest considerations favor Plaintiffs.

In determining whether to grant a preliminary injunction "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted)

(quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)). These considerations merge into one factor when the government is the non-movant. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

It is unclear to the Court how the relief requested will negatively impact Defendants, because it is relatively minor. If granted, Defendants must only apply the Morton Directive in evaluating Plaintiffs' parole requests, without considering immigration deterrence as a factor weighing in favor of denial. Defendants need not grant parole unless warranted by the evaluation. If, as Defendants claim, the Morton Directive is already consistently applied and there is no policy of deterrence, the new parole determinations can pose no harm to them. *See Ramirez*, 2018 WL 1882861, at *18 (holding that the balance of equities favored the plaintiffs where the defendants were not required to offer a "change in placement, unless warranted by [the court's required assessment]," and noting that "while [the defendants] are constrained by Congress's mandate, they have quite a bit of discretion in determining how to weigh the factors and whether to provide a less restrictive setting").

By contrast, denying the opportunity for parole determinations that comply with binding ICE policy denies Plaintiffs an avenue through which to secure their liberty, even if only temporarily. As courts in this jurisdiction have recognized, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L-R*, 80 F. Supp. 3d at 191 (citing *N. Mariana Islands v. United States,* 686 F. Supp. 2d 7, 21 (D.D.C. 2009)); *Klayman v. Obama,* 957 F. Supp. 2d 1, 43 (D.D.C. 2013)); *Damus*, 2018 WL 3232515, at *17.

Defendants' arguments to the contrary are unpersuasive. First, it is true that some district courts in this Circuit apply a rule under which "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Columbia Hosp.*, 15 F. Supp. 2d at 4 (citation and internal quotation marks omitted). Assuming such a rule applies, in this Court's estimation, Plaintiffs have carried their burden. Continued detention, where Plaintiffs might otherwise be eligible for conditional parole, constitutes serious potential damage that merits an injunction.

Second, Defendants correctly state that the public has an interest in the enforcement of immigration laws, but that interest does not favor denying Plaintiffs' motion. While DHS surely has substantial discretion in the area of immigration, *cf. Arizona v. United States*, 567 U.S. 387, 396, 408 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials."), Plaintiffs have identified a specific, binding agency policy constraining ICE's discretion. The public interest surely does not cut in favor of permitting an agency to fail to comply with its own binding policies impacting the rights of individuals. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1977) (recognizing that "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate"). Accordingly, the balance of interests weighs in favor of granting preliminary injunctive relief to Plaintiffs.

\*                    \*                    \*

In sum, the Court concludes that Plaintiffs have met their burden of showing that preliminary injunctive relief is warranted. Plaintiffs have shown that it is likely that they will

succeed on the merits of their claims because they have supplied evidence tending to show that Defendants have considered immigration deterrence when making parole determinations, in contravention of binding agency policy. Plaintiffs have also shown that they would suffer irreparable harm in the absence of a preliminary injunction, and that a balancing of the equities and public interest considerations favor granting their requested relief. Accordingly, the Court orders Defendants to re-evaluate Plaintiff Mikailu J. for parole in strict compliance with the Morton Directive, including its procedural requirements, and without considering immigration deterrence, within two weeks of the date of the order accompanying this Opinion. Should Plaintiff Aracely R.'s parole be revoked, Defendants shall similarly re-evaluate her parole request.

## VII. CONCLUSION

For the forgoing reasons, the Court hereby **ORDERS**:

1. Defendants' Motion to Transfer Venue (ECF No. 38) is **DENIED**.

2. Plaintiffs' Motion to Supplement the Prayer for Relief in their Application for a Preliminary Injunction (ECF No. 79) is **GRANTED**.

3. Plaintiffs' Motion to Present Three Exhibit Updates (ECF No. 89) is **GRANTED**.

4. Plaintiffs' Application for a Preliminary Injunction (ECF No. 79-1) is **GRANTED IN PART**. Defendants shall re-evaluate Plaintiff Mikailu J. for parole in strict compliance with the Morton Directive, including its procedural requirements, and without considering immigration deterrence, within two weeks of the date of the order accompanying this Opinion. Should Plaintiff Aracely R.'s parole be revoked, Defendants shall similarly re-evaluate her parole request.

5. Plaintiffs' Sealed Motions for Leave to File Documents Under Seal (ECF Nos. 55, 75, and 90) are **GRANTED**.

6. Defendants' Motion to Hold in Abeyance Briefing on Preliminary Injunction (ECF No. 61) is **DENIED AS MOOT**.

Dated:  July 3, 2018

RUDOLPH CONTRERAS
United States District Judge