# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SADAT I., South Texas Detention Center, 566
Veterans Drive, Pearsall, TX 78061; MIKAILU J.,
Laredo Detention Center, 4702 E. Saunders, Laredo,
TX 78401; VICTOR V., Laredo Detention Center, 4702
E. Saunders, Laredo, TX 78401; RANSOM A., Laredo
Detention Center, 4702 E. Saunders, Laredo, TX 78401;
LUZIA N., T. Don Hutto Residential Center, 1001 Welch
St., Taylor, TX 76574,

      *Plaintiffs*,

      *v.*

KIRSTJEN NIELSEN, Secretary of the Department of
Homeland Security, Washington, DC 20528; THOMAS
HOMAN, Acting Director of U.S. Immigration and
Customs Enforcement ("ICE"), 500 12th St., SW,
Washington, DC 20536; MATTHEW ALBENCE, ICE
Executive Associate Director of Enforcement and Removal
Operations, 500 12th St., SW, Washington, DC 20536;
PHILLIP MILLER, ICE Deputy Executive Assistant
Director of Enforcement and Removal Operations, 500
12th St., SW, Washington, DC 20536; NATHALIE
ASHER, ICE Assistant Director of Field Operations for
Enforcement and Removal Operations, 500 12th St., SW,
Washington, DC 20536; TAE JOHNSON, ICE Assistant
Director for Custody Management for Enforcement and
Removal Operations, 500 12th St., SW, Washington, DC
20536; DANIEL BIBLE, ICE Field Office Director for
Enforcement and Removal Operations, 1777 NE Loop 410,
Suite 1500, San Antonio, TX 78217; JANIE BENNETT,
ICE Assistant Field Office Director, Port Isabel Detention
Center, 27991 Buena Vista Blvd., Los Fresnos, TX 78566;
FNU AGUIRRE, ICE Officer, 27991 Buena Vista Blvd.,
Los Fresnos, TX 78566; WILLIAM OESTREICH, ICE
Officer, 27991 Buena Vista Blvd., Los Fresnos, TX 78566;
ANDREW HURON, ICE Assistant Field Office Director,
South Texas Detention Center, 566 Veterans Drive,
Pearsall, TX 78061; FNU GROLL, ICE Officer,

C.A. 1:17-cv-01976 RC

**Fourth Amended Complaint for
Injunctive and Declaratory
Relief**

566 Veterans Drive, Pearsall, TX, 78061; ROBERT
CERNA, ICE Assistant Field Office  Director, Laredo
Detention Center, 4702 E. Saunders,  Laredo, TX 78401;
FNU GAMEZ, ICE Officer, 4702
E. Saunders, Laredo, TX 78401;
John DOE, ICE Headquarters Post Order Detention
Unit, 500 12th St., SW, Washington, DC 20536;
 Health Simon, ICE Headquarters Post Order
Detention Unit, 500 12th St., SW, Washington, DC 20536;
all in their official capacities,

     *Defendants.*

---

## FOURTH AMENDED COMPLAINT

### TABLE OF CONTENTS

I. INTRODUCTION ………………………………………………….. 1

II. JURISDICTION AND VENUE……………………………………….. 2

III. PARTIES…………………………………………………………….. 3

IV. FACTS…………………………………………………………… 5

    Legal Background……………………………………………….. 5

    Defendants' Changing Policies……………………………….....7

    Plaintiffs' Allegations………………………………………….13

    Prison-Like Conditions……………………………….………..21

    Defendants' Duties and Actions……………………………….23

V. CAUSES OF ACTION……………………………………………… 27

    Due Process……………………………………………………. 27

First Amendment……………………………………………………….  28

APA……………………………………………………………………30

VI.     PRAYER FOR RELIEF………………………………………………..  32

I.    <u>Introduction</u>

1.  The Plaintiffs in this case are civilians who were forced to flee their homelands due to the ongoing violence there. All are in danger of severe persecution and/or torture should they return.

2.  Rather than enter the United States unlawfully, the Plaintiffs presented themselves to U.S. officials at a U.S. Port of Entry and requested political asylum, as authorized by 8 U.S.C. §§ 1158(a)(1) and 1225. All have passed their credible fear interviews and all are eligible for parole. Nevertheless they remain in the harsh and prison-like conditions of immigration detention facilities while they await final decisions on their claims. As set forth below, Plaintiffs have suffered detention periods of six months to two and a half years.  Unlike asylum seekers who enter the United States without inspection, Plaintiffs have no access to a bond review hearing before an Immigration Judge. 8 C.F.R. § 1003.19(h)(2)(i).

3.  Defendants, pursuant to their current policy and practice described below, have denied parole[1] to the Plaintiffs in order to: a) penalize them for their status as asylum-seekers; b) so burden their right to petition for asylum that they relinquish their claims and return home; and c) deter other victims of persecution from seeking asylum in the United States. This policy continues at this time, despite this Court's Order granting in part Plaintiff's application for preliminary injunction of July 3, 2018.

4.  Defendants' policies are unconstitutional and violate the laws and treaties of the United States, as well as the basic principles of international law, or *jus cogens* norms.

---

[1] "The term "parole" as used throughout this Complaint, also includes the closely related post-removal order parole.

The policy also violates the Defendants own binding rules and directives. Plaintiffs bring suit for declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. §702 *et seq*. ("APA"), and the Fifth Amendment to the United States Constitution.

II.    Jurisdiction and Venue

5.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. Defendants have waived sovereign immunity for purposes of this suit pursuant to 5 U.S.C. § 702. This Court has equitable powers to grant injunctions, and authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

6.  This Court has venue pursuant to 28 U.S.C. §§ 1391(b) (2) and/or (b) (3), and/or 28 U.S.C. §§ 1391(e)(1) (A) and 1391(e)(1)(B).

III.    Parties

*PLAINTIFFS:*

7.  Sadat I. is a 31-year-old man from Ghana. After two and a half years of unjustified detention, he was released on parole pending final determination of his asylum clams. He is currently in San Antonio, Texas. He could be ordered back to ICE detention at any time.

8.  Mikailu J. is a 26-year-old- citizen of Sierra Leone. He has been detained for a year and a half, and is currently detained at the Webb County Detention Center in Laredo, Webb County, Texas.

9.   Victor Antonio V. is a 36-year-old citizen of Honduras. He has been detained for ten months and is currently at the Webb County Detention Center, in Laredo, Webb County, Texas,

10. Ramson A.. is a 20-year-old citizen of Cameroon. He has been detained for almost a year and is currently at the Webb County Detention Center in Laredo, Webb County, Texas.

*11.* Luzia N. is a 39-year-old citizen of Angola. She has been detained for nearly six months and is currently at the T. Don Hutto Residential Center in Tyler, Williamson County, Texas.

*DEFENDANTS:*

12. Defendant Kirstjen Nielsen is the Acting Secretary of the Department of Homeland Security.[2] She is sued in her official capacity and resides in or near Washington, D.C.

13. Defendant Thomas Homan is the Acting Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or near Washington, D.C.

14. Defendant Matthew Albence is the Executive Associate Director of Enforcement and Removal Operations ("ERO") for U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or close to Washington, D.C.

15. Defendant Phillip Miller is the Deputy Executive Assistant Director of ERO for U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or close to Washington, D.C.

16. Defendant Nathalie Asher is the Assistant Director of Field Operations for ERO, within U.S. Immigration and Customs Enforcement. She is sued in her official capacity and resides in or close to Washington, D.C.

---

[2] Defendant Nielson is added pursuant to Fed. R. Civ. P. 25(d), which provides that an "officer's successor is automatically substituted as a party" when a previous public officer ceases to hold office.

17. Defendant Tae Johnson is the Assistant Director for Custody Management for ERO, within U.S. Immigration and Customs Enforcement. He is sued in his official capacity and resides in or close to Washington, D.C.

18. Defendants John Doe and Heath Simon are officials for ICE Headquarters Post Order Detention Unit. Both are sued in their official capacities, and reside in or close to Washington D.C.

19. Defendant Daniel Bible is the Field Office Director of ERO for U.S. Immigration and Customs Enforcement Office in San Antonio, Texas. He is sued in his official capacity and resides in or near San Antonio, Bexar County, Texas.

20. Defendant Janie Bennett is the Assistant Field Office Director of ERO for U.S. Immigration and Customs Enforcement at the Port Isabel Detention Center. She is sued in her official capacity and resides in Cameron County, Texas.

21. Defendant Aguirre is an ICE official at the Port Isabel Detention Center. He is sued in his official capacity and resides in Cameron County, Texas.

22. Defendant Oestreich is an ICE official at the Port Isabel Detention Center. He is sued in his official capacity and resides in Cameron County, Texas.

23. Defendant Andrew Huron is the Assistant Field Office Director of ERO for U.S. Immigration and Customs Enforcement at the South Texas Detention Center. He is sued in his official capacity and resides in Frio County, Texas.

24. Defendant Groll is an ICE official at the South Texas Detention Center. He is sued in his official capacity and resides in Frio County, Texas.

25. Defendant Robert Cerna is the Assistant Field Office Director of ERO for U.S. Immigration and Customs Enforcement at the Laredo Detention Center. He is sued in his official capacity and resides in Webb County, Texas.

26. Defendant M. Gamez is an ICE official at the Laredo Detention Center. He is sued in his official capacity and resides in Webb County, Texas.

IV.  FACTS

*LEGAL BACKGROUND*

27. After the global devastation of World War II, the United Nations promulgated the 1951 U.N. Convention Relating to the Status of Refugees ("Refugee Convention").[3] In relevant part, the Refugee Convention provides that states shall not impose penalties on refugees for illegal entry or presence, nor shall states "expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention Art. 31, Art. 33.[4]

28. The United States adopted these protections by signing the 1967 Protocol Relating to the Status of Refugees ("Protocol"), which incorporated Articles 2-34 of the Refugee Convention.[5]

---

[3]  April 22, 1954, 189 U.N.T.S. 150.

[4]  The Refugee Convention also stipulates that states should allow refugees to move freely within their territory and choose their place of residence.  *Id.* at Art. 26.

[5]  Oct. 4, 1967, 606 U.N.T.S. 267. The United States acceded to the Protocol on November 1, 1968.

29. In order to comply with U.S. obligations under the Protocol, the United States promulgated the Refugee Act of 1980,[6] which required the United States to establish procedures for noncitizens physically present in the United States, at a land border, or at a port of entry to apply for asylum.

30. The prohibition against *refoulement* is enshrined in other important treaties ratified by the United States, including the International Covenant on Civil and Political Rights ("ICCPR")[7] and the Convention Against Torture and Other Cruel, Degrading or Inhuman Punishment ("CAT").[8]

31. The Foreign Affairs Reform and Restructuring Act of 1998 went on to implement the *non-refoulement* provision of CAT (Art. 3), pronouncing it U.S. policy "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture" and directing the appropriate agencies to prescribe regulations to comport with such policy.[9]

32. The objective of these international and domestic laws is to protect and provide a safe haven for persons fleeing imminent persecution and/or torture in their homelands. Plaintiffs are the intended beneficiaries of these laws. Although a grant of asylum is

---

[6] Pub.L. No. 96-212, 94 Stat. 105 (1980).

[7] Dec. 16, 1966, 999 U.N.T.S. 171 (entered into force March 23, 1976). The United States ratified the ICCPR on June 8, 1992.

[8] Dec. 10, 1984, 1465 U.N.T.S. 85 (entered into force June 26, 1987). The United States ratified CAT on Oct. 21, 1994.

[9] Pub. L. No. 105-277, Div. G, 112 Stat. 2681-822.

discretionary, withholding of removal to persons in danger of torture in their homeland, is mandatory.

33. Under the current U.S. statutory scheme, persons fleeing persecution are entitled to request asylum and/or CAT protections at any U.S. Port of Entry. 8 U.S.C. §§ 1158(a)(1) and 1225 (hereinafter "POE Asylum Seekers"). They need only cross the international bridge or roadway and present themselves to the U.S. immigration officers stationed there. Such crossings and requests are lawful.

34. These POE asylum seekers must be referred to a designated asylum officer for a preliminary credible fear interview ("CFI"). 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4).[10]

35. Once the asylum seeker passes the CFI, he or she enters standard immigration court removal proceedings under 8 U.S.C. § 1229a.[11]

36. Prior to the CFI, detention of POE asylum seekers is mandatory. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). However, after the person passes the CFI, he or she may be released on parole by ICE.  8 U.S.C. § 1182(d)(5)(A); 8 CFR § 212.5.

37. Pursuant to agency regulations, the ICE parole decision for POE asylum seekers may not be reviewed by an immigration judge. 8 C.F.R. § 1003.19(h)(2)(i).

38. Such a bar on review by an immigration judge does not apply to persons who entered the United States unlawfully.

---

[10]  In the alternative, the asylum seeker may be placed directly into regular removal proceedings, which commence with the issuance of a Notice to Appear. 8 U.S.C. § 1225(b)(2).

[11]  Those who do not pass their CFI are subject to expedited removal. 8 U.S.C. § 1225(b)(1)(B)(iii).

*DEFENDANTS' CHANGING POLICIES*

39. In the past, most POE asylum seekers were released on parole if they had proper identification, had no criminal background, and presented appropriate sponsorship officers from friends or relatives. This general practice was, however, inconsistently applied.

40. In 2009, ICE issued a policy directive "to ensure transparent, consistent, and considered ICE parole determinations for arriving aliens seeking asylum in the United States." Parole of Arriving Aliens Found to Have Credible Fear, ICE Policy Directive 11002.1 (Jan. 4, 2010) ("Morton Policy Directive").[12] The Directive explained the federal regulations, and instructed ICE personnel to grant parole to any asylum seeker who established his or her identity and did not present a flight risk or danger to the community. As the Policy Directive explained, "continued detention of such persons is not in the public interest." *Id.* at ¶ 6.2; *see also* HUMAN RIGHTS FIRST, LIFELINE ON LOCKDOWN 9 (July 2016) ("LIFELINE").

41. In 2012 Defendants cited this Morton Policy Directive as binding and adequate, in their refusal to initiate rule making procedures on parole eligibility, as well as in their oral argument to the Supreme Court in *Jennings v. Rodriguez*, (Feb. 27, 2018).[13]

42. Pursuant to this Morton Policy Directive, all Plaintiffs should have been promptly released on parole as a matter of public interest. In addition to his presentation of

---

[12] Then Acting Secretary of Homeland Security Kelly clarified that this policy directive remains "in full force and effect" in a 2017 memo.  Implementing the President's Border Security and Immigration Enforcement Improvements Policies, Memorandum from DHS Secretary Kelly to CBP, ICE and USCIS leadership at  9 (Feb. 17, 2017) ("Kelly Memorandum").

[13] As discussed in *R.I.L-R v. Johnson*, 80 F.Supp.3d 164 (D.D.C. 2015)

identification and U.S. citizen sponsors, Plaintiff Victor V.. also qualified for parole on the basis of his fragile medical condition.

43. In 2014 there was a surge in immigration along the southern U.S.-Mexico border. *See* LIFELINE at 9.  A second surge began in late 2016. These two surges resulted, in part, from extraordinary levels of violence and repression in Central America, where the murder rates reached some of the highest levels in the world.

44. In response, Defendants and/or their predecessors began to formulate and adopt various practices and policies aimed at deterring immigration. Some of these policies were openly announced and recognized. However, by 2017, such deterrence policies were often promulgated and enforced without any such public announcements, publications, or official recognition.

45. Defendants responded to the 2014 surge with openly recognized deterrence policies, such as the long term detention of families seeking asylum. In the resulting litigation, U.S. Defendants expressly cited deterrence of immigration as a key justification for their policy. An injunction was issued in favor of Plaintiffs. *R.I.L-R*, 80 F. Supp. 3d at 190-91, (D.D.C. 2015).

46. Meanwhile, unlawfully crossing the Rio Grande or other parts of the U.S.-Mexico border had become extremely dangerous, as well as costly.[14]

---

[14]  Much of this strategic border area, such as the state of Tamaulipas, is now under the control of transnational criminal organizations, who charge victims fleeing persecution high fees for the right to cross the border and kill or forcibly recruit those who do not make proper payment. Falling victim to trafficking rings is a serious risk, as are assaults, robberies, and beatings. The kidnapping of asylum seekers by local gangs has become rampant in certain regions. In addition, asylum seekers and their children face the risk of drowning or perishing in the desert as they seek a safe haven. *See, e.g.*, UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES, WOMEN ON THE RUN 6 (2016); Aaron Nelson, *Border Journalists in Reynosa Mexico Navigate Continuing Dangers to Report on Continued Gunbattles in the Street*, SAN ANTONIO EXPRESS NEWS, May 15, 2017; Abel

47. Many asylum seekers chose to cross into the United States lawfully, and to ask for asylum at a port of entry pursuant to 8 U.S.C. §§1158(a)(1) and 1225.

48. By late 2016 a new surge of asylum seekers began.

49. As a result, by late 2016 and in early 2017, numerous asylum seekers were unlawfully and systematically turned away at the Ports of Entry across the southern border by U.S. officials. Instead of being interviewed for credible fear, these asylum seekers were simply forced back into Mexico in violation of the mandatory processing set forth in 8 U.S.C. §§ 1158(a)(1) and 1225. This too has resulted in litigation. *See Al Otro Lado Inc. v. Kelly*, No. 2:17-cv-5111 (C.D. Cal. filed July 12, 2017).[15]

50. This new de facto policy was never published, publicly announced or officially recognized.

51. Former Plaintiff Aracely R. and former Plaintiff Junior M. were both initially denied the right to apply for asylum in this manner. As a result, Aracely R. was kidnapped as soon as she set foot on the Mexican side of the international bridge.  (Both Plaintiffs were later able to apply for asylum when they were accompanied by observers to the POE)

---

Fernandez, *Authorities Rescue 10 Cubans Allegedly Kidnapped in Mexican Border City*, MIAMI HERALD, Feb. 9, 2017; Sarah Stillman, *Where are the Children?* THE NEW YORKER, April 27, 2015.

[15]  In 2017, U.S. officials also announced that in the future, children arriving at the southern border might be separated from their parents as a further measure of deterrence. Samantha Schmidt, *DHS is considering separating mothers and children who cross the border illegally*, THE WASHINGTON POST, Mar. 7, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/03/07/dhs-is-considering-separating-mothers-and-children-who-cross-the-border-illegally/?utm_term=.7124a3d839b4. In addition, under the Trump Administration, criminal prosecutions for immigration offenses committed at the border are now a priority, including offenses related to illegal entry and reentry.  Kelly Memorandum at 11-12.

52. During this period, Defendants also began a widespread practice of denying parole to POE asylum seekers, resulting in their unjustified and prolonged detention ("Parole /Deterrence Policy"). [16] Although parole is still usually granted to minors, pregnant women, and an adult accompanying a child, most eligible adults like the Plaintiffs are currently denied parole without justification.

53. In order to achieve this result, Defendants initiated an *unwritten* practice and policy, ordering local officials to heavily weight immigration deterrence in deciding parole and similar forms of release. Deterrence of immigration is a punitive and hence unlawful basis for subjecting bona fide asylum seekers to prolonged detention. This policy has also been applied to persons in post removal proceedings under 8 USC § 1231.

54. Soon after his inauguration, President Trump doubled down on deterrence in Executive Order No. 13767, 82 Fed. Reg.8793 (Jan. 30, 2017), requiring the construction of a border wall, urging the end of "catch and release" policies, and ordering an increase in detention facilities to hold immigrants. The document also requires the Defendants to assure there is no "abuse" of the parole regulations. (Id. §2, 5, 7, 11). In his implementation memorandum, former DHS Secretary Kelly stated that the Morton Policy Directive remained in full force and effect, *but* stressed that parole should be granted "sparingly."[17] The initial draft of this document made it

---

[16] See *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. Feb. 20, 2015) (injunction issued against prolonged detention of families), citing *Matter of D.J.*, 23 I&N Dec. 572 (AG 2003).

[17] *Implementing the President's Border Security and Immigration Enforcement Improvements,* John Kelly, Feb. 20, 2017, at p. 9.

clear that immigration deterrence was the key goal.[18] The draft stated that DHS's new policies, including expanded use of detention, "was designed to deter illegal immigration" and that the President determined that detention pending a determination of inadmissibility "has a significant deterrent effect on illegal immigration."

55. Accordingly, by early 2017 Defendants were giving still greater weight to the factor of immigration deterrence in deciding the parole requests of POE asylum seekers.

56. Although unwritten, this policy and practice of deterring immigration through denial of parole ("Parole Denial Policy") was swiftly and uniformly implemented across the United States. The statistics and investigatory reports make this clear.

57. As reported by Human Rights First, the percentage of POE asylum seekers released on parole after passing their CFI was 80 percent in 2012. By 2015, (after the 2014 surge), this figure had dropped to 47 percent. LIFELINE at 13.

58. As noted in HUMAN RIGHTS FIRST, JUDGE AND JAILOR, (SEPT. 2017), since January 2017 immigration attorneys report that arriving asylum seekers are rarely, if ever, granted parole in facilities in Illinois, Michigan, Louisiana, New York, the San Francisco bay area, and South Texas; and remains rare in other areas as well.( Id., 1, 9-10).

59. Recently obtained data indicates, for example, that at the Port Isabel ICE Detention Center in Texas, the grants of parole dropped from 34.7 % in 2016, to 8.7% granted in the first half of 2017. Likewise, the parole release grant rate in the South Texas

---

[18] See, *Damus v. Nielsen*, filed D.D.C., March 15, 2018 at *19.

Detention Center in Pearsall, Texas, fell from 48.9% in 2016 to 26.3 % .[19]  As noted above, the national rate of granting parole was roughly 80% in 2012. In 2016 the rate was 47%. By 2017 the national rate had plummeted to 30.2 %. [20]

60. Such planned, systemic denials of parole to eligible POE seekers constitutes an official agency policy. As stated by Eleanor Acer of Human Rights First, Defendants have a policy of deterring individuals from coming to the United States to seek asylum, and in effect to punish those who have already done so.[21]

61. As a result this harsh national policy, many eligible adults are wrongfully denied parole and are subjected to prolonged and arbitrary detention in prison-like conditions. This miscarriage of justice occurs despite the official Morton Policy Directive favoring the grant of parole and similar release measures to POE asylum seekers if they pose no flight risk or danger to the community. The release of such persons is deemed to be in the public interest. ICE Policy Directive at ¶ 6.2.

62. Throughout 2018 the United States government has continued to apply ever harsher measures of deterrence against asylum seekers.

63. The government began, for example, to separate small children from their asylum-seeking parents in cases of entry without inspection, a shocking and unlawful punishment for such a misdemeanor. Litigation began immediately, and resulted in

---

[19] Dkt. 41-3, Declaration of Eunice Lee, Exhibit 3 filed with Plaintiffs' Response to Defendants' Motion to Transfer Venue.

[20] *Id. See also Damus, supra* at *14-15 noting a 4% grant of parole rate in five areas, including El Paso, Texas.

[21] Declaration of Eleanor Acer, Exhibit 11, filed with Application for Preliminary Injunction in this case.

court orders to reunify all such families. Defendants understood and intended this policy to deter asylum seekers from coming to the United States.[22] In an interview with National Public Radio, former DHS Secretary John Kelly stated that the family separation policy "would be a tough deterrent. A much faster turnaround on asylum seekers."[23]

64.  Defendants have also begun a new practice of halting Port of Entry asylum seekers on the international bridges, requiring them to sit with their children and "wait their turn" to be processed. In May through June 2018 some families were forced to wait on the Hidalgo-Reynosa bridge, and the Roma Miguel Aleman bridge, for up to two weeks in temperatures often rising to 105 degrees. The asylum seekers were not permitted to wait in the large, air-conditioned waiting rooms or even use the restrooms. They depended on local concerned citizens from Mexico and the U.S. for food and water. Such unlawful deterrence/punishment continues sporadically.

65. Meanwhile, Defendants have also continued their practice of heavily weighting deterrence in deciding parole requests by Port of Entry asylum seekers such as the Plaintiffs even after this Court's Order of July 2018. With the exception of minors, pregnant women, or a parent accompanying a child, the Morton Directive standards

---

[22] *See* Julia Preston, *What You Should Know about Family Separations*, The Marshall Project, *available at* https://www.themarshallproject.org/2018/06/19/what-you-should-know-about-family-separations (accessed August 30, 2018) (quoting Steven Wagner, Assistant Secretary of HHS as saying "We expect the new [family separation] policy will result in a deterrence effect.").

[23] John Burnett, Transcript: White House Chief of Staff John Kelly's Interview With NPR, National Public Radio (May 11, 2018), *available at* https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr (accessed August 30, 2018).

continue to be flouted. Single adults remain detained for long periods of time without any true consideration of their eligibility for parole, and the percentages of release remain exceedingly low.

66. Sometimes the Defendant officials give unlawful or pretextual reasons for denying parole, such as requiring Africans to present passports.

67. Defendants may not, of course, impose an irrebuttable presumption of flight risk or danger to the community upon asylum seekers as a group.

68. Defendants intend for their actions to serve as a deterrent to asylum seekers by forcing them to either endure prolonged detention or risk the grave perils involved in unlawful entries.

69. This practice unjustly punishes persons like the Plaintiffs, who have committed no crimes, for their status as POE asylum seekers, and deters others from seeking refuge in the United States. Medical experts report that persons who have experienced trauma, such as the Plaintiffs, are further harmed when they are detained in prison-like conditions.[24] As the result of prolonged detention, many POE asylum seekers fall into despair, relinquish their claims, and return to the dangers of their homelands. This is refoulement.

70. Former Plaintiff Junior M. relinquished his claim for asylum and returned to Honduras for these very reasons. Two of his brothers had already been murdered there; one of them shortly after being deported from the United States.

---

[24] PHYSICIANS FOR HUMAN RIGHTS, FROM PERSECUTION TO PRISON: THE HEALTH CONSEQUENCES OF DETENTION FOR ASYLUM SEEKERS (2003), *available at* https://s3.amazonaws.com/PHR_Reports/persecution-to-prison-US-2003.pdf.

71. Defendants seek to pressure all P.O.E. asylum seekers to abandon their claims and return to their home countries. Such a policy constitutes constructive removal, and hence de facto *refoulement*.

72. Prolonged detention under harsh and prison-like conditions also greatly hampers asylum seekers' ability to work with attorneys and to adequately prepare their cases. *See* "Prison-Like Conditions," *infra*.

73. Deterrence of others is an unconstitutional and unlawful factor to consider in determining whether bona fide victims of persecution, such as persons who have passed their CFIs, should be paroled in the public interest.

74. Consideration of deterrence also brings a new, un-related, and heavily weighted element into the long standing factors of eligibility for parole. This clearly affects substantive rights of POE asylum applicants. The policy was never announced or subjected to any notice, public comment and/or publication. This parole/deterrence policy is final and binding.

75. Such policy was formulated, put into effect, and required by the high-level Defendants based in Washington D.C.

76. Such policy cabins and binds the parole evaluations and decisions by the Texas Defendants.[25]

77. Defendants have no valid justification for their policy of denying parole and similar relief to otherwise eligible POE asylum seekers, and such denials are discriminatory, retaliatory, arbitrary, irrational and capricious.

---

[25] Initial work sheets for Plaintiff Aracely R. , for example, show the officer found her fully eligible for parole. Such evaluation was clearly overturned, and she was denied parole.

78. Furthermore, such denials unlawfully penalize Plaintiffs for petitioning for asylum and/or withholding of removal under CAT in the United States.

79. As a result of Defendants' unlawful policy, the Plaintiffs have spent between six months and two years in harsh and prison-like conditions, although they have never committed a crime.

80. At all times relevant to this lawsuit, Defendants have acted knowingly and intentionally with regard to the unlawful nature and harmful consequences of their actions.

81. Defendants' actions shock the conscience.

*PLAINTIFFS' ALLEGATIONS*

82. Plaintiff  Victor Antonio V. D. (" Victor V."):

A. Plaintiff Victor V. is a thirty- six year old citizen of Honduras. He arrived in the United States with his family when he was a minor, and received Temporary Protected Status or "TPS". For many years he thrived, doing well in school and starting up a small business.  Although he never committed a crime, his TPS status was not renewed, and he was deported to Honduras in 2012.

B. Back in Honduras, Plaintiff Victor V. was attacked by gang members and struck in the head with a machete. Even after he relocated to other áreas, he remained under constant threats. He tried to return to the United States, but was again deported. In Honduras, the threats against him continued,

C. In 2015 he made a final desperate attempt to return to the United States. Destitute, he fled across Mexico on the rooftop of the train known as "La Bestia". He fell under the train and lost hisleft arm and leg.

D.  Once he recovered, Victor V.  lawfully crossed the international bridge at Laredo, and again requested asylum pursuant to 8 U.S.C. §§ 1158(a)(1) and 1225. He promptly passed his credible fear interview, given his now defenseless physical condition.

E.  Victor V. then requested parole, presenting his sister's full  sponsorship documents, and his own substantial identification. ICE is in possession of his passport and birth certificate, and can also verify his identification through his Florida driver's license and social security number.

F.  Victor V. has nevertheless  denied parole, even though Defendants are utterly unable to provide him with reasonable and urgently needed medical care.

G.  Nearly five months ago the Defendants took Victor V.'s prosthetic arm and leg away for repair. They still have not been returned to him, and he has been wheel chair bound for the entire period. As a result, his mental and physical health are deteriorating rapidly.

83. Plaintiff Sadat I.:

A.  Plaintiff Sadat I. was forced to flee Ghana after being brutally attacked, beaten and persecuted due to his status as a gay man. His house was burned to the ground.

B.  In January 2017, Plaintiff Sadat I. legally crossed the international border from Tijuana, Mexico into the United States, and requested asylum at the U.S. port of entry. He was briefly detained at local facilities, under terrible conditions. Various border patrol guards made it clear the detainees were all being punished

20

for coming to the United States. His national identity cards were retained by ICE when he was taken into custody.

C.  Plaintiff Sadat I. passed his credible fear interview on February 11, 2016.

D.  Plaintiff was transferred to detention in Atlanta, Georgia, where he was denied parole.

E.  Plaintiff's continued detention made it more difficult to prepare his legal case. For example, a key evidentiary CD sent from his family was withheld from him by the guards under the detention center's rules. Detainees are not allowed to have CDs.

F.  Plaintiff was denied asylum in 2016, and was informed by an ICE officer that he would soon be released on parole pending his appeal.  He had ample identification and sponsorship offers. However, at the end of 2016 he was told that due to the election results he would not be given parole after all. The denial resulted from Defendants' policy of heavily weighting immigration deterrence in evaluating parole applications.

G.  In January 2017, Plaintiff Sadat I.'s appeal was denied by the Board of Immigration Appeals. He was not removed during the 90 day removal period, nor was he removed in the following three months. Defendants Health Simon and John Doe of the Headquarters Post Order Detention Unit thereafter became responsible for any custody decisions regarding Plaintiff. They too denied his release on parole despite his eligibility. All such denials resulted from the Defendants' policy of heavily weighting immigration deterrence in release decisions.

H.  Plaintiff Sadat I. moved to reopen his case to the BIA and the Eleventh Circuit, based on the grave errors and injustices that occurred.

I.  Plaintiff Sadat I.'s case was ordered re-opened in July 2018.  By then he had been detained for 2 1/2 years in harsh and prison-like conditions without any justification therefore.  He was finally released on parole, but can be recalled and re-detained by the Defendants at any time.

J.  Plaintiff Sadat I. faces arrest as a gay man in Ghana. Other than this invalid charge, Plaintiff has never violated the law, as indicated by his background check. He presents no danger to the community.

K.  Plaintiff Sadat I. has suffered mental and physical harm as a result of the improper denial of parole, and will suffer further harm if ordered re-detained.

L.  The denials of parole were based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding his request.

84.  Plaintiff Ramson A. :

A.  Plaintiff Ramson A. is a 20-year-old citizen of Cameroon. As a young student there, he engaged in protests against ethnic violence. As a result he was secretly detained and horrifically beaten by the police. His injuries required hospitalization and a blood transfusion, and he was able to flee before the police returned for him. His village was later burned and his family remains in hiding.

B.  Plaintiff Ramson A.  fled to the west and lawfully presented himself at a U.S. Port of Entry in August 2017. He promptly passed his credible fear interview.

C.  Plaintiff then presented a full application for parole. This included a copy of his government identification (the original was lost when he nearly drowned during

the journey north from Colombia), his birth certificate. His student identification card, and his sponsorship letters.

D. Plaintiff Ramson A.  was denied parole despite his eligibility therefore. ICE officers told him and other African asylum seekers that Africans would be required to provide passports. There is no such requirement in the Morton Directive.

E. Plaintiff Ramson A. has now been detained in harsh and prison like conditions for a full year. He faces many more months while his case is on appeal.

F. As a result of this unjustified detention Plaintiff Victor V. has suffered serious mental and physical harm.

G. The denials of parole were based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding his request.

85.  Plaintiff Luzia N.

A. Plaintiff Luzia N. is a 39-year-old citizen of Angola. She was brutally tortured in her home country and fled to the United States seeking asylum. She presented herself at a U.S. Port of Entry and was taken into custody.

B. Although Luzia N. passed her credible fear interview and was able to provide documents establishing her identity and sponsorship, she was denied parole. Luzia N. has now been detained in harsh, prison-like conditions at the T. Don Hutto Residential Center since approximately March 21, 2018.

C. The psychological trauma that Luzia N. suffered in her home country as a result of the torture she experienced is exacerbated by her prolonged detention and she experiences symptoms of a severe mental health condition.

D. Like Plaintiff Ramson A., advocates have been informed by Luzia N.'s deportation officer that her application for parole was denied because she did not present a passport to establish her identity, a requirement that is not included in the Morton Directive.

E. The denial of parole to Luzia N. was based on and resulted from Defendants' policy of heavily weighing the factor of deterrence in deciding his request

86. Plaintiff Mikailu J.:

A. Plaintiff Mikailu J. is a young journalist from Sierra Leone.

B. Plaintiff was forced to flee after he published articles criticizing female genital mutilation and supporting gay rights.

C. In January 2017, Plaintiff Mikailu J. walked across the international bridge connecting Matamoros, Mexico to Brownsville, Texas. He presented himself to U.S. officials there and requested asylum.

D. Although he passed his credible fear interview, Plaintiff Mikailu J. has been denied parole and remains detained in the Laredo Detention Center. Like other asylum seekers in other facilities, he has been told by officials that Africans in particular will not be released.

F. Plaintiff has submitted a copy of his national identification card from Sierra Leone, together with his press card and school identification card. He also presented a letter from a relative offering him full sponsorship. This satisfies Defendants' requirements. Plaintiff was never interviewed in compliance with the procedures set out in the Morton Directive. A request for redetermination was also made. Nevertheless, Plaintiff remained in detention. Defendants Cerna and Gamez are

responsible for these initial denials. Plaintiff later submitted a additional request for redetermination, which included three separate sponsorship offers with all accompany materials, as well as letters of support from community organizations. He was still denied parole, with no explanation.

G. When this Court granted Plaintiffs' Preliminary Injunction, Plaintiff Mikailu re-submitted his packet of identification and sponsorship letters. He was not interviewed at all, though such interview is required by the Morton Directive. Such failure to interview him lead once again to the unjustified denial of parole.

H. The denial of parole was made pursuant to the Defendants' continuing policy of heavily weighting deterrence in evaluating parole requests. Defendants also acted with the intent to retaliate against Plaintiff for the filing of this lawsuit.

I. Plaintiff Mikailu J. has no access to review by an immigration judge of the denial of parole.

J. Plaintiff Mikailu J. will suffer further from Defendants' policy of utilizing the deterrence factor, because Defendants' policy extends to the post removal regulations under 8 U.S.C. § 1231 and 8 C.F.R. 241.4.

K. The prolonged detention has greatly hampered Plaintiff's ability to work on his own case.

L. Plaintiff Mikailu J. is suffering from increasing depression and trauma, as well as deteriorating physical health, as a result of his prolonged and unjust detention.

*PRISON-LIKE CONDITIONS*

87. Like most U.S. immigration detention centers, the Port Isabel Detention Center provides harsh and prison-like conditions. This is harmful and improper for civil

detainees such as the Plaintiffs, who have never committed a crime. Such harsh conditions include but are not limited to the following:

88. The detainees must remain in their dormitories unless accompanied to another location by the guards. Detainees cannot mingle with other friendly detainees along the way. Upon their return to the dormitories they are frisked. In many facilities the detainee must walk with hands behind his or her back. Even a paper clip, let alone a nail-clipper or cd, is forbidden.

89. Many guards presume the ICE detainees are dangerous criminals and treat them as such. The detainees may not have any physical contact with one another. Even if a fellow detainee receives bad news from home and is weeping, no one may put a comforting arm around him or her.

90. Most detainees are allowed out of the dormitories for recreational purposes for two hours per day. The area is quite small. An area large enough for a soccer game is accessible only once per week.

91. There is no reasonable privacy or hygiene. At Port Isabel the toilets have no dividers between them, forcing detainees to carry out their bodily functions in front of one another. Detainees are issued previously used and stained scrubs and sheets and can only launder them once a week. This creates serious health problems.

92. The food provided is very unhealthy, with white bread and other heavily processed foods appearing in most meals. Family and friends are not permitted to send healthful foods to the detainees. Former Plaintiff Hatim B. has developed chronic stomach problems as a result of this poor diet.

93. Medical care is often substandard.

94. All calls made by a detainee begin with a recorded message stating that the call is being made from a United States Detention Center. This frightens many people, who simply hang up when they hear the message.

95. Detainees cannot use the internet or email, making communications with friends and family in foreign countries both costly and cumbersome. This limits the detainees' ability to find a lawyer, and work with him or her to prepare their cases. Lack of access to the internet further circumscribes their ability to work to prepare their own cases.

96. Family members and attorneys outside the facility cannot call directly to the dormitories, but may only leave messages with the guards. Delivery of such messages is often delayed.

97. All available telephones are tapped, so that the guards may review the conversations, and all mail other than attorney mail is also reviewed.

98. Non lawyer visitors are separated from the detainees by plate glass windows unless special arrangements are made for a special contact visit.

99. When Former Plaintiff Hatim B. requested an examination by a local physician to support his case, he was twice denied. When the request was finally granted, he was brought to the clinic in scrubs, a waist chain, and handcuffs, escorted at all times by two ICE officers.

100.  Conditions at other ICE detention centers, including the Webb County Detention Center in Laredo, Texas and T. Don Hutto Residential Center, are the same or similar to those of Port Isabel, described above.

*DEFENDANTS' DUTIES AND ACTIONS*

27

101.  All Defendants are officials of Immigration and Customs Enforcement, a United States agency, with the exception of Secretary of Homeland Security Kirstjen Nielsen.

102.  Defendant Janie Bennet is the Assistant Field Office Director of the Port Isabel Detention Center. Together with Defendants Aguirre and Oestreich, she evaluates and decides the parole requests of the POE asylum seekers in her facility. She is also responsible for assuring the proper processing and reporting of the parole requests and decisions to Defendant Bible. She and Defendants Aguirre and William Oestreich initially denied the initial parole requests of Plaintiffs Aracely R. and Hatim B. Their decisions were made in compliance with and pursuant to the national policy set by the Washington D.C. Defendants. Specifically, Defendants Bennett, Oestreich and Aguirre gave heavy weight to the factor of immigration deterrence in evaluating Plaintiffs' requests for parole.

103.  Defendant Andrew Huron is the Assistant Field Office Director of the South Texas Detention Center. Together with Defendant Groll, he evaluates and decides the parole requests of the POE asylum seekers in his facility. He is also responsible for assuring the proper processing and reporting of the parole requests and decisions to Defendant Bible. He and Defendant Groll denied the request for redetermination of the parole denial of Sadat I.  This denial was issued in compliance with and pursuant to the national policy set by the Washington D.C. Defendants. Specifically, these defendants gave great weight to immigration deterrence in evaluating Plaintiff's claim.

104. Defendant Robert Cerna is the Assistant Field Office Director of the Laredo Detention Center.  Together with Defendant Gamez, he evaluates and decides the parole requests of the POE asylum seekers in his facility. He is also responsible for assuring the proper processing and reporting of the parole requests and decisions to Defendant Bible. He and Defendant Gamez initially denied the parole requests of Mikailu J. Their decisions were made in compliance with and pursuant to the national policy set by the Washington D.C. Defendants. Specifically Defendants Cerna and Gamez gave heavy weight to the factor of immigration deterrence in evaluating Plaintiffs' requests for parole.

105. Defendant Daniel Bible, as the Field Office Director (FOD) for Enforcement and Removal Operations in San Antonio, Texas has the following responsibilities:

    A.  Implementing policy and quality assurance process

    B.  Maintaining log of parole adjudications in his geographic areas

    C.  Providing monthly statistical reports

    D.  Making final decisions or delegating final decision to deputy FODs or assistant FODs. The FOD has overall responsibility for compliance with the agency rules and policies.

    E.  Ensuring enforcement and removal personnel and decision-makers are familiar with directives.

106. Defendant Daniel Bible is aware of the sharp decline in parole grants to POE asylum seekers, including the Plaintiffs in this case. Instead of correcting the unlawful situation, he has acquiesced in, supported, required and/or enforced the official policy of denying parole on the basis of immigration deterrence. He has taken such actions

in compliance with the national policy formulated and mandated by the Washington D.C. Defendants.

107. Defendant Nathalie Asher, Assistant Director of Field Operations, Enforcement and Removal Operations, ensures considered and consistent decision making and record keeping nationwide of persons who have passed CFIs; oversees monthly tracking of parole statistics from all ERO field offices; and oversees the effective national quality assurance program to monitor field offices to ensure compliance with directives.

108. Upon information and belief, Defendant Nathalie Asher is aware of the sharp decline in parole grants to POE asylum seekers based on her monitoring and oversight duties. She is aware of and complies with, the ongoing policy and practice of denying parole and/or related release to persons such as the Plaintiffs in order to deter and penalize them. She has helped to formulate the policy of heavily weighing immigration deterrence in release decisions, and supported, required and enforced such policy instead of correcting it.

109. Defendant Tae Johnson is the Assistant Director for Custody Management for ICE's Enforcement and Removal Operations and hence oversees all aspects of the detention and custody of asylum seekers such as the Plaintiffs. He has helped to formulate the policy of heavily weighing immigration deterrence in parole and other release decisions, and supported, required and enforced such policy instead of correcting it.

110. Defendant Matthew Albence, Executive Associate Director, Enforcement and Removal Operations, is responsible for the overall management and monitoring of

the parole and other release decision- making process, including but not limited to establishing, and/or modifying policies and practices, and correcting deficiencies or errors in such process.

111. Phillip Miller, Deputy Executive Assistant Director, Enforcement and Removal Operations is also responsible for the overall management and monitoring of the parole and similar release decision making process, including but not limited to establishing and/or modification of policies and practices, and correcting deficiencies or errors in such process.

112. Defendant Thomas Homan is the Acting Director of Immigrations and Customs Enforcement, and has final responsibility for establishing, modifying and/or correcting policies and practices regarding the grant of parole and similar relief to asylum seekers arriving at a U.S. port of entry.

113. Defendants Albence, Homan and Miller have established, developed and promoted the current binding unlawful policy of heavily weighing immigration deterrence in determining parole and similar release requests from POE asylum seekers. They have required ICE officials to comply with this policy.

114. Defendant Kirstjen Nielsen is the Secretary of the Department of Homeland Security. She thus oversees efforts to enforce and administer our immigration laws. Her duties include supervision of all the employees, files, and records of the agencies within the Department of Homeland Security, including ICE. *See* 8 U.S.C. § 1103(a). As such, she is responsible for ensuring that the ICE Defendants do not violate the U.S. Constitution, and for taking proper remedial action when such violations do occur.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### FIFTH AMENDMENT DUE PROCESS

115.   Plaintiffs hereby repeat and incorporate herein ¶¶ 1- 114 above.

116.   At all times relevant to this litigation, Defendants have been acting under the color of the laws of the United States.

117.   Plaintiffs' have a liberty interest in being free from arbitrary prolonged detention, unnecessary physical restraints, and harsh and prison-like conditions.

118.   Such an interest in physical liberty is a fundamental right and is protected by substantive due process under the Fifth Amendment of the United States constitution.

119.   Plaintiffs also have a property and liberty interest in their right to petition for political asylum and/or CAT withholding of removal.

120.   Plaintiffs are also entitled to some procedural protections under the Due Process clause.

121.   Plaintiff Victor V. has the right to full due process protections, given his many years of living in the United States and his extensive ties here.

122.   Defendants have violated the Plaintiffs' Due Process rights pursuant to Defendants' unwritten policies, patterns and practices as follows:

A. Defendants, pursuant to their general policy and practice of deterring immigration, are subjecting the Plaintiffs to arbitrary and prolonged detention in harsh and prison-like conditions, without any adequate justification therefore.

B.  By giving great weight to deterrence in evaluating parole requests, Defendants are in fact failing and refusing to exercise any full and genuine discretion at all, or to give any fair and reasonable consideration to Plaintiffs' requests for release on parole.

C.  Defendants, giving great weight to deterrence, are subjecting Plaintiffs to harsh and unreasonable punishment in order to deter the future possible wrongful actions of others.

D.  Defendants are punishing the Plaintiffs for seeking asylum in the United States.

123.  Such violations have caused and are causing, mental and physical harms to the Plaintiffs as well as hampering their access to justice.

124.  Plaintiffs seek declaratory and injunctive relief against the Defendants in their official capacities.

125.  Plaintiffs bring this constitutional claim against Defendants in their official capacities.

<u>SECOND CAUSE OF ACTION:</u>
<u>FIFTH AMENDMENT</u>

126.  Plaintiffs hereby repeat and incorporate Paras. 1-114 herein.

127.  At all times relevant to this litigation, Defendants have acted under color of the laws of the United States.

128.  Plaintiffs have a  Fifth Amendment right to petition the United States government for political asylum under 8 U.S.C. §§ 1158(a)(1) and 1225 and/or withholding of removal under the Convention Against Torture.

129.  Plaintiffs have a Fifth Amendment right to be free of retaliation, penalties, deterrence, or chilling effects in seeking asylum and/or withholding remedies.

130. Defendants have violated the Plaintiffs' Fifth Amendment rights by the following actions:

    A. Chilling/penalizing the Plaintiffs' exercise of their rights to petition the government for asylum/withholding by subjecting them to arbitrary, prolonged detention in harsh and prison-like conditions without any adequate justification

    B. Attempting to constructively remove the Plaintiffs from the United States by subjecting them to unjustified and prolonged detention in prison-like conditions. Specifically, Defendants seek to so burden the Plaintiffs' right to petition for asylum that Plaintiffs will simply relinquish their rights and return to their homelands. This constitutes constructive removal and de facto *refoulement*, without the full and fair process of law.

    C. Unjustly retaliating against and penalizing the Plaintiffs for arriving at a U.S. port of entry to lawfully petition for political asylum and/or withholding of removal.

    D. Unjustly hampering the Plaintiffs' ability to prepare their cases and hence their ability to have a meaningful hearing.

131. Plaintiffs have suffered and continue to suffer mental and physical harm, and to be unduly hampered in obtaining counsel and participating in the proper preparation of their cases, as a result of the Defendants' actions.

132. Defendants have no adequate justification for such violations of the Plaintiffs' rights.

133. Plaintiffs seek declaratory and injunctive relief pursuant to the First and Fifth Amendments of the United States Constitution.

134.   Plaintiffs bring this constitutional claim against Defendants in their official capacities.

### THIRD CAUSE OF ACTION
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §706

135.   Plaintiffs hereby repeat and incorporate herein ¶¶ 1-114 above.

136.   At all times relevant to this litigation, Defendants were acting under the color of the laws of the United States.

137.   Immigration and Customs Enforcement is a United States agency, and all Defendants are officials of that agency.

138.   Defendants' denial of parole, and for redetermination of such denial, is a final agency action.

139.   The Refugee Protocol was ratified by the United States government, and incorporated into U.S. domestic law. *See* ¶¶ 23-25, *supra*.

140.   The Convention Against Torture has likewise been ratified and incorporated into U.S. domestic law. *See* ¶¶ 26-27, *supra*.

141.   These treaties and statutes are designed to protect victims of persecution and to prevent them from being returned to any region where they are at risk of persecution and/or torture.

142.   The rights of the Plaintiffs to seek asylum and/or withholding of removal, and to be free of removal to any region where they face persecution and/or torture, fall within the zone of interests expressly protected by these statutes and treaties.

143.   Defendants' parole/deterrence policy is final and binding agency action.

144.   Defendants have violated the Administrative Procedure Act as follows:

A.  Defendants' policy of giving great weight to immigration deterrence as a basis for denial of parole to asylum seekers impacts substantive rights but has not passed through any required rule-making procedures.

B.  Defendants' policy and practice of denying parole to numerous eligible POE asylum seekers, and instead subjecting them to long-term detention, is in direct conflict with the objectives, requirements, and prohibitions of the Refugee Protocol, the Convention Against Torture, and the laws and Constitution of the United States. Defendants' actions are thus arbitrary and capricious, not in accordance with law, without authority, contrary to constitutional right, power, privilege, or immunity, and ultra vires.

C.  Defendants are also acting ultra vires and without authority in seeking to constructively remove Plaintiffs and other asylum seekers who have passed their credible fear interviews by subjecting them to unjustified and prolonged detention. Such efforts constitute prohibited *refoulement* and violate the laws, Constitution and treaties of the United States.

D.  Defendants' practice and policy of giving great weight to deterrence in making parole determinations is arbitrary and capricious because it violates the agency's own rules and regulations, as interpreted by the 2010 Morton Policy Directive, which provides that asylum seekers who are not a flight risk or a danger to the community should be granted parole because their continued detention is not in the public interest.

E. All such acts were taken pursuant to Defendants' de facto policy and practice of giving great weight to deterrence of immigration in deciding parole requests of POE asylum seekers.

145. Plaintiffs have suffered physical and emotional harm as a result of the Defendants' unlawful actions and continue to suffer such harms at this time.

146. Plaintiffs have been and still are seriously hampered in preparing their legal cases.

147. Plaintiffs seek injunctive relief against the Defendants pursuant to the Administrative Procedure Act, 5 U.S.C. §702 et. seq.

148. Plaintiffs bring this claim against the Defendants in their official capacities.

VI.   <u>PRAYER FOR RELIEF</u>

WHEREFORE PLAINTIFFS PRAY THAT THIS COURT:

1. Grant declaratory judgment declaring that the Defendants' policy of considering deterrence in deciding parole requests from POE asylum seekers, such as Plaintiffs, violates the Administrative Procedure Act and the Fifth Amendment of the United States Constitution.

2. Grant declaratory judgment that the prolonged and arbitrary detention of the Plaintiffs, without concrete proof of flight risk and/or danger to the community, violates the Fifth Amendment of the United States Constitution;

4. Grant an injunction barring the Defendants from considering immigration deterrence in evaluating the Plaintiffs' requests for parole.

5. Grant an injunction prohibiting Defendants from retaliating against or penalizing the Plaintiffs for exercising their right to petition for asylum.

6. Grant an injunction prohibiting Defendants from violating the United States constitution, the APA, and the applicable immigration statutes by imposing prolonged and unjustified detention on Plaintiffs in order to force them to return to their dangerous homelands.

7. Grant an injunction requiring that Plaintiffs' requests for parole be heard and considered in full compliance with the Executive Policy Directive of 2010, and without any consideration of immigration deterrence.

8. Grant the Plaintiffs reasonable costs.

Respectfully submitted,

/S/ Jennifer K. Harbury
Jennifer K. Harbury
Attorney in Charge
D.D.C. Bar No. TX0022
TEXAS BAR NO. 08946500
TEXAS RIO GRANDE LEGAL AID, INC.
301 S. Texas Ave.
Mercedes, Texas 78750
Telephone: (956) 447-4800
Email: JHarbury@trla.org

Peter McGraw
Texas Bar No. 24081036
TEXAS RIOGRANDE LEGAL AID, INC.
1206 East Van Buren St.
Brownsville, Texas 78520
Phone: (956) 982-5543
Fax: (956) 541-1410
Email: pmcgraw@trla.org
*Admitted pro hac vice*